# EXHIBIT E

**Execution Copy**

HELLAS TELECOMMUNICATIONS FINANCE

**Issuer**

HELLAS TELECOMMUNICATIONS I S.à r.l.

**Guarantor**

€200,000,000 Floating Rate Senior PIK Notes due 2015

---

INDENTURE

Dated as of December  21, 2006

---

THE BANK OF NEW YORK

Trustee

THE BANK OF NEW YORK

Registrar and Paying Agent

THE BANK OF NEW YORK (LUXEMBOURG) S.A.

Transfer Agent and Paying Agent

DEUTSCHE BANK AG, LONDON BRANCH

Security Agent

---

# LATHAM&WATKINS

London
99 Bishopsgate
London EC2M 3XF
(44) 020 7710 1000 (Tel)
(44) 020 7374 4460 (Fax)
www.lw.com

LO\332299.7

TABLE OF CONTENTS

*Page*

**ARTICLE 1**
DEFINITIONS AND INCORPORATION
BY REFERENCE

Section 1.01    Definitions. .................................................................................................................1
Section 1.02    Other Definitions. ......................................................................................................28
Section 1.03    Incorporation by Reference of Trust Indenture Act......................................................28
Section 1.04    Rules of Construction. ................................................................................................28

**ARTICLE 2**
THE NOTES

Section 2.01    Form and Dating..........................................................................................................29
Section 2.02    Execution and Authentication. ...................................................................................30
Section 2.03    Appointment of Agents**.** ............................................................................................30
Section 2.04    Holders to Be Treated as Owners; Payments of Interest. .............................................32
Section 2.05    Paying Agents to Hold Money and Additional Notes. ..................................................33
Section 2.06    Noteholder Lists. ........................................................................................................33
Section 2.07    Transfer and Exchange. ..............................................................................................33
Section 2.08    Replacement Notes. ....................................................................................................41
Section 2.09    Outstanding Notes. .....................................................................................................42
Section 2.10    Treasury Notes............................................................................................................42
Section 2.11    Temporary Notes. .......................................................................................................42
Section 2.12    Cancellation. ..............................................................................................................42
Section 2.13    Defaulted Interest. ......................................................................................................43
Section 2.14    Common Code and ISIN Number. ..............................................................................43
Section 2.15    Deposit of Moneys......................................................................................................43
Section 2.16    Currency. ....................................................................................................................43
Section 2.17    Issuance of Additional Notes......................................................................................44

**ARTICLE 3**
REDEMPTION AND PREPAYMENT

Section 3.01    Notices to Trustee.......................................................................................................45
Section 3.02    Selection of Notes to Be Redeemed or Purchased.......................................................45
Section 3.03    Notice of Redemption.................................................................................................46
Section 3.04    Effect of Notice of Redemption..................................................................................46
Section 3.05    Deposit of Redemption or Purchase Price. ..................................................................47
Section 3.06    Notes Redeemed or Purchased in Part.........................................................................47
Section 3.07    Optional Redemption...................................................................................................47
Section 3.08    Mandatory Redemption. .............................................................................................47
Section 3.09    Redemption for Changes in Withholding Tax...............................................................47

**ARTICLE 4**
COVENANTS

Section 4.01    Payment of Notes........................................................................................................48
Section 4.02    Maintenance of Office or Agency. ..............................................................................49
Section 4.03    Reports........................................................................................................................49
Section 4.04    Compliance Certificate................................................................................................50
Section 4.05    Taxes..........................................................................................................................51
Section 4.06    Stay, Extension and Usury Laws. ...............................................................................51
Section 4.07    Limitation on Indebtedness. ........................................................................................51
Section 4.08    Limitation on Restricted Payments..............................................................................55

LO\332299.7

Section 4.09    Limitation on Liens. ..................................................................................................59
Section 4.10    Limitation on Sales of Assets and Subsidiary Stock. ....................................................60
Section 4.11    Limitation on Affiliate Transactions. ............................................................................63
Section 4.12    [Reserved]......................................................................................................................65
Section 4.13    Limitation on Activities.................................................................................................65
Section 4.14    Corporate Existence.......................................................................................................66
Section 4.15    Change of Control. .........................................................................................................66
Section 4.16    [Reserved]......................................................................................................................68
Section 4.17    Limitation on Sale and Leaseback Transactions. ..........................................................68
Section 4.18    Withholding Taxes. ........................................................................................................69
Section 4.19    Listing.............................................................................................................................71

## ARTICLE 5
### SUCCESSORS

Section 5.01    Merger and Consolidation. .............................................................................................71
Section 5.02    Successor Person Substituted. .......................................................................................72

## ARTICLE 6
### DEFAULTS AND REMEDIES

Section 6.01    Events of Default...........................................................................................................72
Section 6.02    Acceleration...................................................................................................................74
Section 6.03    Other Remedies. ............................................................................................................74
Section 6.04    Waiver of Past Defaults.................................................................................................74
Section 6.05    Control by Majority.......................................................................................................74
Section 6.06    Limitation on Suits. .......................................................................................................75
Section 6.07    Rights of Holders of Notes to Receive Payment. .........................................................75
Section 6.08    Collection Suit by Trustee. ............................................................................................75
Section 6.09    Trustee May File Proofs of Claim. ................................................................................75
Section 6.10    Priorities. .......................................................................................................................76
Section 6.11    Undertaking for Costs....................................................................................................76

## ARTICLE 7
### TRUSTEE

Section 7.01    Duties of Trustee. ..........................................................................................................77
Section 7.02    Rights of Trustee. ..........................................................................................................77
Section 7.03    Individual Rights of Trustee. .........................................................................................79
Section 7.04    Trustee's Disclaimer......................................................................................................79
Section 7.05    Notice of Defaults..........................................................................................................79
Section 7.06    Reports by Trustee to Holders of the Notes..................................................................79
Section 7.07    Compensation and Indemnity.........................................................................................80
Section 7.08    Replacement of Trustee. ................................................................................................80
Section 7.09    Successor Trustee by Merger, etc...................................................................................81
Section 7.10    Eligibility; Disqualification. ..........................................................................................81

## ARTICLE 8
### LEGAL DEFEASANCE AND COVENANT DEFEASANCE

Section 8.01    Option to Effect Legal Defeasance or Covenant Defeasance.........................................82
Section 8.02    Legal Defeasance and Discharge....................................................................................82
Section 8.03    Covenant Defeasance. ...................................................................................................82
Section 8.04    Conditions to Legal or Covenant Defeasance. ..............................................................83
Section 8.05    Deposited Money and European Government Obligations to be Held in Trust;
                Other Miscellaneous Provisions. ...................................................................................84
Section 8.06    Repayment......................................................................................................................84
Section 8.07    Reinstatement. ...............................................................................................................85

LO\332299.7

## ARTICLE 9
### AMENDMENT, SUPPLEMENT AND WAIVER

Section 9.01    Without Consent of Holders of Notes. ........................................................................ 85
Section 9.02    With Consent of Holders of Notes.............................................................................. 86
Section 9.03    Compliance with Trust Indenture Act. ....................................................................... 88
Section 9.04    Revocation and Effect of Consents............................................................................. 88
Section 9.05    Notation on or Exchange of Notes.............................................................................. 88
Section 9.06    Trustee to Sign Amendments, etc............................................................................... 88
Section 9.07    Payment for Consent. ................................................................................................. 88

## ARTICLE 10
### [RESERVED]

## ARTICLE 11
### COLLATERAL AND SECURITY

Section 11.01    Security Document. ................................................................................................... 89
Section 11.02    [Reserved]................................................................................................................. 89
Section 11.03    [Reserved]................................................................................................................. 89
Section 11.04    Authorization of Actions to be Taken by the Trustee................................................. 89
Section 11.05    Authorization of Receipt of Funds Under the Security Document............................... 90
Section 11.06    Termination of Security Interest................................................................................. 90
Section 11.07    Appointment of Security Agent.................................................................................. 90

## ARTICLE 12
### GUARANTEES

Section 12.01    Guarantee................................................................................................................... 90
Section 12.02    Limitation on Guarantor Liability. ............................................................................. 91
Section 12.03    Execution and Delivery of Guarantee......................................................................... 92
Section 12.04    Releases. ................................................................................................................... 92

## ARTICLE 13
### SATISFACTION AND DISCHARGE

Section 13.01    Satisfaction and Discharge. ....................................................................................... 93
Section 13.02    Application of Trust Money. ...................................................................................... 94

## ARTICLE 14
### MISCELLANEOUS

Section 14.01    [Reserved]................................................................................................................. 94
Section 14.02    Notices....................................................................................................................... 94
Section 14.03    [Reserved]................................................................................................................. 95
Section 14.04    Certificate and Opinion as to Conditions Precedent.................................................... 95
Section 14.05    Statements Required in Certificate or Opinion............................................................ 96
Section 14.06    Rules by Trustee and Agents. .................................................................................... 96
Section 14.07    No Personal Liability of Directors, Officers, Employees and Stockholders. ............... 96
Section 14.08    Governing Law........................................................................................................... 96
Section 14.09    Consent to Jurisdiction and Service............................................................................ 96
Section 14.10    No Adverse Interpretation of Other Agreements......................................................... 97
Section 14.11    Successors.................................................................................................................. 97
Section 14.12    Severability................................................................................................................ 97
Section 14.13    Counterpart Originals. ............................................................................................... 97
Section 14.14    Table of Contents, Headings, etc................................................................................ 97
Section 14.15    Luxembourg Law Provision. ..................................................................................... 97
Section 14.16    Prescription................................................................................................................ 98

LO\332299.7

EXHIBITS

Exhibit A       FORM OF NOTE
Exhibit B       FORM OF CERTIFICATE OF TRANSFER
Exhibit C       FORM OF CERTIFICATE OF EXCHANGE
Exhibit D       FORM OF NOTATION OF GUARANTEE

iv

LO\332299.7

INDENTURE dated as of December 21, 2006 between Hellas Telecommunications Finance (the "*Issuer*"), a partnership limited by shares (*société en commandite par actions*), the Guarantor (as defined), The Bank of New York, as trustee (the "*Trustee*"), Registrar and Paying Agent, The Bank of New York (Luxembourg) S.A., as Luxembourg Paying Agent, and the Security Agent (as defined).

The Issuer, the Guarantor and the Trustee agree as follows for the benefit of each other and for the equal and ratable benefit of the Holders of (a) the Issuer's euro-denominated Floating Rate Senior PIK Notes due 2015 issued on the date hereof (the "*Original Notes*") and (b) additional securities as interest, in lieu of cash payment thereof, having identical terms and conditions as the Original Notes (the "*Additional Notes*") (all such notes in clauses (a) and (b) being referred to collectively as the "*Notes*"):

## ARTICLE 1
## DEFINITIONS AND INCORPORATION
## BY REFERENCE

Section 1.01     *Definitions*.

"*Acquired Indebtedness*" means Indebtedness (1) of a Person or any of its Subsidiaries existing at the time such Person becomes a Restricted Subsidiary, or (2) assumed in connection with the acquisition of assets from such Person, in each case whether or not Incurred by such Person in connection with such Person becoming a Restricted Subsidiary or such acquisition or (3) of a Person at the time such Person merges with or into or consolidates or otherwise combines with the Parent Guarantor or any Restricted Subsidiary. Acquired Indebtedness shall be deemed to have been Incurred, with respect to clause (1) of the preceding sentence, on the date such Person becomes a Restricted Subsidiary and, with respect to clause (2) of the preceding sentence, on the date of consummation of such acquisition of assets and, with respect to clause (3) of the preceding sentence, on the date of the relevant merger, consolidation or other combination.

"*Acquisition*" means the acquisition of TIM Hellas.

"*Additional Assets*" means:

(a)  any property, plant or equipment or other asset used or useful in a Related Business and any capital expenditure relating thereto;

(b)  the Capital Stock of a Person that becomes a Restricted Subsidiary as a result of the acquisition of such Capital Stock by the Parent Guarantor or a Restricted Subsidiary; or

(c) Capital Stock constituting a minority interest in any Person that at such time is a Restricted Subsidiary;

*provided, however,* that any such Restricted Subsidiary described in clause (b) or (c) above is primarily engaged in a Related Business.

"*Additional Notes*" has the meaning assigned to it in the preamble to this Indenture.

"*Affiliate*" means, with respect to any specified Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition "control," when used with respect to any specified Person, means the power to direct or cause the direction of the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

1

"*Apax Partners*" means each of the various entities which comprise the fund collectively known as Apax Europe VI being at the date hereof Apax Europe VI—A, L.P., Apax Europe VI—1, L.P. and, where the context requires, the general partner or managing limited partner of such partnerships being at the date hereof Apax Europe VI GP, L.P. or the investment manager of the partnerships being at the date hereof Apax Partners Europe Managers Limited.

"*Applicable Procedures*" means, with respect to any transfer or exchange of or for beneficial interests in any Global Note, the rules and procedures of the Depositary, Euroclear and Clearstream that apply to such transfer or exchange.

"*Asset Disposition*" means any sale, issuance, conveyance, transfer, lease or other disposition (including, without limitation, by way of merger, amalgamation, consolidation or sale and leaseback transaction) (collectively, a "transfer"), directly or indirectly, in one or a series of related transactions, of:

(a) any Capital Stock of any Restricted Subsidiary (other than directors' qualifying shares or shares required by applicable law to be held by a Person other than the Parent Guarantor or a Restricted Subsidiary);

(b) all or substantially all of the properties and assets of any division or line of the Parent Guarantor's or any Restricted Subsidiary's business; or

(c) any other of the Parent Guarantor's or any Restricted Subsidiary's properties or assets, other than in the ordinary course of business.

Any sale, lease, conveyance or other disposition of any shares of Hellas Finance or Hellas II will be governed as described under Section 4.15.

Notwithstanding clauses (a), (b) and (c) above, the following will not constitute an Asset Disposition:

(A) a disposition by a Restricted Subsidiary to the Parent Guarantor or by the Parent Guarantor or a Restricted Subsidiary to a Restricted Subsidiary;

(B) for purposes of Section 4.10 only, (x) a Permitted Investment or a Restricted Payment (or a transaction that would constitute a Restricted Payment but for the exclusions from the definition thereof) and that is not prohibited by Section 4.08 and (y) a disposition of all or substantially all the assets of the Parent Guarantor in accordance with Section 5.01 or any disposition that constitutes a Change of Control;

(C) dispositions of assets in a single transaction or series of related transactions with an aggregate Fair Market Value in any calendar year of less than €5 million;

(D) a disposition of cash or Temporary Cash Investments;

(E) the sale or disposition of any assets or property received as a result of a foreclosure by the Parent Guarantor or any of its Restricted Subsidiaries on any secured Investment or any other transfer of title with respect to any secured Investment in default;

(F) (i) any disposition of obsolete, worn-out or surplus equipment or facilities or other assets of the Parent Guarantor or any Restricted Subsidiary or (ii) the disposition or abandonment of intellectual property of the Parent Guarantor or

2

any Restricted Subsidiary, in each case, that is no longer economically practicable to maintain or is no longer used or useful in the ordinary course of the business of the Parent Guarantor or any Restricted Subsidiary;

(G) the surrender or waiver of contract rights or the settlement, release, surrender of contract, tort or other claims of any kind;

(H) a disposition that is made in connection with the establishment of a joint venture which is a Permitted Investment;

(I)  the grant of licenses to intellectual property rights to third parties on an arm's-length basis in the ordinary course of business or in relation to any risk and/or revenue sharing partnerships or consortia or other similar arrangements;

(J) any sale of Capital Stock or Indebtedness or other securities of an Unrestricted Subsidiary;

(K) foreclosure, condemnation or similar action with respect to property or other assets;

(L) any factoring transaction in the ordinary course of business; and

(M) dispositions constituting the Incurrence of Liens permitted to be incurred under this Indenture (but not, for the avoidance of doubt, a foreclosure on, a Lien).

"*Authenticating Agent*" means each Person authorized pursuant to Section 2.03(b) to authenticate Notes and any Person authorized pursuant to Section 2.03(b) to act on behalf of the Trustee to authenticate Notes.

"*Average Life*" means, as of the date of determination with respect to any Indebtedness, the quotient obtained by dividing (a) the sum of the products of (i) the number of years from the date of determination to the date or dates of each successive scheduled principal payment of or redemption or similar payment with respect to such Indebtedness multiplied by (ii) the amount of each such principal payment by (b) the sum of all such principal payments.

"*Bankruptcy Law*" means any law relating to bankruptcy, insolvency, receivership, winding-up, liquidation, dissolution, reorganization or relief of debtors or any amendment to, succession to or change in any such law (including, without limitation, in relation to the Issuer and any other company incorporated under the laws of Luxembourg, bankruptcy (*faillite*), insolvency, voluntary or judicial liquidation (*liquidation volontaire ou judiciaire*), composition with creditors (*concordat préventif de faillite*), reprieve from payment (*sursis de paiement*), controlled management (*gestion contrôlée*), fraudulent conveyance (*actio pauliana*), general settlement with creditors, reorganisation or similar laws affecting the rights of creditors generally).

"*Board of Directors*" means the board of managers of the Parent Guarantor or any authorized committee of the board of managers of the Parent Guarantor.

"*Book-Entry Interest*" means a beneficial interest in a Global Note held through and shown on, and transferred only through, records maintained in book-entry form by a Depositary.

"*Business Day*" means a day other than a Saturday, Sunday or other day on which banking institutions in London, England, the State of New York or a place of payment under this Indenture are authorized or required by law to close.

3

"*Calculation Agent*" means the calculation agent which will determine the interest rate per annum (reset quarterly) for the Notes, as provided in the Notes, and which will initially be the Trustee.

"*Capital Lease Obligation*" means, with respect to any Person, any obligation of such Person under a lease of (or other agreement conveying the right to use) any property (whether real, personal or mixed), which obligation is required to be classified and accounted for as a capital lease obligation under IFRS, and, for purposes of this Indenture, the amount of such obligation at any date will be the capitalized amount thereof at such date, determined in accordance with IFRS, and the Stated Maturity thereof will be the date of the last payment of rent or any other amount due under such lease prior to the first date such lease may be terminated without penalty.

"*Capital Stock*" means, with respect to any Person, any and all shares, interests, partnership interests (whether general or limited), participations, rights in or other equivalents (however designated) of such Person's equity, any other interest or participation that confers the right to receive a share of the profits and losses, or distributions of assets of, such Person and any rights (other than debt securities convertible into or exchangeable for Capital Stock), warrants or options exchangeable for or convertible into such Capital Stock, whether now outstanding or issued after the date of this Indenture.

"*Clearstream*" means Clearstream Banking, S.A.

"*Code*" means the U.S. Internal Revenue Code of 1986, as amended.

"*Collateral*" means the assets and property pledged under the Security Document on the date hereof as such may be increased or amended from time to time pursuant to the terms of this Indenture.

"*Collateral Agent*" means Deutsche Bank AG, London Branch, as security or collateral agent under the Security Document, together with any additional or successor security or collateral agent.

"*Common Depositary*" means The Bank of New York Depository as common depositary until a successor replaces it and thereafter means the successor serving hereunder.

"*Consolidated EBITDA*" for any period means, without duplication, the Consolidated Net Income for such period, plus the following to the extent deducted in calculating such Consolidated Net Income:

(a) Consolidated Interest Expense;

(b) Consolidated Income Taxes;

(c) consolidated depreciation expense;

(d) consolidated amortization expense;

(e) any expenses, charges or other costs related to any Equity Offering, Investment, acquisition (including amounts paid in connection with the acquisition or retention of one or more individuals comprising part of a management team retained to manage the acquired business, *provided* that such payments are made at the time of such acquisition and are consistent with the customary practice in the industry at the time of such acquisition), disposition, recapitalization or the Incurrence of any Indebtedness permitted by this Indenture (whether or not successful) (including any expenses in connection with related due diligence activities), in each case, as determined in good faith by an Officer of the Parent Guarantor;

4

(f) any minority interest expense consisting of income attributable to minority equity interests of third parties in such period or any prior period, except to the extent of dividends declared or paid on, or other cash payments in respect of Capital Stock held by such third parties;

(g) non-recurring pension costs, so long as such costs do not exceed €2 million per year;

(h) other non-cash charges reducing Consolidated Net Income (excluding any such non-cash charge to the extent it represents an accrual of or reserve for cash charges in any future period) less other non-cash items of income increasing Consolidated Net Income (excluding any such non-cash item of income to the extent it represents a receipt of cash in any future period); and

(i) any Management Fees paid in such period.

Notwithstanding the foregoing, the provision for taxes and the depreciation, amortization and non-cash items of a Restricted Subsidiary will be added to Consolidated Net Income to compute Consolidated EBITDA only to the extent (and in the same proportion, including by reason of minority interests) that the net income of such Restricted Subsidiary was included in calculating Consolidated Net Income and only if a corresponding amount would be permitted at the date of determination to be distributed to the Parent Guarantor by such Restricted Subsidiary without prior approval (that has not been obtained), pursuant to the terms of its charter and all agreements, instruments, judgments, decrees, orders, statutes, governmental rules and regulations applicable to such Restricted Subsidiary or its shareholders (other than any restriction specified in sub-clauses (i) through (iv) of clause (b) of the definition of "Consolidated Net Income").

"*Consolidated Income Taxes*" means taxes or other payments, including deferred Taxes, based on income, profits or capital of any of the Parent Guarantor and its Restricted Subsidiaries whether or not paid, estimated, accrued or required to be remitted to any governmental authority.

"*Consolidated Interest Expense*" means, for any period (in each case, determined on the basis of IFRS), the consolidated total interest expense of the Parent Guarantor and its Restricted Subsidiaries, plus, to the extent not included in such total interest expense and to the extent Incurred by the Parent Guarantor or its Restricted Subsidiaries, the following, without duplication:

(a) interest expense attributable to Capital Lease Obligations;

(b) amortization of debt discount and debt issuance cost;

(c) non-cash interest expense (but excluding such interest on Subordinated Shareholder Funding);

(d) commissions, discounts and other fees and charges owed with respect to financings not included in clause (b) above including with respect to letters of credit and bankers' acceptance financing;

(e) costs associated with Hedging Obligations;

(f) dividends on and other distributions in respect of all Disqualified Stock of the Parent Guarantor or any Restricted Subsidiary and all Preferred Stock of any Restricted Subsidiary, to the extent held by Persons other than the Parent Guarantor or a Subsidiary of the Parent Guarantor;

(g) the consolidated interest expense that was capitalized during such periods (but excluding such interest on Subordinated Shareholder Funding); and

5

(h) interest actually paid by the Parent Guarantor or any Restricted Subsidiary under any Indebtedness or other obligation of any other Person that is guaranteed by, or secured by the assets or properties of, the Parent Guarantor or any Restricted Subsidiary.

"*Consolidated Leverage*" means the sum of the aggregate outstanding Indebtedness of the Parent Guarantor and its Restricted Subsidiaries (excluding Hedging Obligations) as of the relevant date of calculation on a consolidated basis in accordance with IFRS.

"*Consolidated Leverage Ratio*" means, as of any date of determination, the ratio of (x) Consolidated Leverage at such date to (y) the aggregate amount of Consolidated EBITDA for the period of the most recent four consecutive fiscal quarters ending prior to the date of such determination for which internal consolidated financial statements of the Parent Guarantor are available; *provided, however,* that for the purposes of calculating Consolidated EBITDA for such period, if, as of such date of determination:

(a)  since the beginning of such period the Parent Guarantor or any Restricted Subsidiary has disposed of any company, any business, or any group of assets constituting an operating unit of a business (any such disposition, a "Sale") or if the transaction giving rise to the need to calculate the Consolidated Leverage Ratio is such a Sale, Consolidated EBITDA for such period will be reduced by an amount equal to the Consolidated EBITDA (if positive) attributable to the assets which are the subject of such Sale for such period or increased by an amount equal to the Consolidated EBITDA (if negative) attributable thereto for such period;

(b)  since the beginning of such period the Parent Guarantor or any Restricted Subsidiary (by merger or otherwise) has made an Investment in any Person that thereby becomes a Restricted Subsidiary, or otherwise has acquired any company, any business, or any group of assets constituting an operating unit of a business (any such Investment or acquisition, a "Purchase"), including any such Purchase occurring in connection with a transaction causing a calculation to be made hereunder, Consolidated EBITDA for such period will be calculated after giving *pro forma* effect thereto as if such Purchase occurred on the first day of such period; and

(c)  since the beginning of such period any Person (that became a Restricted Subsidiary or was merged or otherwise combined with or into the Parent Guarantor or any Restricted Subsidiary since the beginning of such period) will have made any Sale or any Purchase that would have required an adjustment pursuant to clause (a) or (b) of this definition if made by the Parent Guarantor or a Restricted Subsidiary since the beginning of such period, Consolidated EBITDA for such period will be calculated after giving *pro forma* effect thereto as if such Sale or Purchase occurred on the first day of such period.

For purposes of this definition, whenever *pro forma* effect is to be given to any transaction or calculation under this definition, the *pro forma* calculations will be as determined in good faith by a responsible financial or accounting officer of TIM Hellas or the Parent Guarantor (including in respect of anticipated expense and cost reductions and synergies). In determining the amount of Indebtedness outstanding on any date of determination, *pro forma* effect will be given to any Incurrence, repayment, repurchase, defeasance or other acquisition, retirement or discharge or Indebtedness on such date.

"*Consolidated Net Income*" means, for any period, net income (loss) of the Parent Guarantor and its Restricted Subsidiaries determined on a consolidated basis on the basis of IFRS; *provided, however,* that there will not be included in such Consolidated Net Income:

(a) subject to the limitations contained in clause (c) below, any net income (loss) of any Person if such Person is not a Restricted Subsidiary, except that the Parent Guarantor's equity in the net income of any such Person for such period will be included in such Consolidated Net Income up to the aggregate amount of cash or Temporary Cash Investments actually distributed by such Person

during such period to the Parent Guarantor or a Restricted Subsidiary as a dividend or other distribution or return on investment (subject, in the case of a dividend or other distribution or return on investment to a Restricted Subsidiary, to the limitations contained in clause (b) below);

(b) any net income (loss) of any Restricted Subsidiary if such Subsidiary is subject to restrictions, directly or indirectly, on the payment of dividends or the making of distributions by such Restricted Subsidiary, directly or indirectly, to the Parent Guarantor by operation of the terms of such Restricted Subsidiary's charter or any agreement, instrument, judgment, decree, order, statute or governmental rule or regulation applicable to such Restricted Subsidiary or its shareholders (other than (i) restrictions that have been waived or otherwise released, (ii) restrictions pursuant to the Notes or this Indenture and (iii) restrictions in effect on the Issue Date with respect to a Restricted Subsidiary (including pursuant to the Revolving Credit Facility) and other restrictions with respect to such Restricted Subsidiary that taken as a whole are not materially less favorable to the Holders than such restrictions in effect on the Issue Date; except that the Parent Guarantor's equity in the net income of any such Restricted Subsidiary for such period will be included in such Consolidated Net Income up to the aggregate amount of cash or Temporary Cash Investments actually distributed or that could have been distributed by such Restricted Subsidiary during such period to the Parent Guarantor or another Restricted Subsidiary as a dividend or other distribution (subject, in the case of a dividend to another Restricted Subsidiary, to the limitation contained in this clause);

(c) any net gain (or loss) realized upon the sale or other disposition of any asset or disposed operations of the Parent Guarantor or any Restricted Subsidiaries (including pursuant to any Sale/Leaseback Transaction) which is not sold or otherwise disposed of in the ordinary course of business (as determined in good faith by an Officer or the Board of Directors);

(d) any extraordinary, exceptional, unusual or non-recurring gain, loss or charge or any charges in respect of any restructuring, redundancy or severance;

(e) the cumulative effect of a change in accounting principles;

(f) any non-cash compensation charge arising from any grant of stock, stock options or other equity based awards;

(g) all deferred financing costs written off and premiums paid in connection with any early extinguishment of Indebtedness and any net gain (loss) from any write-off or forgiveness of Indebtedness;

(h) any gains or losses in respect of Hedging Obligations or any ineffectiveness recognized in earnings related to qualifying hedge transaction or the fair value or changes therein recognized in earnings for derivatives that do not qualify as hedge transactions, in each case, in respect of Hedging Obligations;

(i) any foreign currency transaction gains or losses in respect of Indebtedness of any Person denominated in a currency other than the functional currency of such Person;

(j) any foreign currency translation gains or losses in respect of Indebtedness or other obligations of the Parent Guarantor or any Restricted Subsidiary owing to the Parent Guarantor or any Restricted Subsidiary;

(k) any one-time non-cash charges or increases in amortization or depreciation resulting from purchase accounting, in each case, in relation to any acquisition of another Person or business;

(l) any goodwill or other intangible asset impairment charge;

(m) the impact of capitalized interest on Subordinated Shareholder Funding; and

7

(n)  any license payments due to Tim Italia S.p.A. in connection with the Acquisition.

"*Corporate Trust Office of the Trustee*" will be at the address of the Trustee specified in Section 14.02 hereof or such other address as to which the Trustee may give notice to the Issuer.

"*Credit Facility*" or "*Credit Facilities*" means one or more indebtedness facilities (including the Revolving Credit Facility) or commercial paper facilities with banks, insurance companies or other institutional lenders providing for revolving credit loans, term loans, notes, letters of credit or other forms of guarantees and assurances, asset backed credit facilities or other credit facilities, including overdrafts, in each case, as amended, restated, modified, renewed, refunded, replaced or refinanced in whole or in part from time to time.

"*Currency Agreement*" means any spot or forward foreign exchange agreements and currency swap, currency option or other similar financial agreements or arrangements designed to protect against or manage exposure to fluctuations in foreign currency exchange rates.

"*Custodian*" means the Trustee, as custodian with respect to the Notes in global form, or any successor entity thereto.

"*Default*" means any event or condition that would constitute an Event of Default but for the requirement that notice be given or time elapse or both.

"*Definitive Note*" means a certificated Note registered in the name of the Holder thereof and issued in accordance with Section 2.06 hereof, substantially in the form of Exhibit A hereto except that such Note shall not bear the Global Note Legend and shall not have the "Schedule of Exchanges of Interests in the Global Note" attached thereto.

"*Depositary*" means any of Euroclear or Clearstream Banking and their respective nominees and successors, acting through itself or the Common Depositary.

"*Designated Preferred Stock*" means preferred stock (other than Disqualified Stock) of the Issuer or the Parent Guarantor that is issued for cash (other than to the Parent Guarantor or a Restricted Subsidiary) and is so designated as Designated Preferred Stock, pursuant to an Officer's Certificate executed on the date of such issuance.

"*Determination Date*" with respect to an Interest Period relating to EURIBOR, will be the day that is two TARGET Settlement Days preceding the first day of such Interest Period.

"*Disqualified Stock*" means, with respect to any Person, any Capital Stock which by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable at the option of the holder) or upon the happening of any event:

(a)  matures or is mandatorily redeemable (other than redeemable only for Capital Stock of such Person which is not itself Disqualified Stock) pursuant to a sinking fund obligation or otherwise;

(b)  is convertible or exchangeable at the option of the holder for Indebtedness or Disqualified Stock; or

(c)  is mandatorily redeemable or must be purchased upon the occurrence of certain events or otherwise, in whole or in part;

in each case on or prior to the Stated Maturity of the Notes; *provided, however,* that any Capital Stock that would not constitute Disqualified Stock but for provisions thereof giving holders thereof the right to require such Person to purchase or redeem such Capital Stock upon the occurrence of an "asset

LO\332299.7

sale" or "change of control" occurring prior to the Stated Maturity of the Notes will not constitute Disqualified Stock if:

(a)  the "asset sale" or "change of control" provisions applicable to such Capital Stock are not more favorable to the holders of such Capital Stock than the terms applicable to the Notes and described in Sections 4.10 and 4.15; and

(b) any such requirement only becomes operative after compliance with such terms applicable to the Notes, including the purchase of any Notes tendered pursuant thereto, *provided*, *however*, that the preferred equity certificates or the convertible preferred equity certificates issued by the Parent Guarantor to Hellas or Hellas II to the Parent Guarantor in connection with the Acquisition (or additional instruments issued on substantially the same terms, mutatis mutandis) shall in no event be deemed to be Disqualified Stock.

"*Equity Offering*" means an offer and sale of capital stock or options, warrants or rights with respect to Capital Stock (which is Qualified Capital Stock) of the Parent Guarantor or any Parent Company with gross proceeds of at least €15 million (including any sale of Capital Stock purchased upon the exercise of any over-allotment option granted in connection therewith).

"*EURIBOR*" with respect to an Interest Period, will be the rate (expressed as a percentage per annum) for deposits in euros for a three-month period beginning on the day that is two TARGET Settlement Days after the Determination Date that appears on Telerate Page 248 as of 11:00 a.m., Brussels time, on the Determination Date. If Telerate Page 248 does not include such a rate or is unavailable on a Determination Date, the Calculation Agent will request the principal London office of each of four major banks in the Euro-zone inter-bank market, as selected by the Calculation Agent, to provide such bank's offered quotation (expressed as a percentage per annum) as of approximately 11:00 a.m., Brussels time, on such Determination Date, to prime banks in the Euro-zone interbank market for deposits in a Representative Amount in euro for a three-month period beginning on the day that is two TARGET Settlement Days after the Determination Date. If at least two such offered quotations are so provided, the rate for the Interest Period will be the arithmetic mean of such quotations. If fewer than two such quotations are so provided, the Calculation Agent will request each of three major banks in London, as selected by the Calculation Agent ("*Reference Banks*"), to provide such bank's rate (expressed as a percentage per annum), as of approximately 11.00 a.m., London time, on such Determination Date, for loans in a Representative Amount in euros to leading European banks for a three-month period beginning on the day that is two TARGET Settlement Days after the Determination Date. If at least two such rates are so provided, the rate for the Interest Period will be the arithmetic mean of such rates. If fewer than two such rates are so provided then the rate for the Interest Period will be the rate in effect with respect to the immediately preceding Interest Period.

"*Euro Equivalent*" means, with respect to any monetary amount in a currency other than euro, at any time of determination thereof by the Parent Guarantor or the Holders, the amount of euro obtained by converting such currency other than euro involved in such computation into euro at the spot rate for the purchase of euro with the applicable currency other than euro as published in *The Financial Times* in the "Currency Rates" section (or, if *The Financial Times* is no longer published, or if such information is no longer available in *The Financial Times*, such source as may be selected in good faith by the Parent Guarantor) on the date of such determination.

"*European Government Obligations*" means direct obligations (or certificates representing an ownership interest in such obligations) of any country that is a European Union Member State (including any agency or instrumentality thereof) for the payment of which the full faith and credit of such country is pledged and which are not callable at the holder's option.

"*Euroclear*" means Euroclear Bank, S.A./N.V., as operator of the Euroclear system.

"*European Union Member State*" means any country that was a member of the European Union as of January 1, 2004.

"*Euro-zone*" means the region comprised of member states of the European Union that adopt the euro.

"*Exchange Act*" means the U.S. Securities Exchange Act of 1934, as amended, or any successor statute, and the rules and regulations promulgated by the U.S. Securities and Exchange Commission thereunder.

"*Excluded Contribution*" means the Net Cash Proceeds or marketable securities received by the Parent Guarantor from (a) capital contributions from its shareholders, including Subordinated Shareholder Funding, and (b) the sale (other than a sale to (i) a Restricted Subsidiary or (ii) any employee stock ownership plan or trust established by the Parent Guarantor or any Restricted Subsidiary for the benefit of their employees to the extent funded by the Parent Guarantor or any Restricted Subsidiary) of Capital Stock (other than Disqualified Stock and Designated Preferred Stock) of the Parent Guarantor, in each case designated as Excluded Contributions pursuant to an Officer's Certificate on the date such capital contributions are made or the date such Capital Stock or Subordinated Shareholder Funding is sold, as the case may be, that are excluded from the calculation set forth in Section 4.08(a)(3).

"*Fair Market Value*" means, with respect to any asset or property, the sale value that would be obtained in an arm's-length free market transaction between an informed and willing seller under no compulsion to sell and an informed and willing buyer under no compulsion to buy, as determined in good faith by the Board of Directors.

"*Global Note Legend*" means the legend set forth in Section 2.07(l)(2) hereof, which is required to be placed on all Global Notes issued under this Indenture.

"*Global Notes*" means, individually and collectively, each of the Restricted Global Notes and the Unrestricted Global Notes deposited with or on behalf of and registered in the name of the Common Depositary or its nominee, substantially in the form of Exhibit A hereto and that bears the Global Note Legend and that has the "Schedule of Exchanges of Interests in the Global Note" attached thereto, issued in accordance with Section 2.01, 2.07(c), 2.07(d), 2.07(f) or 2.07(i) hereof.

"*Group*" means the Parent Guarantor and its Subsidiaries.

"*Guarantee*" means any guarantee of the Issuer's obligations under this Indenture and the Notes by the Parent Guarantor or any other Person in accordance with the provisions of this Indenture. When used as a verb, "Guarantee" will have a corresponding meaning.

"*Guarantee Agreement*" means a supplemental indenture pursuant to which a Guarantor guarantees the Issuer's obligations with respect to the Notes on the terms provided for in this Indenture, substantially in the form attached to this Indenture with such modifications as may be appropriate consistent with the terms provided for in this Indenture.

"*guarantees*" means, as applied to any obligation, (a) a guarantee (other than by endorsement of negotiable instruments for collection in the ordinary course of business), direct or indirect, in any manner, of any part or all of such obligation and (b) an agreement, direct or indirect, contingent or otherwise, the practical effect of which is to assure in any way the payment or performance (or payment of damages in the event of non-performance) of all or any part of such obligation, including, without limiting the foregoing, by the pledge of assets and the payment of amounts drawn down under letters of credit.

LO\332299.7

"*Guarantor*" means the Parent Guarantor and any other Person that is a guarantor of the Notes, until a successor replaces such party pursuant to the applicable provisions of this Indenture and, thereafter, will mean such successor.

"*Hedging Obligations*" of any Person means the obligations of such Person pursuant to any Interest Rate Agreement or Currency Agreement.

"*Hellas*" refers to Hellas Telecommunications, a company incorporated as a *société à responsabilité limitée* (private limited liability company) under the laws of the Grand Duchy of Luxembourg, having its registered offices at 8-10, rue Mathias Hardt at L-1717 Luxembourg and registered with the Luxembourg trade and companies register under number B.107.292.

"*Hellas I*" means Hellas Telecommunications I S.à r.l., a company incorporated as a *société à responsabilité limitée* under the laws of Luxembourg, having its registered office at 8-10, rue Mathias Hardt at L-1717 Luxembourg and registered with the Luxembourg trade and companies register under number B.107.372.

"*Hellas II*" means Hellas Telecommunications (Luxembourg) II, a company incorporated as a *société en commandite par actions* (partnership limited by shares) under the laws of Luxembourg, having its registered office at 8-10, rue Mathias Hardt at L-1717 Luxembourg and registered with the Luxembourg trade and companies register under number B.93.039.

"*Hellas II Restricted Subsidiary*" means any subsidiary of Hellas II other than an Unrestricted Subsidiary.

"*Hellas III*" means Hellas Telecommunications (Luxembourg) III, a company incorporated as a *société en commandite par actions* (partnership limited by shares) under the laws of Luxembourg, having its registered office at 8-10, rue Mathias Hardt at L-1717 Luxembourg and registered with the Luxembourg trade and companies register under number B.107.291.

"*Hellas V*" means Hellas Telecommunications (Luxembourg) V, a company incorporated as a *société en commandite par actions* (partnership limited by shares) under the laws of Luxembourg, having its registered office at 8-10, rue Mathias Hardt at L-1717 Luxembourg and registered with the Luxembourg trade and companies register under number B.107.289.

"*Hellas Finance*" means Hellas Telecommunications Finance, a company incorporated as a *société en commandite par actions* (partnership limited by shares) under the laws of Luxembourg, having its registered office at 8-10, rue Mathias Hardt at L-1717 Luxembourg and registered with the Luxembourg trade and companies register under number B.107.288.

"*Holder*" means, with respect to any Note, the Person in whose name such Note is registered in the register maintained by the registrar pursuant to the provisions of this Indenture.

"*IFRS*" means the international accounting standards promulgated by the International Accounting Standards Board and its predecessors (or any successor board or agency), as adopted by the European Union, as in effect on the Issue Date.

"*Incur*" means to issue, assume, guarantee, incur or to otherwise become liable for; *provided, however,* that any Indebtedness or Capital Stock of a Person existing at the time such Person becomes a Restricted Subsidiary (whether by merger, consolidation, acquisition or otherwise) will be deemed to be Incurred by such Person at the time it becomes a Restricted Subsidiary. The term "Incurrence" when used as a noun will have a correlative meaning.

"*Indebtedness*" means, with respect to any Person on any date of determination (without duplication):

11

(a) the principal in respect of (i) indebtedness of such Person for money borrowed and (ii) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such person is responsible or liable, including, in each case, any premium on such indebtedness to the extent such premium has become due and payable;

(b) all Capital Lease Obligations of such Person;

(c) the principal component of all obligations of such Person to pay the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement, in each case that are due more than 12 months after the date on which such property is acquired (but excluding trade accounts payable arising in the ordinary course of business);

(d) all obligations of such Person for the reimbursement of any obligor on any letter of credit, bankers' acceptance or similar credit transaction (other than obligations with respect to letters of credit securing obligations (other than obligations described in clauses (a) through (c) above) entered into in the ordinary course of business of such Person to the extent such letters of credit are not drawn upon or, if and to the extent drawn upon, such drawing is reimbursed no later than the tenth Business Day following payment on the letter of credit);

(e) the principal amount of *any* Disqualified Stock of the Parent Guarantor, the Issuer or any other Restricted Subsidiary, or Preferred Stock of a Restricted Subsidiary (excluding, in each case, accrued dividends);

(f) all obligations of the type referred to in clause (a) through (e) of other Persons and all dividends of other Persons for the payment of which, in either case, such Person is responsible or liable, directly or indirectly, as obligor, guarantor or otherwise, including by means of any guarantee or any Lien on any asset of any such Person; and

(g) to the extent not otherwise included in this definition, net obligations of such Person under Hedging Obligations (the amounts of any such obligations to be equal at any time to the termination value of such agreement or arrangement giving rise to such obligation that would be payable by such Person at such time);

if and to the extent that any of the foregoing Indebtedness (other than the Indebtedness specified in clauses (b), (d) or (f) or to the extent relating to any such clause, clause (g)) would appear as a liability on the balance sheet (excluding footnotes thereto) of the relevant Person prepared in accordance with IFRS.

The term "Indebtedness" will not include Subordinated Shareholder Funding.

Notwithstanding the foregoing, the term "Indebtedness" will exclude contingent obligations incurred in the ordinary course of business. In addition, in connection with the purchase by the Parent Guarantor or any Restricted Subsidiary of any business, the term "Indebtedness" will exclude post-closing payment adjustments to which the seller may become entitled to the extent such payment is determined by a final closing balance sheet or such payment depends on the performance of such business after the closing; *provided, however,* that, at the time of closing, the amount of any such payment is not determinable and, to the extent such payment thereafter becomes fixed and determined, the amount is paid within 90 days thereafter.

The amount of Indebtedness of any Person at any date will be the outstanding balance at such date of all unconditional obligations as described above; *provided, however,* that in the case of Indebtedness sold at a discount, the amount of such Indebtedness at any time will be the accreted value thereof at such time.

12

"*Indenture*" means this Indenture, as amended or supplemented from time to time.

"*Independent Financial Advisor*" means an investment banking firm, accounting firm or appraisal firm of national or international standing; *provided, however,* that such firm is not an Affiliate of the Parent Guarantor.

"*Indirect Participant*" means a Person who holds a beneficial interest in a Global Note through a Participant.

"*Institutional Accredited Investor*" means an institution that is an "accredited investor" as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act, who are not also QIBs.

"*Intercompany Proceeds Loan*" means the instruments evidencing the debt owed by Hellas I to Hellas Finance as a result of the loan from Hellas Finance of the proceeds from the issuance of the Notes.

"*Intercreditor Agreement*" means the intercreditor deed dated as of April 3, 2005, as amended and restated on July 15, 2005 and as further amended on October 7, 2005 and January 31, 2006 entered into between, *inter alia*, Hellas II and certain of its subsidiaries and J.P. Morgan Europe Limited, as amended or restated from time to time.

"*Interest Payment Date*" means the Stated Maturity of an installment of interest on the Notes.

"*Interest Period*" means the period commencing on and including an interest payment date and ending on and including the day immediately preceding the next succeeding interest payment date, with the exception that the first Interest Period will commence on and include the Issue Date and end on and include April 14, 2007.

"*Interest Rate Agreements*" means any interest rate protection agreements and other types of interest rate hedging agreements (including, without limitation, interest rate swaps, caps, floors, collars and similar agreements) designed to protect against or manage exposure to fluctuations in interest rates.

"*Investment*" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of loans or other extensions of credit (including guarantees and similar arrangements), advances or capital contributions (excluding bank deposits, accounts receivable, trade credit, advances to customers, commission, travel and similar advances to officers and employees, in each case, made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Capital Stock or other securities issued by any other Person and investments that are required by IFRS to be classified on the balance sheet (excluding the footnotes) of the relevant Person in the same manner as the other investments included in this definition to the extent such transactions involve the transfer of cash or other property. If the Parent Guarantor or any Restricted Subsidiary issues, sells or otherwise disposes of any Capital Stock of a Person that is a Restricted Subsidiary such that, after giving effect thereto, such Person is no longer a Restricted Subsidiary, any Investment by the Parent Guarantor or any Restricted Subsidiary in such Person remaining after giving effect thereto will be deemed to be a new Investment at such time. The acquisition by the Parent Guarantor or any Restricted Subsidiary of a Person that holds an Investment in a third Person will be deemed to be an Investment by the Parent Guarantor or such Restricted Subsidiary in such third Person at such time. Except as otherwise provided for herein, the amount of an Investment will be its Fair Market Value at the time the Investment is made and without giving effect to subsequent changes in value.

For purposes of the definition of "Unrestricted Subsidiary," the definition of "Restricted Payment" and Section 4.08:

LO\332299.7

(a) "Investments" will include the portion (proportionate to the Parent Guarantor's equity interests in such Subsidiary) of the Fair Market Value of the net assets of a Subsidiary of the Parent Guarantor at the time that such Subsidiary is designated an Unrestricted Subsidiary, *provided*, that upon a redesignation of such Subsidiary as a Restricted Subsidiary, the Parent Guarantor will be deemed to continue to have a permanent Investment in an Unrestricted Subsidiary in an amount (if positive) equal to (x) the Parent Guarantor Investment in such Subsidiary at the time of such redesignation less (y) the portion (proportionate to the Parent Guarantor's equity interest in such Subsidiary) of the Fair Market Value of the net assets of such Subsidiary at the time of such redesignation; and

(b) any property transferred to or from an Unrestricted Subsidiary will be valued at its Fair Market Value at the time of such transfer.

"*Issue Date*" means December 21, 2006.

"*Issuer*" means the party named as such in the preamble to this Indenture and any and all successors thereto.

"*Issuer Request*" means a written request or order signed in the name of the Issuer by any Officer of the Issuer and delivered to the relevant Person.

"*Lien*" means any mortgage or deed of trust, charge, pledge, lien (statutory or otherwise), security interest, assignment for security, encumbrance, or charge of any kind upon, or with respect to, any property of any kind, real or personal, movable or immovable, now owned or hereafter acquired. A Person will be deemed to own subject to a Lien any property which such Person has acquired or holds subject to the interest of a vendor or lessor under any conditional sale agreement, capital lease or other title retention agreement; *provided* that in no event will an operating lease constitute a Lien.

"*Luxembourg*" means the Grand Duchy of Luxembourg.

"*Luxembourg Companies*" means Hellas, Hellas I, Hellas II, Hellas III, Hellas V, Hellas Finance and any corporate entity incorporated under the laws of Luxembourg.

"*Management Advances*" means loans or advances made to, or guarantees with respect to loans or advances made to, directors, officers, employees or consultants of any Parent Company, the Parent Guarantor or any Restricted Subsidiary:

(a) in respect of travel, entertainment or moving related expenses incurred in the ordinary course of business;

(b) in respect of moving related expenses incurred in connection with any closing or consolidation of any facility; or

(c) in the ordinary course of business consistent with past practice.

"*Management Equity Subsidiary*" means any Subsidiary of any Parent Company (a) engaged solely in holding Capital Stock in any Parent Company, (b) whose minority shareholders are limited to members of management, directors or consultants of the Parent Guarantor, any of its Subsidiaries or any Parent Company and (c) whose aggregate expenses payable by the Parent Guarantor or any Restricted Subsidiary, including customary salary, bonus and other benefits (including indemnification and insurance) payable to or in favor of its officers and employees, do not exceed €2 million in any calendar year.

"*Management Fees*" means:

LO\332299.7

(a)  customary annual fees for the performance of monitoring services by TPG or Apax or any of their respective Affiliates for the Parent Guarantor or any Restricted Subsidiary; *provided* that such fees will not, in the aggregate, exceed €5 million per annum (inclusive of out of pocket expenses); and

(b)  customary fees and related expenses for the performance of transaction, management, consulting, financial or other advisory services or underwriting, placement or other investment banking activities, including in connection with mergers, acquisitions, dispositions or joint ventures, by TPG or Apax or any of their respective Affiliates for the Parent Guarantor or any of its Restricted Subsidiaries.

"*Maturity*" means, with respect to any indebtedness, the date on which any principal of such indebtedness becomes due and payable as therein or herein provided, whether at the Stated Maturity with respect to such principal or by declaration of acceleration, call for redemption or purchase or otherwise.

"*Maturity Date*" means July 15, 2015.

"*Moody's*" means Moody's Investors Service, Inc. and its successors.

"*Net Available Cash*" from an Asset Disposition means cash payments received therefrom (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or otherwise and proceeds from the sale or other disposition of any securities received as consideration, but only as and when received, but excluding any other consideration received in the form of assumption by the acquiring Person of Indebtedness or other obligations relating to such properties or assets or received in any other non-cash form), in each case net of:

(1) all legal, accounting, investment banking fees and expenses, title and recording tax expenses, commissions and other fees and expenses incurred, and all national, state, provincial, foreign and local taxes required to be accrued as a liability under IFRS, as a consequence of such Asset Disposition;

(2) all payments made on any Indebtedness which is secured by any assets subject to such Asset Disposition, in accordance with the terms of any Lien upon or other security agreement of any kind with respect to such assets, or which must by its terms, or in order to obtain a necessary consent to such Asset Disposition, or by applicable law, be repaid out of the proceeds from such Asset Disposition;

(3) all distributions and other payments required to be made to minority interest holders in Restricted Subsidiaries as a result of such Asset Disposition;

(4) the deduction of appropriate amounts provided by the seller as a reserve, in accordance with IFRS, against any liabilities associated with the property or other assets disposed in such Asset Disposition and retained by the Parent Guarantor, the Issuer or any other Restricted Subsidiary after such Asset Disposition, including pension liabilities and other post-employment; and

(5) any portion of the purchase price from an Asset Disposition placed in escrow, whether as a reserve for adjustment of the purchase price, for satisfaction of indemnities in respect of such Asset Disposition or otherwise in connection with that Asset Disposition; *provided, however,* that upon the termination of that escrow, Net Available Cash will be increased by any portion of funds in the escrow that are released to the Parent Guarantor, the Issuer or any other Restricted Subsidiary.

"*Net Cash Proceeds*" means, with respect to any capital contributions, issuance or sale of Capital Stock or options, warrants or rights to purchase Capital Stock, or debt securities or Capital

15

Stock that have been converted into or exchanged for Capital Stock as referred to in Section 4.07, the proceeds of such issuance or sale in the form of cash or Temporary Cash Investments, payments in respect of deferred payment obligations when received in the form of, or stock or other assets when disposed of for, cash or Temporary Cash Investments (except to the extent that such obligations are financed or sold with recourse to the Issuer or any Restricted Subsidiary), net of attorney's fees, accountant's fees and brokerage, consultation, underwriting and other fees and expenses actually Incurred in connection with such issuance or sale and net of taxes paid or payable as a result of thereof.

"*Notes*" has the meaning assigned to it in the preamble to this Indenture. The Original Notes and any Additional Notes shall be treated as a single class for all purposes under this Indenture, and unless the context otherwise requires, all references to the Notes shall include the Original Notes and any Additional Notes.

"*Notes Documents*" means all of the documents evidencing the terms of the Notes, the security therefor and the Guarantees, including the Notes, this Indenture, the Security Document, Subordination Agreement and any other deed, agreement or instrument entered into or executed pursuant thereto or in connection therewith.

"*Obligations*" means any principal, interest, penalties, fees, indemnifications, reimbursements, damages and other liabilities payable under the documentation governing any Indebtedness.

"*Officer*" means the chairman of the board, the general partner, the principal executive officer, the president, the principal financial officer, the principal operating officer, the treasurer or the principal accounting officer of the Parent Guarantor or the Issuer, as the case may be.

"*Officer's Certificate*" means a certificate signed by an Officer of the Parent Guarantor or the Issuer, as the case may be, that meets the requirements set forth in this Indenture and is delivered to the Trustee.

"*Opinion of Counsel*" means a written opinion from legal counsel reasonably satisfactory to the Trustee. The counsel may be an employee of or counsel to the Issuer or Trustee.

"*Original Notes*" has the meaning assigned to it in the preamble to this Indenture.

"*Parent Company*" of the Parent Guarantor means any other Person (other than a natural person) which either:

(a) legally and beneficially owns more than 50% of the Voting Stock of the Parent Guarantor, either directly or through one or more Subsidiaries; or

(b) is a Subsidiary of any Person referred to in the preceding clause; *provided*, *however*, that in no event will any Subsidiary of the Parent Guarantor constitute its Parent Company.

"*Parent Guarantor*" means Hellas I.

"*Participant*" means, with respect to the Depositary, Euroclear or Clearstream, a Person who has an account with the Depositary, Euroclear or Clearstream, respectively.

"*Permitted Holders*" means, collectively,

(a) Apax Partners;

(b) TPG Group;

16

(c)  limited partners of each of the foregoing and all funds managed, advised or operated by advisors of any Permitted Holder described in clauses (a) and (b) above;

(d)  any Senior Management Investor;

(e)  any Affiliate or Related Person of any Permitted Holders described in clauses (a) and (b) above;

(f)  any Person acting in the capacity as an underwriter in connection with any public or private offering of the Parent Guarantor's or any of its Affiliates' Capital Stock; and

(g)  trusts solely for the benefit of any of the foregoing Persons, or any of their heirs by blood or marriage, executors or legal representatives.

"*Permitted Investments*" means an Investment by the Parent Guarantor or any Restricted Subsidiary:

(a)  in the Parent Guarantor, a Restricted Subsidiary or a Person that will, upon the making of such Investment, become a Restricted Subsidiary;

(b)  in another Person if, as a result of such Investment, such other Person is merged or consolidated with or into, or transfers or conveys all or substantially all its assets to, the Parent Guarantor or a Restricted Subsidiary;

(c)  in cash and Temporary Cash Investments;

(d)  in receivables owing to the Parent Guarantor or any Restricted Subsidiary if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms; *provided*, *however*, that such trade terms may include such concessionary trade terms as the Parent Guarantor or any such Restricted Subsidiary deems reasonable under the circumstances;

(e)  in payroll, travel and similar advances to cover matters that are expected at the time of such advances ultimately to be treated as expenses for accounting purposes and that are made in the ordinary course of business;

(f)  in (i) loans or advances, or guarantees of third-party loans, to employees, officers or directors of the Parent Guarantor or any Parent Company or any Restricted Subsidiary approved by the Board of Directors or (ii) Management Advances; *provided, however,* that any such loans or advances to any employees, officers and directors of any Parent Company pursuant to clause (i) and (ii) shall only be permitted in an amount, taken together with all Restricted Payments made pursuant to Section 4.08(b)(9) since the Issue Date, not to exceed €15.0 million in the aggregate per annum;

(g)  in stock, obligations or securities received in settlement of debts created in the ordinary course of business and owing to the Parent Guarantor or any Restricted Subsidiary or in satisfaction of judgments;

(h)  in any Person to the extent such Investment represents the non-cash portion of the consideration received for (i) an Asset Disposition as permitted pursuant to Section 4.10 hereof or (ii) any other disposition of property or assets or the issuance or sale of Capital Stock not constituting an Asset Disposition;

(i)  in any Person where such Investment was acquired by the Parent Guarantor or any of its Restricted Subsidiaries (i) in exchange for any other Investment or accounts receivable held by the Parent Guarantor or any such Restricted Subsidiary in connection with or as a result of a bankruptcy,

17

workout, reorganization or recapitalization of the issuer of such other Investment or accounts receivable or (ii) as a result of a foreclosure by the Parent Guarantor or any Restricted Subsidiary with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

(j) in any Person to the extent such Investments consist of prepaid expenses, negotiable instruments held for collection and lease, utility and workers' compensation, performance and other similar deposits made in the ordinary course of business by the Parent Guarantor or any Restricted Subsidiary;

(k) in any Person to the extent such Investments consist of Hedging Obligations otherwise permitted pursuant to Section 4.07 hereof;

(l) in any Person to the extent such Investment exists or is made pursuant to legally binding commitments in existence on the Issue Date, and any extension, modification or renewal of any such Investments existing on the Issue Date, but only to the extent not involving additional advances, contributions or other Investments of cash or other assets or other increases thereof (other than as a result of the accrual or accretion of interest or original issue discount or the issuance of pay-in-kind securities), in each case, pursuant to the terms of such Investment on the Issue Date;

(m) in Guarantees permitted to be Incurred pursuant to Section 4.07;

(n) in any Person where such Investment was acquired by the Parent Guarantor or any Restricted Subsidiary in exchange for the issuance of Capital Stock (other than Disqualified Stock) of the Parent Guarantor, Subordinated Shareholder Funding or Capital Stock of any Parent Company;

(o) in repurchases of the Notes;

(p) held by a Person (other than an Affiliate of such Person) that becomes a Restricted Subsidiary, *provided* that (i) such Investments were not acquired in contemplation of the acquisition of such Person and (ii) at the time such Person becomes a Restricted Subsidiary such Investments would not, individually or in the aggregate, constitute a Significant Subsidiary of such acquired Person;

(q) in exchange for the licensing or contribution of intellectual property pursuant to marketing arrangements entered into is the ordinary course of business;

(r) represented by the Intercompany Proceeds Loan;

(s) in joint ventures (i) engaged in a Related Business or (ii) for the purpose of outsourcing the internal administrative functions of the Parent Guarantor or any Restricted Subsidiaries; *provided*, *however*, that the aggregate principal amount of all Investments permitted pursuant to this clause (s) will not exceed, at any time outstanding, the greater of €25 million or 2.5% of Total Assets in the aggregate;

(t) made with Excluded Contributions or with the proceeds of any sale of Disqualified Stock; and

(u) which, when taken together with all other Investments made from the Senior Notes Issue Date through the Issue Date and all other Investments made pursuant to this clause (u) and outstanding on the date such Investment is made, do not exceed the greater of €50 million or 5% of Total Assets in the aggregate; provided that no loans to or Investment in any Parent Company shall be permitted pursuant to this clause.

"*Permitted Liens*" means the following types of Liens:

18

(a) Liens existing as of the Issue Date;

(b) Liens on property or assets of the Parent Guarantor securing Indebtedness permitted to be secured under the terms of the Subordinated Notes, excluding for the avoidance of doubt Liens in respect of the Intercompany Proceeds Loan;

(c) Liens on any property or assets of (i) Hellas Finance granted in favor of the Parent Guarantor or (ii) the Parent Guarantor granted in favor of Hellas Finance;

(d) Liens on any of the Parent Guarantor's or the Issuer's property or assets securing the Notes or any Guarantees;

(e) Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into by the Parent Guarantor or any Restricted Subsidiary in the ordinary course of business;

(f) Liens imposed by law, including statutory Liens of landlords and carriers, warehousemen, mechanics, suppliers, materialmen, repairmen, employees, pension plan administrators or other like Liens and with respect to amounts not yet delinquent or being contested in good faith by appropriate proceedings and for which a reserve or other appropriate provision, if any, as will be required in conformity with IFRS will have been made or Liens arising solely by virtue of any statutory or common law provisions relating to bankers' liens, rights of set-off or similar rights and remedies as to deposit accounts or other funds maintained with a creditor depositary institution;

(g) Liens for taxes, assessments, government charges or claims that are being contested in good faith by appropriate proceedings and for which a reserve or other appropriate provision, if any, as will be required in conformity with IFRS will have been made;

(h) Liens Incurred or deposits made to secure the performance of tenders, bids, leases, statutory or regulatory obligations, surety and appeal bonds, government contracts, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(i) zoning restrictions, easements, licenses, reservations, title defects, rights of others for rights-of-way, utilities, sewers, electrical lines, telephone lines, telegraph wires, restrictions and other similar charges or encumbrances as to the use of real property that were not incurred in connection with Indebtedness and that do not in the aggregate materially adversely affect the value of said property or materially impair their use in the operation of the business of such Person;

(j) Liens arising by reason of any judgment, decree or order of any court so long as any appropriate legal proceedings that may have been duly initiated for the review of such judgment, decree or order will not have been finally terminated or the period within which such proceedings may be initiated will not have expired;

(k) Liens securing the Parent Guarantor's or the Issuer's obligations under Interest Rate Agreements or Currency Agreements permitted under Section 4.07;

(l) Liens Incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security or other insurance (including unemployment insurance);

(m) Liens Incurred in connection with a cash management program established in the ordinary course of business;

19

(n)  Liens encumbering deposits made to secure obligations arising from statutory, regulatory, contractual, or warranty requirements of the Parent Guarantor or the Issuer, including rights of offset and set-off;

(o)  Liens encumbering cash deposits made to secure obligations arising from letters of credit issued by the Parent Guarantor or any Restricted Subsidiary in connection with reinsurance obligations of the Parent Guarantor or the Restricted Subsidiaries in accordance with past practice of the Parent Guarantor or any Restricted Subsidiary; and

(p)  any extension, renewal or replacement, in whole or in part, of any Lien described in the foregoing clauses (a) through (n); *provided* that any such extension, renewal or replacement will be no more restrictive in any material respect than the Lien so extended, renewed or replaced and will not extend in any material respect to any additional property or assets.

"*Person*" means any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"*Preferred Stock*" means, with respect to any Person, Capital Stock of any class or classes (however designated) of such Person which is preferred as to the payment of dividends or distributions, or as to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such Person, over the Capital Stock of any other class of such Person whether now outstanding, or issued after the date of this Indenture, and including, without limitation, all classes and series of preferred or preference stock of such Person.

"*Private Placement Legend*" means the legend set forth in Section 2.07(l)(1) hereof to be placed on all Notes issued under this Indenture except where otherwise permitted by the provisions of this Indenture.

"*Proceeds Distribution*" means, the payment of a dividend or distribution to shareholders of the Parent Guarantor or repayment of Subordinated Shareholder Funding with the proceeds from the issuance of the Senior Secured Notes, the Subordinated Notes and the Notes on the Issue Date.

"*Proposed Subsidiary Merger*" means the transfer of the shares in TIM Hellas to a wholly owned direct subsidiary of Hellas II in connection with the subsequent merger of such wholly owned subsidiary with TIM Hellas in order to facilitate the creation of distributable reserves and the making of cash payments from TIM Hellas to a Restricted Subsidiary.

"*Property*" means, with respect to any Person, any interest of such Person in any kind of property or asset, whether real, personal or mixed, or tangible or intangible, including Capital Stock, and other securities of, any other Person.  For purposes of any calculation required pursuant to this Indenture, the value of any Property will be its Fair Market Value.

"*Purchase Money Obligations*" means Indebtedness:

(a)  consisting of the deferred purchase price of property, plant, equipment or capital assets, conditional sale obligations, obligations under any title retention agreement, other purchase money obligations and obligations in respect of industrial revenue bonds or similar Indebtedness, in each case where the maturity of such Indebtedness does not exceed the anticipated useful life of the property, plant, equipment or capital assets, being financed; and

(b)  Incurred to finance the acquisition, construction, improvement or lease of such property, plant, equipment or capital assets, including additions and improvements thereto; *provided*, *however*, that such Indebtedness is Incurred within 180 days after such acquisition, construction, improvement

20

or lease of such property, plant, equipment or capital assets by the Parent Guarantor or any Restricted Subsidiary.

"*QIB*" means a "qualified institutional buyer" as defined in Rule 144A.

"*Qualified Capital Stock*" of any Person means any and all Capital Stock of such Person other than Disqualified Capital Stock.

"*Redemption Date*" means, when used with respect to any Note to be redeemed pursuant to this Indenture, the date fixed for such redemption.

"*Refinance*" means, with respect to any Indebtedness, to amend, modify, extend, substitute, renew, replace, refund, prepay, repay, repurchase, redeem, defease or retire, or to issue other Indebtedness, in exchange or replacement for, such Indebtedness. "Refinanced" and "Refinancing" will have correlative meanings.

"*Refinancing Indebtedness*" means Indebtedness that Refinances any Indebtedness of the Parent Guarantor or any Restricted Subsidiary existing on the Issue Date or Incurred in compliance with this Indenture, including Indebtedness that Refinances Refinancing Indebtedness; *provided, however,* that:

(a)  such Refinancing Indebtedness has a Stated Maturity no earlier than the Stated Maturity of the Indebtedness being Refinanced;

(b) such Refinancing Indebtedness has an Average Life at the time such Refinancing Indebtedness is Incurred that is equal to or greater than the Average Life of the Indebtedness being Refinanced;

(c) such Refinancing Indebtedness has an aggregate principal amount (or if Incurred with original issue discount, an aggregate issue price) that is equal to or less than the aggregate principal amount (or if Incurred with original issue discount, the aggregate accreted value) then outstanding (plus fees and expenses, including any premium and defeasance costs) under the Indebtedness being Refinanced plus reasonable and customary fees and expenses in connection with such Refinancing;

(d) if the Indebtedness being Refinanced is subordinated in right of payment (or security) to the Notes or a Guarantee, such Refinancing Indebtedness is subordinated in right of payment or (as applicable) security to the Notes or such Guarantee at least to the same extent as the Indebtedness being Refinanced;

(e) if the Indebtedness being Refinanced is Indebtedness of the Issuer or a Guarantor, such Refinancing Indebtedness is Incurred only by the Issuer or a Guarantor; and

(f)  if the Indebtedness being Refinanced is Indebtedness of Hellas II or a Hellas II Restricted Subsidiary, such Refinancing Indebtedness is Incurred only by Hellas II or a Hellas II Restricted Subsidiary;

*provided further, however,* that Refinancing Indebtedness will not include (A) Indebtedness of a Subsidiary that Refinances Indebtedness of the Parent Guarantor or (B) Indebtedness of the Parent Guarantor or a Restricted Subsidiary that Refinances Indebtedness of an Unrestricted Subsidiary.

"*Regulation S*" means Regulation S promulgated under the Securities Act.

"*Regulation S Definitive Note*" means a Definitive Note sold in reliance on Regulation S.

21

"*Regulation S Global Note*" means a Global Note substantially in the form of Exhibit A hereto bearing the Global Note Legend and the Private Placement Legend and deposited with or on behalf of and registered in the name of the Depositary or its nominee, issued in a denomination equal to the outstanding principal amount of the Notes sold in reliance on Rule 903 of Regulation S.

"*Related Business*" means any business which is the same as or related, ancillary or complementary to any of the businesses of the Parent Guarantor and its Subsidiaries on the Issue Date.

"*Related Person*" with respect to any Permitted Holder means:

(a)  any controlling equity holder or majority (or more) owned Subsidiary of any such Person;

(b)  in the case of an individual, any spouse, family member or relative of such individual, any trust or partnership for the benefit of one or more of such individual and any such spouse, family member or relative, or the estate, executor, administrator, committee or beneficiaries of any thereof;

(c)  any trust, corporation, partnership or other Person for which one or more of the Permitted Holders and other Related Persons of any thereof constitute the beneficiaries, stockholders, partners or owners thereof, or Persons beneficially holding in the aggregate a majority (or more) controlling interest therein; or

(d)  in the case of Apax Partners or TPG, any investment fund or vehicle managed, sponsored or advised by such Person or any successor thereto, or by any Affiliate of such Person or any such successor.

"*Responsible Officer,*" when used with respect to the Trustee, means any officer within the Corporate Trust Administration of the Trustee (or any successor group of the Trustee) including any vice president, assistant vice president, assistant treasurer or any other officer of the Trustee customarily performing functions similar to those performed by any of the above designated officers and also means, with respect to a particular corporate trust matter, any other officer to whom such matter is referred because of his or her knowledge of and familiarity with the particular subject.

"*Representative Amount*" means the greater of (a) €1,000,000 and (b) an amount that is representative for a single transaction in the relevant market at the relevant time.

"*Restricted Definitive Note*" means a Definitive Note bearing the Private Placement Legend.

"*Restricted Global Note*" means a Global Note bearing the Private Placement Legend.

"*Restricted Investment*" means an Investment that is not a Permitted Investment.

"*Restricted Payment*" with respect to any Person means:

(a)  the declaration or payment of any dividends or any other distributions of any sort in respect of its Capital Stock (including any payment in connection with any merger or consolidation involving such Person) or similar payment to the direct or indirect holders of its Capital Stock (other than (A) dividends or distributions payable solely in its Capital Stock (other than Disqualified Stock), (B) dividends or distributions payable to the Parent Guarantor or a Restricted Subsidiary and (C) pro rata dividends or other distributions made by a Restricted Subsidiary to minority stockholders (or owners of an equivalent interest in the case of a Subsidiary that is an entity other than a corporation)) and any payment of cash interest on Subordinated Shareholder Funding;

(b)  the purchase, repurchase, redemption, defeasance or other acquisition or retirement for value of any Capital Stock of the Parent Guarantor or Subordinated Shareholder Funding held by any

22

Person (other than by a Restricted Subsidiary), including in connection with any merger or consolidation and including the exercise of any option to exchange any Capital Stock (other than into Capital Stock of the Parent Guarantor that is not Disqualified Stock);

(c) the purchase, repurchase, redemption, defeasance or other acquisition or retirement for value, prior to scheduled maturity, scheduled repayment or scheduled sinking fund payment of any Subordinated Obligations of the Parent Guarantor or the Issuer (other than (A) from the Parent Guarantor or a Restricted Subsidiary or (B) the purchase, repurchase, redemption, defeasance or other acquisition or retirement of Subordinated Obligations purchased in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case due within one year of the date of such purchase, repurchase, redemption, defeasance or other acquisition or retirement); or

(d) the making of any Investment (other than a Permitted Investment) in any Person.

"*Restricted Subsidiary*" means any Subsidiary of the Parent Guarantor other than an Unrestricted Subsidiary.

"*Revolving Credit Facility*" means the senior subscription agreement, dated as of April 3, 2005 (as amended and restated from time to time), between, among others, Hellas II and the banks named therein and any other revolving credit facility that refinances, in whole or in part, any such revolving credit facility (it being understood that any Indebtedness the proceeds of which are used to pay fees, expenses, premiums or defeasance costs in connection with any such refinancing and accrued interest on the Indebtedness being refinanced will be permitted as Indebtedness under a Revolving Credit Facility and will be permitted to be Incurred for purposes of the limitation in Section 4.07(b)(i), but will not be counted against the limitation in such clause).

"*Rule 144*" means Rule 144 promulgated under the Securities Act.

"*Rule 144A*" means Rule 144A promulgated under the Securities Act.

"*Rule 144A Definitive Note*" means a Definitive Note sold in reliance on Rule 144A.

"*Rule 144A Global Note*" means a Global Note substantially in the form of Exhibit A hereto bearing the Global Note Legend and the Private Placement Legend and deposited with or on behalf of, and registered in the name of, the Depositary or its nominee that will be issued in a denomination equal to the outstanding principal amount of the Notes sold in reliance on Rule 144A.

"*Rule 144A Note*" means a Rule 144A Definitive Note or a Rule 144A Global Note, as applicable.

"*Rule 903*" means Rule 903 promulgated under the Securities Act.

"*Rule 904*" means Rule 904 promulgated under the Securities Act.

"*S&P*" means Standard and Poor's, a division of the McGraw-Hill Companies, Inc. and its successors.

"*Sale/Leaseback Transaction*" means an arrangement relating to property owned by any Restricted Subsidiary (other than the Issuer) on the Issue Date or thereafter acquired by any Restricted Subsidiary (other than the Issuer) whereby such Restricted Subsidiary transfers such property to a Person and leases it from such Person; *provided, however,* that any sale and leaseback transaction or series of related sale and leaseback transactions relating to property with a value of less than or equal to €10 million in aggregate will not be a Sale/Leaseback Transaction.

"*SEC*" means the U.S. Securities and Exchange Commission.

LO\332299.7

"*Securities Act*" means the U.S. Securities Act of 1933, as amended.

"*Security Agent*" means Deutsche Bank AG, London Branch.

"*Security*" means any mortgage, mortgage pre-notice (under articles 1274 et seq. of the Greek Civil Code), charge (fixed or floating), standard security, pledge, lien, hypothecation, right of set-off, security trust, assignment by way of security, reservation of title, or any other security interest whatsoever, howsoever created or arising or any other agreement or arrangement entered into for the purposes of conferring security and any agreement to create or establish any of the foregoing.

"*Security Document*" means the pledge over the Intercompany Proceeds Loan entered into by the Issuer and the Parent Guarantor for the benefit of any of the Holders and any additional security granted for the benefit of the Holders, as amended, modified, restated, supplemented or replaced from time to time.

"*Senior Facility Agent*" means with respect to the Revolving Credit Facility, the Agent as defined in the Revolving Credit Facility.

"*Senior Management Investors*" means the officers, directors and other members of the management of, or senior consultants to, any Parent Company, the Parent Guarantor or any of their respective Subsidiaries, or spouses, immediate family members thereof or any trust, partnership or other entity for the benefit of, or the beneficial owner of which (directly or indirectly) is any of the foregoing, or any of their heirs, executives and legal representatives, who at any date beneficially own or have the right to acquire, directly or indirectly, Capital Stock of the Parent Guarantor or any Parent Company.

"*Senior Notes*" means each of the Senior Secured Notes and the Senior Unsecured Notes.

"*Senior Notes Indentures*" means each of the amended and restated indenture in respect of the Senior Secured Notes due 2012 of Hellas V dated December 18, 2006 and the amended and restated indenture in respect of the Senior Notes due 2013 of Hellas III dated December 18, 2006.

"*Senior Secured Notes*" means the senior secured floating rate notes of Hellas V due 2012.

"*Senior Unsecured Notes*" means the senior notes of Hellas III due 2013.

"*Significant Subsidiary*" means any Restricted Subsidiary that would be a "Significant Subsidiary" of the Parent Guarantor within the meaning of Rule 1-02 under Regulation S-X promulgated by the SEC.

"*Stated Maturity*" means, when used with respect to any Note or any installment of interest thereon, the date specified in such Note as the fixed date on which the principal of such Note or such installment of interest, respectively, is due and payable, and, when used with respect to any other indebtedness, means the date specified in the agreement or instrument governing such indebtedness as the fixed date on which the principal of such indebtedness, or any installment of interest thereon, is due and payable.

"*Subordinated Notes*" means the floating rate subordinated notes of Hellas II due 2015.

"*Subordinated Obligation*" means, with respect to a Person, any Indebtedness of such Person (whether outstanding on the Issue Date or thereafter Incurred) which is subordinate or junior in right of payment to the Notes or a guarantee of such Person, as the case may be, pursuant to a written agreement to that effect, and will include, for the avoidance of doubt, any Subordinated Shareholder Funding; *provided, however,* that no Indebtedness will be deemed to be subordinate or junior in right

of payment to any other Indebtedness solely by virtue of being unsecured or secured on a junior basis or by virtue of not being guaranteed.

"*Subordinated Shareholder Funding*" means, collectively, any funds provided to the Parent Guarantor by Hellas or any Parent Company in exchange for or pursuant to any security, instrument or agreement other than Capital Stock, including all preferred equity certificates and convertible preferred equity certificates outstanding on the Issue Date, together with any such security, instrument or agreement and any other security or instrument other than Capital Stock issued in payment of any obligation under any Subordinated Shareholder Funding; *provided, however,* that such Subordinated Shareholder Funding is in the form of (or has substantially the same terms as, *mutatis* mutandis) the preferred equity certificates or the convertible preferred equity certificates each issued by the Parent Guarantor to Hellas in connection with the Acquisition; or

(a)  does not mature or require any amortization, redemption or other repayment of principal or any sinking fund payment prior to the first anniversary of the Stated Maturity of the Notes (other than through conversion or exchange of such funding into Capital Stock (other than Disqualified Stock) of the Parent Guarantor or any funding meeting the requirements of this definition);

(b) does not require, prior to the first anniversary of the Stated Maturity of the Notes, payment of cash interest, cash withholding amounts or other cash gross-ups, or any similar cash amounts;

(c)  contains no change of control or similar provisions and does not accelerate and has no right to declare a default or event of default or take any enforcement action or otherwise require any cash payment, in each case, prior to the first anniversary of the Stated Maturity of the Notes;

(d)  does not provide for or require any security interest or encumbrance over any asset of the Parent Guarantor or any of its Subsidiaries;

(e)  does not contain any covenants (financial or otherwise) other than a covenant to pay such Subordinated Shareholder Funding; and

(f)  is fully subordinated and junior in right of payment to the Notes pursuant to subordination, payment blockage and enforcement limitation terms not materially less favorable than the terms of the Intercreditor Agreement which govern the subordinated guarantees of the Senior Notes.

"*Subordination Agreement*" means the subordination agreement dated December 21, 2006 entered into between Hellas, Hellas I and the Trustee.

"*Subsidiary*" means, with respect to any Person: (a) a corporation a majority of whose Voting Stock is at the time, directly or indirectly, owned by such Person, by one or more Subsidiaries of such Person or by such Person and one or more Subsidiaries thereof and (b) any other Person (other than a corporation), including, without limitation, a partnership, limited liability company, business trust or joint venture, in which such Person, one or more Subsidiaries thereof or such Person and one or more Subsidiaries thereof, directly or indirectly, at the date of determination thereof, has at least majority ownership interest entitled to vote in the election of directors, managers or Trustees thereof (or other Person performing similar functions).

"*Surviving Entity*" means the surviving entity resulting from the Merger.

"*TARGET Settlement Day*" means any day on which the Trans-European Automated Real-Time Gross Settlement Express Transfer (TARGET) System is open for settlement of payments in euro.

LO\332299.7

"*Telerate Page 248*" means, the display page so designated on Bridge's Telerate Service (or such other page as may replace that page on that service, or such other service as may be nominated as the information vendor).

"*Temporary Cash Investments*" means any of the following:

(a)  any investment in direct obligations of, or obligations guaranteed by, (i) the United States of America, (ii) any European Union Member State, or (iii) any agency or instrumentality of any such country or member state; or

(b)  overnight bank deposits, and investments in time deposit accounts, certificates of deposit, bankers' acceptances and money market deposits (or, with respect to foreign banks, similar instruments) maturing not more than one year after the date of acquisition thereof issued by

    (i)    any lender under the Revolving Credit Facility;

    (ii)   any institution authorized to operate as a bank in any of the countries or member states referred to in subclause (a)(i) above; or

    (iii)  any bank or trust company organized under the laws of any such country or member state or any political subdivision thereof,

in each case, having capital and surplus aggregating in excess of €200 million (or the foreign currency equivalent thereof) and whose long-term debt is rated at least "A" by S&P or "A-2" by Moody's (or, in either case, the equivalent of such rating by such organization or, if no rating of S&P or Moody's then exists, the equivalent of such rating by any internationally recognized rating organization) at the time such Investment is made;

(c)  repurchase obligations with a term of not more than 30 days for underlying securities of the types described in clause (a) or (b) above entered into with a Person meeting the qualifications described in clause (b) above;

(d)  Investments in commercial paper, maturing not more than 270 days after the date of acquisition, issued by a Person (other than any Parent Company, the Parent Guarantor or any of its Subsidiaries), with a rating at the time as of which any Investment therein is made of "P-1" (or higher) according to Moody's or "A-1" (or higher) according to S&P (or, in either case, the equivalent of such rating by such organization or, if no rating of S&P or Moody's then exists, the equivalent of such rating by any internationally recognized rating organization);

(e)  Investments in securities maturing not more than one year after the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States of America or any European Union Member State, or by any political subdivision or taxing authority of any such state, commonwealth, territory or country, and rated at least "A" by S&P or "A" by Moody's (or, in either case, the equivalent of such rating by such organization or, if no rating of S&P or Moody's then exists, the equivalent of such rating by any nationally recognized rating organization); and

(f)  Investment funds investing 95% of their assets in securities of the types described in clauses (a) through (e) above (which funds may also hold reasonable amounts of cash pending investment and/or distribution).

"*TIA*" means the Trust Indenture Act of 1939, as amended (15 U.S.C. §§ 77aaa-77bbbb).

"*TIM Hellas*" means TIM Hellas Telecommunications S.A.

26

LO\332299.7

"*Total Assets*" means the consolidated total assets of the Parent Guarantor and its Restricted Subsidiaries as shown on the most recent consolidated balance sheet (excluding the footnotes thereto) of the Parent Guarantor.

"*TPG*" means TPG Partners IV, Inc. and its Affiliates.

"*TPG Group*" means (a) TPG and (b) any Affiliate of TPG.

"*Trustee*" means the party named as such in the preamble to this Indenture and any and all successors thereto.

"*Unrestricted Definitive Note*" means a Definitive Note that does not bear and is not required to bear the Private Placement Legend.

"*Unrestricted Global Note*" means a Global Note that does not bear and is not required to bear the Private Placement Legend.

"*Unrestricted Subsidiary*" means: (a) any Subsidiary of the Parent Guarantor that at the time of determination is an Unrestricted Subsidiary (as designated by the Board of Directors in the manner provided below) and (b) any Subsidiary of an Unrestricted Subsidiary.

The Board of Directors may designate any Subsidiary of the Parent Guarantor (including any newly acquired or newly formed Subsidiary of the Parent Guarantor) to be an Unrestricted Subsidiary unless such Subsidiary or any of its Subsidiaries owns any Capital Stock or Indebtedness of, or holds any Lien on any property of, the Parent Guarantor or any Restricted Subsidiary; *provided, however,* that either (a) the Subsidiary to be so designated has total assets of €1,000 or less or (b) if such Subsidiary has assets greater than €1,000, such designation would be permitted under Section 4.08 (including as a Permitted Investment).

The Board of Directors may designate any Unrestricted Subsidiary to be a Restricted Subsidiary; *provided, however,* that immediately after giving effect to such designation (a) a Restricted Subsidiary could Incur €1.00 of additional Indebtedness under paragraph (a) of Section 4.07 and (b) no Default will have occurred and be continuing or would otherwise result therefrom. Any such designation by the Board of Directors will be evidenced to the Holders by promptly filing with the Trustee a copy of the resolution of the Board of Directors giving effect to such designation and an Officer's Certificate certifying that such designation complied with the foregoing provisions.

"*Voting Stock*" means any class or classes of Capital Stock pursuant to which the holders thereof have the general voting power under ordinary circumstances to elect at least a majority of the board of directors, managers or trustees (or Persons performing similar functions) of any Person (irrespective of whether or not, at the time, stock of any other class or classes will have, or might have, voting power by reason of the happening of any contingency).

"*Weighted Average Life to Maturity*" means, when applied to any Indebtedness at any date, the number of years obtained by dividing:

(1) the sum of the products obtained by multiplying (a) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect of the Indebtedness, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; *by*

(2) the then outstanding principal amount of such Indebtedness.

27

LO\332299.7

Section 1.02    *Other Definitions*.

| Term | Defined in Section |
|------|--------------------|
| *"Additional Amounts"* | 4.18 |
| *"Affiliate Transaction"* | 4.11 |
| *"Authentication Order"* | 2.02 |
| *"Authorized Agent"* | 14.09 |
| *"Change of Control"* | 4.15 |
| *"Change of Control Offer"* | 4.15 |
| *"Change of Control Payment"* | 4.15 |
| *"Change of Control Payment Date"* | 4.15 |
| *"Change of Tax Law"* | 3.09 |
| *"Covenant Defeasance"* | 8.03 |
| *"Event of Default"* | 6.01 |
| *"Excess Proceeds Offer"* | 4.10 |
| *"Initial Lien"* | 4.09 |
| *"Legal Defeasance"* | 8.02 |
| *"Luxembourg Paying Agent* | 2.03 |
| *"Offer Amount"* | 4.10 |
| *"Offer Period"* | 4.10 |
| *"Paying Agent"* | 2.03 |
| *"Payor"* | 4.18 |
| *"Permitted Indebtedness"* | 4.07 |
| *"Purchase Date"* | 4.10 |
| *"Register"* | 2.03 |
| *"Registrar"* | 2.03 |
| *"Regular Record Date"* | 2.04 |
| *"Relevant Taxing Jurisdiction"* | 4.18 |
| *"Successor Company"* | 5.01 |
| *"Taxes"* | 4.18 |

Section 1.03    *Incorporation by Reference of Trust Indenture Act*.

Whenever this Indenture refers to a provision of the TIA, the provision is incorporated by reference in and made a part of this Indenture, as if this Indenture were required to be qualified under the TIA.

Section 1.04    *Rules of Construction*.

Unless the context otherwise requires:

(1) a term has the meaning assigned to it;

(2) an accounting term not otherwise defined has the meaning assigned to it in accordance with IFRS;

(3) "or" is not exclusive;

(4) words in the singular include the plural, and in the plural include the singular;

(5) "will" shall be interpreted to express a command;

(6) provisions apply to successive events and transactions; and

28

(7) references to sections of or rules under the Securities Act will be deemed to include substitute, replacement of successor sections or rules adopted by the SEC from time to time.

## ARTICLE 2
## THE NOTES

Section 2.01    *Form and Dating*.

(a) *Global Notes*.  Notes offered and sold in reliance on Rule 144A shall be issued initially in the form of the Rule 144A Global Note, duly executed by the Issuer, endorsed by the Guarantor and authenticated by the Trustee or an Authenticating Agent as hereinafter provided.  Notes offered and sold in reliance on Regulation S shall be issued initially in the form of a Regulation S Global Note, duly executed by the Issuer, endorsed by the Guarantor and authenticated by the Trustee or an Authenticating Agent as hereinafter provided.

Each Global Note shall represent such aggregate principal amount of the outstanding Notes as shall be specified therein and each shall provide that it shall represent the aggregate principal amount of outstanding Notes from time to time endorsed thereon and that the aggregate principal amount of outstanding Notes represented thereby may from time to time be reduced or increased, as appropriate, by the Registrar or the Trustee to reflect exchanges, repurchases, redemptions and transfers of interests therein, in accordance with the terms of this Indenture.

The terms and provisions contained in the Notes will constitute, and are hereby expressly made, a part of this Indenture and the Issuer, the Guarantor, the Trustee and the Security Agent, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby.  However, to the extent any provision of any Note or any Guarantee conflicts with the express provisions of this Indenture, the provisions of this Indenture shall govern and be controlling.

Ownership of interests in the Global Notes will be limited to Participants and Indirect Participants.  Book-Entry Interests in the Global Notes will be shown on, and transfers thereof will be effected only through, records maintained in book-entry form by the Depositary and its Participants. The Applicable Procedures shall be applicable to Book-Entry Interests in Global Notes.

Except as set forth in Section 2.07(a) hereof, the Global Notes may be transferred, in whole and not in part, only to a nominee or a successor of the Depositary.

(b) *Definitive Notes*.  Definitive Notes issued upon transfer of a Book-Entry Interest or a Definitive Note, or in exchange for a Book-Entry Interest or a Definitive Note, shall be issued in accordance with this Indenture.

(c) *Book-Entry Provisions*.  Neither Participants nor Indirect Participants shall have any rights either under this Indenture or under any Global Note held on their behalf by the Depositary. Notwithstanding the foregoing, nothing herein shall prevent the Issuer, any Guarantor or the Trustee from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as between the Depositary and its Participants, the operation of customary practices of such Depositary governing the exercise of the rights of an owner of a beneficial interest in any Global Note.

(d) *Note Forms*.  The Global Notes and the Definitive Notes shall be issuable only in registered form, substantially in the forms set forth as <u>Exhibit A</u>, hereto. The Notes shall be issued without coupons and only in denominations of €1 and increments thereof.

(e) *Dating*.  Each Note shall be dated the date of its authentication.

Section 2.02    *Execution and Authentication*.

At least one duly authorized Officer of the Issuer shall execute the Notes on behalf of the Issuer by manual or facsimile signature.  The Issuer's seal may but need not be impressed, affixed, imprinted or reproduced on the Notes.

If an Officer whose signature is on a Note no longer holds that office at the time the Note is authenticated or at any time thereafter, the Note shall be valid nevertheless.

A Note shall not be valid until an authorized signatory of the Trustee or, as the case may be, an Authenticating Agent manually or by facsimile signs the certificate of authentication on the Note.  Such signature shall be conclusive evidence that the Note has been authenticated under this Indenture.

The Trustee shall authenticate the Original Notes on the Issue Date in an aggregate principal amount of €200,000,000, upon receipt of an Issuer Request directing the Trustee to authenticate the Original Notes and certifying that all conditions precedent to the issuance of the Original Notes contained herein have been complied with (an "*Authentication Order*").  Each Note shall be dated the date of its authentication. The Trustee shall authenticate Additional Notes upon receipt of an Authentication Order relating thereto.

Section 2.03    *Appointment of Agents*.

(a) The Issuer shall maintain (i) an office or agency in the City of London, England where Definitive Notes may be presented for registration of transfer or for exchange; (ii) an office or agency in the City of London, England where Notes may be presented for payment; (iii) when and for so long as the Notes are listed on the official list of the Luxembourg Stock Exchange and admitted to trading on the Euro MTF market, to the extent required by the Luxembourg Stock Exchange, an office or agency in Luxembourg where Definitive Notes may be presented for transfer or for exchange and for payment thereof; (iv) an office or agency where notices and demands to or upon the Issuer and/or any Guarantor in respect of the Notes, the Note Guarantee and this Indenture may be served; and (v) an office or agency in the location where the Common Depositary holds the Global Notes where annotation of increases and decreases of the principal amount of Global Notes will be made.  In addition, the Parent Guarantor and the Issuer will undertake to maintain a paying agent in a member state of the European Union that is not obligated to withhold or deduct tax pursuant to European Council Directive 2003/48/EC or any other Directive implementing the conclusions of the ECOFIN Council meeting of November 26-27, 2000 or any law implementing or complying with, or introduced in order to conform to, such Directive.  The office or agency referred to in clause (i) above shall be referred to as the "*Registrar*," the office or agency referred to in clause (ii) above shall be referred to as the "*Trustee*," the office or agency referred to in clause (iii), shall be referred to as the "*Luxembourg Paying Agent*," each office or agency referred to in clauses (i), (ii), and (iii) above and in the immediately proceeding sentence shall be referred to as a "*Paying Agent*," and the office or agency referred to in clause (v) above shall be referred to as the "*Trustee*."

The Issuer may change any Paying Agent, Registrar or transfer agent for the Notes without prior notice to the Holders of the Notes.  For so long as the Notes are listed on the official list of the Luxembourg Stock Exchange and admitted to trading on the Euro MTF market, and the rules and regulations of the Luxembourg Stock Exchange so require, the Issuer will deliver notice of the change in a Paying Agent, Registrar or transfer agent to the Luxembourg Stock Exchange.  The Parent Guarantor or any of its Restricted Subsidiaries may act as paying agent or Registrar in respect of the Notes.

The Registrar shall maintain a register (the "*Register*") of the Holders of the Notes and of the transfer and exchange of Notes, and the transfer agents in each of London and Luxembourg will

maintain a register reflecting ownership of the Global Notes and Definitive Notes outstanding from time to time.  Upon request by the Issuer, the Registrar shall deliver an up-to-date copy of the Register to the Issuer.  Any notice to be given under this Indenture or under the Notes by the Trustee, the Issuer or any Guarantor to the Holders shall be mailed by first-class mail to each Holder of Notes at their address as it appears at the time of such mailing in the Register.

The Issuer hereby appoints The Bank of New York at One Canada Square, 48th Floor, London E14 5AL as the Trustee, Registrar and Paying Agent with respect to the Notes, and The Bank of New York hereby accepts such appointment. The Issuer hereby appoints The Bank of New York (Luxembourg) S.A. at Aerogolf Center, 1A Hoehenhof, L-1736 Senningerberg, Luxembourg as the Luxembourg Paying Agent and transfer agent, and the Bank of New York (Luxembourg) S.A. hereby accepts such appointment.

The Issuer may appoint one or more co-Registrars and one or more additional Paying Agents and the terms "*Registrar*" and "*Paying Agent*" shall include any such additional co-Registrar or Paying Agent, as applicable.

The Issuer shall notify the Trustee of the name and address of any agent appointed after the date of this Indenture.  If the Issuer fails to maintain the Registrar or Paying Agent, or fails to give the foregoing notice, the Trustee shall act as such and shall be entitled to appropriate compensation in accordance with Section 7.07 hereof.

(b) The Trustee may authenticate Notes as the Issuer's Authenticating Agent. The Trustee may appoint an additional Authenticating Agent or agents acceptable to the Issuer to authenticate Notes. Unless limited by the terms of such appointment, an Authenticating Agent may authenticate Notes whenever the Trustee may do so. Each reference in this Indenture to authentication by the Trustee includes authentication by such Authenticating Agent. Such Authenticating Agent shall have the same rights as the Trustee in any dealings hereunder with the Issuer or with any of the Issuer's Affiliates.

Notes authenticated by an Authenticating Agent shall be entitled to the benefits of this Indenture and shall be valid and obligatory for all purposes as if authenticated hereunder by the Trustee hereunder, and every reference in this Indenture to the authentication and delivery of Notes by the Trustee or the Trustee's certificate of authentication shall be deemed to include authentication and delivery on behalf of the Trustee by an Authenticating Agent. Each Authenticating Agent shall be subject to acceptance by the Issuer and shall at all times be a corporation organized and doing business under, or licensed to do business pursuant to, the laws of the United States of America (including any State thereof or the District of Columbia) or a jurisdiction in the European Union and authorized under such laws to act as Authenticating Agent, subject to supervision or examination by governmental authorities. If at any time an Authenticating Agent shall cease to be eligible in accordance with the provisions of this Section 2.03(b), such Authenticating Agent shall resign immediately in the manner and with the effect specified in this Section 2.03(b).

Any corporation into which an Authenticating Agent may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which such Authenticating Agent shall be a party, or any corporation resulting from any merger, conversion or consolidation to which such Authenticating Agent shall be a party, or any corporation succeeding to all or substantially all the corporate agency or corporate trust business of an Authenticating Agent, shall continue to be an Authenticating Agent, *provided* such corporation shall be otherwise eligible under this Section 2.03(b), without the execution or filing of any paper or any further act on the part of the Trustee or the Authenticating Agent.

An Authenticating Agent may resign at any time by giving written notice of resignation to the Trustee and the Issuer. Each of the Trustee and the Issuer may at any time terminate the agency of an Authenticating Agent by giving written notice of the termination to that Authenticating Agent and the

31

Issuer or the Trustee, as the case may be. Upon receiving such a notice of resignation or upon such a termination, or in case at any time any Authenticating Agent ceases to be eligible in accordance with the provisions of this Section 2.03(b), the Trustee may appoint a successor Authenticating Agent acceptable to the Issuer. Any successor Authenticating Agent, upon acceptance of its appointment hereunder, shall become vested with all of the rights, powers and duties of its predecessor hereunder, with like effect as if originally named as an Authenticating Agent. No successor Authenticating Agent shall be appointed unless eligible under the provisions of this Section 2.03(b).

The Issuer agrees to pay to each Authenticating Agent from time to time reasonable compensation for its services under this Section 2.03(b).

If an Authenticating Agent is appointed with respect to the Notes pursuant to this Section 2.03(b), the Notes may have endorsed thereon, in addition to or in lieu of the Trustee's certification of authentication, an alternative certificate of authentication in the following form:

"This is one of the Notes referred to in the within-mentioned Indenture.

[NAME OF AUTHENTICATING AGENT],
 as Authenticating Agent

By: _____
 Authorized Signatory"

In authenticating the Notes hereunder, the Trustee and the Authenticating Agent, subject to Article 7 hereof, shall be entitled to receive and shall be fully protected in relying upon (i) an Opinion of Counsel substantially to the effect that (A) the Notes are in the form contemplated by this Indenture; and (B) this Indenture, the Notes and the Guarantees have been duly authorized, executed, issued and delivered by the Issuer and each Guarantor and constitute valid and legally binding obligations of the Issuer and each Guarantor, enforceable in accordance with their terms, subject to the respective Bankruptcy Law or similar laws of general applicability relating to or affecting creditors' rights and to general equity principles; and (ii) an Officer's Certificate stating, to the best knowledge of each signer of such certificate, that no event which is, or after notice or lapse of time would become, an Event of Default with respect to any of the Notes shall have occurred and be continuing.

Section 2.04    *Holders to Be Treated as Owners; Payments of Interest*.

(a)  Except as otherwise ordered by a court of competent jurisdiction or required by applicable law, the Issuer, any Guarantor, the Paying Agents, the Registrar, the Trustee and any agent of the Issuer, any Guarantor, any Paying Agent, the Registrar or the Trustee may deem and treat the Holder of a Note as the absolute owner of such Note for the purpose of receiving payment of or on account of the principal, premium or interest on such Note and for all other purposes; and neither the Issuer, any Guarantor, any Paying Agent, the Registrar, the Trustee nor any agent of the Issuer, any Guarantor, any Paying Agent, the Registrar or the Trustee shall be affected by any notice to the contrary.  All such payments so made to any such Person, or upon his or her order, shall be valid, and, to the extent of the sum or sums so paid, effective to satisfy and discharge the liability for moneys payable upon any Note or Guarantee.

(b)  Notwithstanding the foregoing, nothing herein shall prevent the Issuer or the Trustee from giving effect to any written certification, proxy or other authorization furnished to Euroclear or Clearstream or their nominees or impair, as between Euroclear or Clearstream, its nominees, the Participants or any other person, the operation of customary practices of such persons governing the exercise of the rights of a Holder.

LO\332299.7

(c) A Holder of a Note at the close of business on any Regular Record Date with respect to any Interest Payment Date shall be entitled to receive the interest payable on such Interest Payment Date notwithstanding any transfer or exchange of such Note subsequent to the Regular Record Date and prior to such Interest Payment Date, except if and to the extent the Issuer shall default in the payment of the interest due on such Interest Payment Date, in which case such defaulted interest shall be paid in accordance with Section 2.13.  The term *"Regular Record Date"* as used with respect to any Interest Payment Date for the Notes shall mean the date specified as a "Record Date" in the Notes.

Section 2.05    *Paying Agents to Hold Money and Additional Notes*.

Each Paying Agent shall hold for the benefit of the Holders or the Trustee all money and Additional Notes received by the Paying Agent for the payment of principal, premium, interest or Additional Amounts on the Notes (whether such money has been paid to it by the Issuer or any other obligor on the Notes), and the Issuer and the Paying Agent shall notify the Trustee of any default by the Issuer (or any other obligor on the Notes) in making any such payment.  Money and Additional Notes held by a Paying Agent need not be segregated, except as required by law, and in no event shall any Paying Agent be liable for any interest on any money or Additional Notes received by it hereunder.  The Issuer at any time may require each Paying Agent to pay all money held by it to the Trustee and account for any funds disbursed, and the Trustee may require any Paying Agent to pay forthwith all money and Additional Notes so held by it to the Trustee and to account for any funds or Additional Notes disbursed.  Upon making such payment, the relevant Paying Agent shall have no further liability for the money and Additional Notes delivered to the Trustee.  If the Issuer or an Affiliate of the Issuer acts as Paying Agent, it will segregate and hold in a separate trust fund for the benefit of the Holders all money and Additional Notes held by it as Paying Agent.  Upon any bankruptcy or reorganization proceedings relating to the Issuer (including, without limitation, in relation to the Issuer, bankruptcy (*faillite*), insolvency, its voluntary or judicial liquidation (*liquidation volontaire ou judiciaire*), composition with creditors (*concordat préventif de faillite*), reprieve from payment (*sursis de paiement*), controlled management (*gestion contrôlée*), fraudulent conveyance (*action pauliana*), general settlement with creditors, reorganization or similar laws affecting the rights of creditors generally) or such Affiliate, the Trustee will serve as Paying Agent for the Notes.

Section 2.06    *Noteholder Lists*.

The Trustee shall preserve in as current a form as is reasonably practicable the most recent list available to it from the Registrar of the names and addresses of the Holders.  The Issuer shall obtain from the Registrar and furnish to the Trustee (if the Trustee is not the Registrar) and each Paying Agent at least one Business Day before each Regular Record Date, and at such other times as they may request in writing, a list in such form and as of such date as they may reasonably require of the names and addresses of the Holders.

Section 2.07    *Transfer and Exchange*.

(a)  Transfer and Exchange of Global Notes.

(1) The Global Notes cannot be transferred to any Person other than to another nominee of the Depositary or to a successor clearing agency or its nominee approved by the Issuer, each Guarantor and the Trustee.

(2) All Global Notes will be exchanged by the Issuer for Definitive Notes: (A) if Euroclear or Clearstream notifies the Issuer that they are unwilling or unable to act as a clearing system in respect of the Notes and a successor clearing system is not appointed by the Issuer within 120 days; (B) in whole, but not in part, if the Issuer or Euroclear or Clearstream so requests following an Event of Default; or (C) if the owner of a Book-Entry Interest requires such exchange in writing delivered through the respective Depositary

33

following an Event of Default.  Upon the occurrence of any of the preceding events, Definitive Notes shall be issued in the name or names and issued in any approved denominations, as the Depositary shall instruct the Issuer based on the instructions received by the Depositary from the holders of Book-Entry Interests.

(3) Global Notes may also be exchanged or replaced, in whole or in part, as provided in Section 2.08 and Section 2.11.  Every Note authenticated and delivered in exchange for, or in lieu of, a Global Note or any portion thereof, pursuant to Section 2.08 or Section 2.11 hereof, shall be authenticated and delivered in the form of, and shall be, a Global Note.  A Global Note may not be exchanged for another Note, other than as provided in this Section 2.07(a).

(b)  *General Provisions Applicable to Transfers and Exchanges of the Notes*.

The transfer and exchange of Book-Entry Interests shall be effected through the relevant Depositary, in accordance with the provisions of this Indenture and the Applicable Procedures.

Transfers of Book-Entry Interests in the Global Notes (other than transfers of Book-Entry Interests in connection with which the transferor takes delivery thereof in the form of a Book-Entry Interest in the same Global Note) shall require compliance with this Section 2.07(b), as well as one or more of the other following subparagraphs of this Section 2.07, as applicable.

In connection with all transfers and exchanges of Book-Entry Interests (other than transfers of Book-Entry Interests in connection with which the transferor takes delivery thereof in the form of a Book-Entry Interest in the same Global Note), the Trustee must receive:  (i) a written order from a Participant or an Indirect Participant given to the Depositary in accordance with the Applicable Procedures directing the Depositary to debit from the transferor a Book-Entry Interest in an amount equal to the Book-Entry Interest to be transferred or exchanged; (ii) a written order from a Participant or an Indirect Participant given to the Depositary in accordance with the Applicable Procedures directing the Depositary to credit or cause to be credited a Book-Entry Interest in another Global Note in an amount equal to the Book-Entry Interest to be transferred or exchanged; and (iii) instructions given in accordance with the Applicable Procedures containing information regarding the Participant account to be credited or debited with such increase or decrease, as applicable.

In connection with a transfer or exchange of a Book-Entry Interest for a Definitive Note, the Trustee and the Registrar must receive:  (i) a written order from a Participant or an Indirect Participant given to the Depositary in accordance with the Applicable Procedures directing the Depositary to debit from the transferor a Book-Entry Interest in an amount equal to the Book-Entry Interest to be transferred or exchanged; (ii) a written order from a Participant directing the Registrar to cause to be issued a Definitive Note in an amount equal to the Book-Entry Interest to be transferred or exchanged; and (ii) instructions containing information regarding the Person in whose name such Definitive Note shall be registered to effect the transfer or exchange referred to above.

In connection with any transfer or exchange of Definitive Notes, the Holder of such Notes shall present or surrender to the Registrar the Definitive Notes duly endorsed or accompanied by a written instruction of transfer in form satisfactory to the Registrar duly executed by such Holder or by its attorney, duly authorized in writing.  In addition, in connection with a transfer or exchange of a Definitive Note for a Book-Entry Interest, the Trustee must receive a written order directing the Depositary to credit the account of the transferee in an amount equal to the Book-Entry Interest to be transferred or exchanged.

Upon satisfaction of all of the requirements for transfer or exchange of Book-Entry Interests in Global Notes contained in this Indenture, the Trustee or the Registrar, as specified in this Section 2.07, shall endorse the relevant Global Note(s) with any increase or decrease and instruct the Depositary to reflect such increase or decrease in its systems.

LO\332299.7

(c) *Transfer of Book-Entry Interests in a Regulation S Global Note to Book-Entry Interests in a Rule 144A Global Note.* A Book-Entry Interest in the Regulation S Global Note may be transferred to a Person who takes delivery thereof in the form of a Book-Entry Interest in the Rule 144A Global Note, in each case, only if the transfer complies with the requirements of Section 2.07(b) above, such transfer takes place after January 30, 2007 and the Trustee receives a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (1) thereof.

Upon the receipt of such certificate and the orders and instructions required by Section 2.07(b), the Trustee shall (i) instruct the Common Depositary to deliver, or cause to be delivered, the Global Notes to the Trustee for endorsement and upon receipt thereof, decrease Schedule A to the Regulation S Global Note and increase Schedule A to the Rule 144A Global Note, in each case, by the principal amount of such transfer, and (ii) thereafter, return the Global Notes to the Common Depositary, together with all information regarding the Participant accounts to be credited and debited in connection with such transfer.

(d) *Transfer of Book-Entry Interests in a Rule 144A Global Note to Book-Entry Interests in a Regulation S Global Note.* A Book-Entry Interest in the Rule 144A Global Note may be transferred to a Person who takes delivery thereof in the form of a Book-Entry Interest in the Regulation S Global Note, only if the transfer complies with the requirements of Section 2.07(b) above and the Trustee receives a certificate from the holder of such Book-Entry Interest in the form of Exhibit B hereto, including the certifications in item (2) or (3) thereof.

Upon receipt of such certificates and the orders and instructions required by Section 2.07(b), the Trustee shall (i) instruct the Common Depositary to deliver, or cause to be delivered, the Global Notes to the Common Depositary for endorsement and, upon receipt thereof, increase Schedule A to the Regulation S Global Note and decrease Schedule A to the Rule 144A Global Note, by the principal amount of such transfer, and (ii) thereafter, return the Global Notes to the Common Depositary, together with all information regarding the Participant accounts to be credited and debited in connection with such transfer.

(e) *Transfer of Book-Entry Interests in Global Notes to Definitive Notes.* To the extent permitted by the Depositary, a holder of a Book-Entry Interest in a Global Note may transfer such Book-Entry Interest to a Person who takes delivery thereof in the form of a Definitive Note if the transfer complies with the requirements of Section 2.07(b) above and:

(1) in the case of a transfer on or before January 30, 2007 by a holder of a Book-Entry Interest in a Regulation S Global Note, the Trustee shall have received a certificate to the effect set forth in Exhibit B hereto, including the certifications in either (A) item (1), or (B) item (2) thereof;

(2) in the case of a transfer after January 30, 2007 by a holder of a Book-Entry Interest in a Regulation S Global Note, the transfer complies with Section 2.07(b);

(3) in the case of a transfer by a holder of a Book-Entry Interest in a Rule 144A Global Note to a QIB in reliance on Rule 144A, the Trustee shall have received a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (1) thereof;

(4) in the case of a transfer by a holder of a Book-Entry Interest in a Rule 144A Global Note in reliance on Regulation S, the Trustee shall have received a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (2) thereof; or

(5) in the case of a transfer by a holder of a Book-Entry Interest in a Rule 144A Global Note in reliance on Rule 144, the Trustee shall have received a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3) thereof.

LO\332299.7

Upon receipt of such certificates and the orders and instructions required by Section 2.07(b), the Trustee shall (i) instruct the Common Depositary to deliver, or cause to be delivered, the relevant Global Note to the Trustee for endorsement and upon receipt thereof, decrease Schedule A to the relevant Global Note by the principal amount of such transfer; (ii) thereafter, return the Global Note to the Common Depositary, together with all information regarding the Participant accounts to be debited in connection with such transfer; and (iii) deliver to the Registrar the instructions received by it that contain information regarding the Person in whose name Definitive Notes shall be registered to effect such transfer. The Registrar shall cause any Definitive Note issued in connection with a transfer pursuant to Section 2.07(e)(1)(A), Section 2.07(e)(3), Section 2.07(e)(1)(B) or Section 2.07(e)(4) to have the applicable Private Placement Legend.

The Issuer shall issue and, upon receipt of an Authentication Order from the Issuer in accordance with Section 2.02 hereof, the Authenticating Agent shall authenticate, one or more Definitive Notes in an aggregate principal amount equal to the aggregate principal amount of Book-Entry Interests so transferred and in the names set forth in the instructions received by the Registrar.

(f) *Transfer of Definitive Notes to Book-Entry Interests in Global Notes.*

To the extent permitted by the Depositary, any Holder of a Definitive Note may transfer such Definitive Note to a Person who takes delivery thereof in the form of a Book-Entry Interest in a Global Note only if such transfer occurs after January 30, 2007 and:

(1) in the case of a transfer by a holder of a Regulation S Definitive Note to a person who takes delivery thereof in the form of a Book-Entry Interest in the Regulation S Global Note, the Registrar shall have received a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (2) or (3) thereof;

(2) in the case of a transfer by a holder of Definitive Notes to a QIB in reliance on Rule 144A, the Registrar shall have received a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (1) thereof; or

(3) in the case of a transfer by a holder of a Rule 144A Definitive Notes in reliance on Regulation S or Rule 144 under the U.S. Securities Act, the Registrar shall have received a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (2) or (3) thereof.

Upon satisfaction of the foregoing conditions, the Registrar shall (i) deliver the Definitive Notes to the Registrar for cancellation pursuant to Section 2.12 hereof; (ii) record such transfer on the Register; (iii) instruct the Common Depositary to deliver (A) in the case of a transfer pursuant to Section 2.07(f)(1) or Section 2.07(f)(3) above, the applicable Regulation S Global Note and (B) in the case of a transfer pursuant to Section 2.07(f)(2), the applicable Rule 144A Global Note; (iv) endorse Schedule A to such Global Note to reflect the increase in principal amount resulting from such transfer; and (v) thereafter, return the Global Notes to the Common Depositary, together with all information regarding the Participant accounts to be credited in connection with such transfer.

(g) *Exchanges of Book-Entry Interests in Global Notes for Restricted Definitive Notes.* A holder of a Book-Entry Interest in a Global Note may exchange such Book-Entry Interest for a Restricted Definitive Note if the exchange or transfer complies with the requirements of Section 2.07(b) above and the Trustee receives the following:

(1) if the holder of such Book-Entry Interest in a Global Note proposes to exchange such Book-Entry Interest for a Regulation S Definitive Note, a certificate from such holder in the form of Exhibit C hereto, including the certifications in items 2(a) and 2(b) thereof;

36

(2) if the holder of such Book-Entry Interest in a Global Note proposes to exchange such Book-Entry Interest for a Rule 144A Definitive Note, a certificate from such holder in the form of Exhibit C hereto including the certifications in item 2(a) thereof.

Upon receipt of such certificates and the orders and instructions required by Section 2.07(b), the Trustee shall (i) instruct the Common Depositary to deliver, or cause to be delivered, the relevant Global Note to the Trustee for endorsement and upon receipt thereof, decrease Schedule A to the relevant Global Note by the principal amount of such exchange; (ii) thereafter, return the Global Note to the Common Depositary, together with all information regarding the Participant accounts to be debited in connection with such exchange; and (iii) deliver to the Registrar instructions received by it that contain information regarding the Person in whose name Definitive Notes shall be registered to effect such exchange. The Registrar shall cause all Definitive Notes issued in exchange for a Book-Entry Interest in a Global Note pursuant to this Section 2.07(g) to bear the appropriate legend required by item 2(b) of Exhibit C hereto.

The Issuer shall issue and, upon receipt of an Authentication Order from the Issuer in accordance with Section 2.02 hereof, the Authenticating Agent shall authenticate, one or more Definitive Notes in an aggregate principal amount equal to the aggregate principal amount of Book-Entry Interests so exchanged and in the names set forth in the instructions received by the Registrar.

(h) *Exchanges of Book-Entry Interests in Global Notes for Unrestricted Definitive Notes*.  To the extent permitted by the Depositary, a holder of a Book-Entry Interest in a Global Note may exchange such Book-Entry Interest for an Unrestricted Definitive Note only if the Trustee receives the following:

(1) if the holder of such Book-Entry Interest in a Rule 144A Global Note proposes to exchange such Book-Entry Interest for an Unrestricted Definitive Note, a certificate from such holder in the form of Exhibit C hereto, including the certifications in item 1(a) thereof; or

(2) if the holder of such Book-Entry Interest in a Regulation S Global Note proposes to exchange such Book-Entry Interest for an Unrestricted Definitive Note, a certificate from such holder in the form of Exhibit C hereto, including the certifications in item 1(b) thereof.

Upon receipt of such certificates and the orders and instructions required by Section 2.07(b), the Trustee shall (i) instruct the Common Depositary to deliver, or cause to be delivered, the relevant Global Note to the Trustee for endorsement and upon receipt thereof, decrease Schedule A to the relevant Global Note by the principal amount of such exchange; (ii) thereafter, return the Global Note to the Common Depositary, together with all information regarding the Participant accounts to be debited in connection with such exchange; and (iii) deliver to the Registrar instructions received by it that contain information regarding the Person in whose name Definitive Notes shall be registered to effect such transfer.

The Issuer shall issue and, upon receipt of an Authentication Order from the Issuer in accordance with Section 2.02 hereof, the Authenticating Agent shall authenticate, one or more Definitive Notes in an aggregate principal amount equal to the aggregate principal amount of Book-Entry Interests so exchanged and in the names set forth in the instructions received by the Registrar. Any Definitive Note issued in exchange for a Book-Entry Interest pursuant to this Section 2.07(h) shall not bear the Private Placement Legend.

(i) *Exchanges of Definitive Notes for Book-Entry Interests in Global Notes*.  Any Holder of a Restricted Definitive Note may exchange such Note for a Book-Entry Interest in a Global Note if such exchange complies with Section 2.07(b) above, such exchange takes place after January 31, 2007 and the Registrar receives the following documentation:

37

(1) if the Holder of a Rule 144A Definitive Note proposes to exchange such Note for a Book-Entry Interest in a Rule 144A Global Note, a certificate from such Holder in the form of <u>Exhibit C</u> hereto, including the certifications in item 2(a) thereof;

(2) if the Holder of a Rule 144A Definitive Note proposes to exchange such Note for a Book-Entry Interest in a Regulation S Global Note, a certificate from such Holder in the form of <u>Exhibit C</u> hereto, including the certifications in item 1(a) thereof;

(3) if the Holder of a Regulation S Definitive Notes proposes to exchange such Notes for a Book-Entry Interest in a Regulation S Global Note, a certificate from such Holder in the form of <u>Exhibit C</u> hereto, including the certifications in item 2(a) <u>and</u> (b) thereof;

(4) if the Holder of an Unrestricted Definitive Note proposes to exchange such Note for a Book-Entry Interest in a Regulation S Global Note, a certificate from such Holder in the form of <u>Exhibit C</u> hereto, including the certifications in item 2(a) thereof;

Upon satisfaction of the foregoing conditions, the Registrar shall (i) cancel such Note pursuant to Section 2.12 hereof; (ii) record such exchange on the Register; (iii) instruct the Common Depositary to deliver (A) in the case of an exchange pursuant to Section 2.07(i)(1), the Rule 144A Global Note, and (B) in the case of an exchange pursuant to Section 2.07(i)(2), (3) or (4), the Regulation S Global Note; (iv) endorse <u>Schedule A</u> to such Global Note to reflect the increase in principal amount resulting from such exchange; and (v) thereafter, return the Global Note to the Common Depositary, together with all information regarding the Participant accounts to be credited in connection with such exchange.

(j) *Transfer of Restricted Definitive Notes for Definitive Notes*.

Any Holder of a Restricted Definitive Note may transfer such Note to a Person who takes delivery thereof in the form of Definitive Notes if the transfer complies with Section 2.07(b) above and the Registrar receives the following additional documentation:

(1) in the case of a transfer on or before January 30, 2007 by a holder of a Regulation S Definitive Note, the Registrar shall have received a certificate to the effect set forth in <u>Exhibit B</u> hereto, including the certifications in either (A) item (1), or (B) item (2) thereof;

(2) in the case of a transfer after January 30, 2007 by a holder of a Regulation S Definitive Note, the transfer complies with Section 2.07(b);

(3) in the case of a transfer by a holder of a Rule 144A Definitive Note to a QIB in reliance on Rule 144A, the Registrar shall have received a certificate to the effect set forth in <u>Exhibit B</u> hereto, including the certifications in item (1) thereof;

(4) in the case of a transfer by a holder of a Rule 144A Definitive Note in reliance on Regulation S, the Registrar shall have received a certificate to the effect set forth in <u>Exhibit B</u> hereto, including the certifications in item (2) thereof; or

(5) in the case of a transfer by a holder of a Rule 144A Definitive Note in reliance on Rule 144, the Registrar shall have received a certificate to the effect set forth in <u>Exhibit B</u> hereto, including the certifications in item (3) thereof.

Upon the receipt of any Definitive Note, the Registrar shall cancel such Note pursuant to Section 2.12 hereof and complete and deliver to the Issuer (i) in the case of a transfer pursuant to Section 2.07(j)(1)(A) or Section 2.07(j)(3), a Rule 144A Definitive Note; (ii) in the case of a transfer pursuant to Section 2.07(j)(1)(B) or Section 2.07(j)(4), a Regulation S Definitive Note; and (iii) in the case of a transfer pursuant to Section 2.07(j)(2) or Section 2.07(j)(5), an Unrestricted Definitive Note.

38

The Issuer shall execute and the Authenticating Agent shall authenticate and deliver such Definitive Note to such Person(s) as the Holder of the surrendered Definitive Note shall designate.

(k) *Transfer of Unrestricted Definitive Notes*.  Any Holder of an Unrestricted Definitive Note may transfer such Note to a Person who takes delivery thereof in the form of Definitive Notes if the transfer complies with Section 2.07(b) above.

(l) *Legends*

(1) *Private Placement Legend*.  The following legend shall appear on the face of all Notes issued under this Indenture, unless the Issuer determines otherwise in compliance with applicable law:

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933 (THE "U.S. SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. NEITHER THIS NOTE NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION. THE HOLDER OF THIS NOTE, BY ITS ACCEPTANCE HEREOF, AGREES ON ITS OWN BEHALF AND ON BEHALF OF ANY INVESTOR ACCOUNT FOR WHICH IT HAS PURCHASED SECURITIES, TO OFFER, SELL OR OTHERWISE TRANSFER SUCH NOTE, PRIOR TO THE DATE (THE "RESALE RESTRICTION TERMINATION DATE") THAT IS [*IN THE CASE OF RULE 144A NOTES*: TWO YEARS] [*IN THE CASE OF REGULATION S NOTES*: 40 DAYS] AFTER THE LATER OF THE ORIGINAL ISSUE DATE HEREOF AND THE LAST DATE ON WHICH THE ISSUER OR ANY AFFILIATE OF THE ISSUER WAS THE OWNER OF THIS NOTE (OR ANY PREDECESSOR OF SUCH NOTE), ONLY (A) TO THE ISSUER, (B) PURSUANT TO A REGISTRATION STATEMENT THAT HAS BEEN DECLARED EFFECTIVE UNDER THE U.S. SECURITIES ACT, (C) FOR SO LONG AS THE SECURITIES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE U.S. SECURITIES ACT, TO A PERSON IT REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE U.S. SECURITIES ACT THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (D) PURSUANT TO OFFERS AND SALES THAT OCCUR OUTSIDE THE UNITED STATES WITHIN THE MEANING OF REGULATION S UNDER THE U.S. SECURITIES ACT, (E) TO AN INSTITUTIONAL "ACCREDITED INVESTOR" WITHIN THE MEANING OF RULE 501(a)(1), (2), (3) OR (7) UNDER THE U.S. SECURITIES ACT THAT IS AN INSTITUTIONAL ACCREDITED INVESTOR ACQUIRING THE NOTE FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF SUCH AN INSTITUTIONAL ACCREDITED INVESTOR, IN EACH CASE IN A MINIMUM PRINCIPAL AMOUNT OF THE SECURITIES OF $250,000, FOR INVESTMENT PURPOSES AND NOT WITH A VIEW TO OR FOR OFFER OR SALE IN CONNECTION WITH ANY DISTRIBUTION IN VIOLATION OF THE U.S. SECURITIES ACT, OR (F) PURSUANT TO ANOTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE U.S. SECURITIES ACT, SUBJECT TO THE ISSUER'S AND THE TRUSTEE'S RIGHT PRIOR TO ANY SUCH OFFER, SALE OR TRANSFER PURSUANT TO CLAUSES (D), (E) OR (F) TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, CERTIFICATION AND/OR OTHER INFORMATION SATISFACTORY TO EACH OF THEM. THIS LEGEND WILL BE REMOVED UPON THE REQUEST OF THE HOLDER AFTER THE RESALE RESTRICTION TERMINATION DATE.

EACH PURCHASER OF THIS NOTE OR ANY INTEREST HEREIN AGREES THAT IT

39

WILL DELIVER TO EACH PURCHASER OF THIS NOTE OR BOOK-ENTRY INTERESTS HEREIN A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND.

THIS NOTE (OR ANY INTEREST THEREIN) MAY NOT BE SOLD, TRANSFERRED OR DELIVERED TO INDIVIDUALS OR LEGAL ENTITIES WHO ARE ESTABLISHED, DOMICILED OR HAVE THEIR RESIDENCE IN THE NETHERLANDS ("DUTCH RESIDENTS") OTHER THAN PROFESSIONAL MARKET PARTIES ("PMP") UNDER THE DUTCH ACT ON THE SUPERVISION OF CREDIT INSTITUTIONS 1992 (AS AMENDED).

EACH DUTCH RESIDENT BY PURCHASING THIS NOTE (OR ANY INTEREST THEREIN), WILL BE DEEMED TO HAVE REPRESENTED AND AGREED FOR THE BENEFIT OF THE ISSUER THAT IT IS A PMP AND IS ACQUIRING THIS NOTE (OR ANY INTEREST THEREIN) FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A PMP.

EACH HOLDER OF THIS NOTE (OR ANY INTEREST THEREIN), BY PURCHASING SUCH NOTE (OR ANY INTEREST THEREIN), WILL BE DEEMED TO HAVE REPRESENTED AND AGREED FOR THE BENEFIT OF THE ISSUER THAT (1) SUCH NOTE (OR ANY INTEREST THEREIN) MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED TO ANY DUTCH RESIDENT OTHER THAN A PMP ACQUIRING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A PMP AND THAT (2) IT WILL PROVIDE NOTICE OF THE TRANSFER RESTRICTIONS DESCRIBED HEREIN TO ANY SUBSEQUENT TRANSFEREE.

THE HOLDER OF THIS NOTE, BY ITS ACCEPTANCE HEREOF, AGREES ON ITS OWN BEHALF AND ON BEHALF OF ANY INVESTOR ACCOUNT FOR WHICH IT HAS PURCHASED SECURITIES THAT IT SHALL NOT TRANSFER THE SECURITIES IN AN AMOUNT LESS THAN €100,000.

THE FOLLOWING INFORMATION IS SUPPLIED SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES.  THIS NOTE WAS ISSUED WITH "ORIGINAL ISSUE DISCOUNT" ("OID") WITHIN THE MEANING OF SECTION 1273 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), AND THIS LEGEND IS REQUIRED BY SECTION 1275(c) OF THE CODE:

Holders may obtain information regarding the amount of OID, the issue price, the issue date, and the yield to maturity relating to the Notes by contacting Alain Peigneux at 8-10, rue Mathias Hardt, L-1717 Luxembourg +352 4800 021.

> (2) *Global Note Legend*.  Each Global Note shall bear a legend in substantially the following form:

"THIS GLOBAL NOTE IS HELD BY THE COMMON DEPOSITARY (AS DEFINED IN THE INDENTURE GOVERNING THIS NOTE) OR ITS NOMINEE IN CUSTODY FOR THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF, AND IS NOT TRANSFERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT THAT (i) THIS GLOBAL NOTE MAY BE EXCHANGED IN WHOLE BUT NOT IN PART PURSUANT TO SECTION 2.07(a) OF THE INDENTURE; AND (ii) THIS GLOBAL NOTE MAY BE DELIVERED IN ACCORDANCE WITH SECTION 2.07(m) OF THE INDENTURE TO THE REGISTRAR FOR CANCELLATION PURSUANT TO SECTION 2.12 OF THE INDENTURE."

40

(m) *Cancellation*. At such time as all Book-Entry Interests have been exchanged for Definitive Notes or all Global Notes have been redeemed or repurchased, the Global Notes shall be returned to the Registrar for cancellation in accordance with Section 2.12 hereof.

(n) *General Provisions Relating to Registration of Transfers and Exchanges*. To permit registration of transfers and exchanges, the Issuer shall execute and the Authentication Agent shall authenticate Global Notes and Definitive Notes upon the Issuer's order in accordance with the provisions of Section 2.02 hereof.

(1) No service charge shall be made to a Holder for any registration of transfer or exchange, but the Issuer or the Parent Guarantor may require payment of a sum sufficient to cover any taxes, duties or governmental charge payable in connection therewith (other than any such taxes, duties or governmental charge payable upon exchange or transfer pursuant to Sections 2.11, 4.10, 4.15 and 9.05 hereof).

(2) All Global Notes and Definitive Notes issued upon any registration of transfer or exchange of Global Notes or Definitive Notes shall be the valid obligations of the Issuer and each Guarantor, evidencing the same debt and entitled to the same benefits under this Indenture, as the Global Notes or Definitive Notes surrendered upon such registration of transfer or exchange.

(3) The Issuer shall not be required to register the transfer of or, to exchange, Definitive Notes during (A) a period beginning at the opening of business 15 calendar days before any Redemption Date and ending at the close of business on the Redemption Date; (B) a period beginning at the opening of business 15 calendar days immediately prior to the date fixed for selection of Notes to be redeemed in part, and ending at the close of business on the date on which such Notes are selected; (C) which the holder has tendered (and not withdrawn) for repurchase in connection with a Change of Control Offer or an Excess Proceeds Offer; or (D) the period between a Regular Record Date and the next succeeding Interest Payment Date.

(4) As soon as practicable after delivering any Global Note or Definitive Note, the Registrar shall supply to the Trustee and the Paying Agent all relevant details of the Notes delivered.

Section 2.08    *Replacement Notes*.

If a mutilated Note is surrendered to a Paying Agent, the Registrar or the Trustee, or if the Holder of a Note claims that the Note has been lost, destroyed or wrongfully taken, the Issuer shall issue and the Authenticating Agent shall authenticate a replacement Note in such form as the Notes mutilated, lost, destroyed or wrongfully taken if, in the case of a lost, destroyed or wrongfully taken Note, the Holder of such Note furnishes to the Issuer, the Paying Agent, the Registrar, the Authenticating Agent and/or the Trustee, as applicable, evidence reasonably acceptable to them of the ownership and the destruction, loss or theft of such Note. If required by the Issuer, the Paying Agent, the Registrar, the Authenticating Agent or the Trustee, an indemnity bond shall be posted, sufficient in the judgment of each to protect the Issuer, the Paying Agent, the Registrar, the Authenticating Agent and the Trustee from any loss that any of them may suffer if such Note is replaced. The Issuer may charge such Holder for the Issuer's exceptional out-of-pocket expenses in replacing such Note, and the Paying Agent, the Registrar and the Trustee may charge the Issuer for their expenses in replacing such Note. Every replacement Note shall constitute an additional obligation of the Issuer. If, after the delivery of such replacement Note, a bona fide purchaser of the original Note in lieu of which such replacement Note was issued presents for payment or registration such original Note, the Trustee shall be entitled to recover such replacement Note from the Person to whom it was delivered or any Person taking therefrom, except a bona fide purchaser, and shall be entitled to recover upon the security or indemnity provided therefore to the extent of any loss, damage, cost or expense incurred

41

by the Issuer, the Trustee and the Paying Agent; *however*, Notes held by the Issuer or a Subsidiary of the Issuer shall not be deemed to be outstanding for purposes of Section 3.07(b) hereof.

Section 2.09    *Outstanding Notes*.

The Notes outstanding at any time are all Notes that have been authenticated by the Authenticating Agent except for (i) those cancelled by the Registrar; (ii) those delivered to the Registrar for cancellation; (iii) to the extent set forth in Section 8.02 on or after the date on which the conditions set forth in Section 8.04 have been satisfied, those Notes theretofore authenticated by the Authenticating Agent and delivered by the Registrar hereunder; (iv) Notes in respect of which the Issuer and each Guarantor have been fully discharged for the payment of principal, premium, interest and Additional Amounts; and (v) those Notes described in this Section 2.09 as not outstanding. Subject to Section 2.10 hereof, a Note does not cease to be outstanding because the Issuer or one of its Affiliates holds the Note.

If a Note is replaced pursuant to Section 2.08 hereof, it ceases to be outstanding unless the Trustee and the Registrar receive proof satisfactory to them that the replaced Note is held by a bona fide purchaser in whose hands such Note is a legal, valid and binding obligation of the Issuer.

If the principal amount of any Note is considered to be paid under Section 4.01, it ceases to be outstanding and interest thereon shall cease to accrue.

A mutilated Note ceases to be outstanding upon surrender of such Note and replacement thereof pursuant to Section 2.08.

If one or more Paying Agents hold, in their capacity as such, on the Maturity Date or on any Redemption Date, money sufficient to pay all principal, premium, Additional Amounts, if any, and accrued interest with respect to the outstanding Notes payable on that date and are not prohibited from paying such money to the Holders thereof pursuant to the terms of this Indenture, then on and after that date such Notes cease to be outstanding and interest on them ceases to accrue.

Section 2.10    *Treasury Notes*.

In determining whether the Holders of the required principal amount of Notes have concurred in any direction, waiver or consent, Notes owned by the Issuer, or by any Person directly or indirectly controlling or controlled by or under direct or indirect common control with the Issuer or any Guarantor, shall be considered as though not outstanding, except that for the purposes of determining whether the Trustee shall be protected in relying on any such direction, waiver or consent, only Notes that a Responsible Officer of the Trustee knows or believes are so owned shall be so disregarded.

Section 2.11    *Temporary Notes*.

Until definitive Notes are prepared and ready for delivery, the Issuer may prepare, and the Authenticating Agent shall authenticate, temporary Notes. Temporary Notes shall be substantially in the form of definitive Notes but may have variations that the Issuer considers appropriate for temporary Notes. Without unreasonable delay, the Issuer shall prepare, and the Authenticating Agent shall authenticate, definitive Notes in exchange for temporary Notes. Until such exchange, temporary Notes shall be entitled to the same rights, benefits and privileges as definitive Notes.

Section 2.12    *Cancellation*.

The Issuer at any time may deliver Notes to the Registrar for cancellation. Each Paying Agent shall forward to the Registrar any Definitive Notes surrendered to it for registration of transfer or exchange, or payment, redemption or purchase. The Common Depositary shall cause all Global Notes to be delivered to the Registrar for cancellation under the circumstances set forth in Section

2.07(m).  The Registrar shall cancel all Notes surrendered for registration of transfer, exchange, payment, replacement, cancellation or purchase and shall dispose of cancelled Notes in accordance with its policy of disposal, unless the Issuer directs the Registrar in writing to return such Notes to the Issuer, and, if so disposed, shall deliver a certificate of disposition thereof to the Issuer.  The Issuer may not reissue or resell, or issue new Notes to replace, Notes that the Issuer has redeemed, paid, purchased or converted, or that have been delivered to the Registrar for cancellation.  For so long as the Notes remain listed on the official list of the Luxembourg Stock Exchange and admitted to trading on the Euro MTF market, the Issuer will inform the Luxembourg Stock Exchange of any such cancellation.

Section 2.13    *Defaulted Interest*.

If the Issuer defaults on a payment of interest on the Notes, it shall pay the defaulted interest, *plus* (to the extent permitted by law) any interest payable on the defaulted interest, in accordance with the terms hereof, to the Persons who are Holders of Notes, if any, on a subsequent special record date, which date shall be at least ten Business Days prior to the payment date and shall notify the Trustee in writing of the amount of defaulted interest proposed to be paid on the Notes and the date of such proposed payment.  The Issuer shall fix such special record date and payment date in a manner satisfactory to the Trustee.  At least 15 days before such special record date, the Issuer shall mail by first-class mail to the Common Depositary, each Depositary and, if any Definitive Notes are outstanding, each Holder, a notice that states the special record date, the payment date and the amount of defaulted interest and interest payable on such defaulted interest, if any, to be paid and whether it is to be paid in the form of cash or Additional Notes.

Section 2.14    *Common Code and ISIN Number*.

The Issuer in issuing the Notes may use a "Common Code" number or an "ISIN" number, and if so, such Common Code and/or ISIN number shall be included in notices of redemption or purchase as a convenience to Holders; *provided*, *however*, that any such notice may state that no representation is made as to the correctness or accuracy of the Common Code and/or ISIN number printed in the notice or on the Notes, and that reliance may be placed only on the other identification numbers printed on the Notes.  The Issuer will promptly notify the Trustee and the Paying Agent of any change in the Common Code and/or ISIN number.

Section 2.15    *Deposit of Moneys*.

Prior to 10:00 am (London time), on each Interest Payment Date, the Maturity Date and each payment date relating to an Excess Proceeds Offer or a Change of Control Offer, and on the Business Day immediately following any acceleration of the Notes pursuant to Section 6.02 (except with respect to payments of interest, any Additional Notes and any Additional Amounts in the form of Additional Notes in accordance with the terms of this Indenture), the Issuer shall deposit with the Paying Agent, in immediately available funds, money in euro sufficient to make cash payments, if any, due on such Interest Payment Date, Maturity Date, the payment date relating to an Excess Proceeds Offer or a Change of Control Offer, or Business Day, as the case may be.  Subject to receipt of such funds as provided by this Section 2.15 by the designated Paying Agent, such Paying Agent shall remit such payment in a timely manner to the Holders on such Interest Payment Date, Maturity Date, the payment date relating to an Excess Proceeds Offer or a Change of Control Offer, or Business Day, as the case may be, to the Persons and in the manner set forth in paragraph 2 of the Notes.

Section 2.16    *Currency*.

The euro is the only currency of account and payment for all sums payable by the Issuer or any Guarantor under or in connection with this Indenture, the Notes and Guarantees, in each case, including any damages. Any amount received or recovered in a currency other than euro whether as a

43

result of, or of the enforcement of, a judgment or order of a court of any jurisdiction, in the winding-up or dissolution of the Issuer or a Guarantor or otherwise) by the Trustee or any Holder in respect of any amount of euro expressed to be due to it from the Issuer or any Guarantor will constitute a discharge of the Issuer or a Guarantor, as the case may be, only to the extent of the euro amount which the recipient is able to purchase with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date due to currency market conditions generally, on the first date on which it is practicable to do so).  If that euro amount is less than the euro amount expressed to be due to the recipient under the Note, or the respective Guarantee, the Issuer and each Guarantor, jointly and severally, will indemnify the recipient against any loss sustained by it as a result, including the cost of making any such purchase. For the purposes of this indemnity, it will be sufficient for the Trustee or the Holder, as applicable, to certify (indicating the sources of information used) that it would have suffered a loss had the actual purchase of euro been made with the amount so received in that other currency on the date of receipt or recovery (or, if a purchase of euro on such date had not been practicable due to currency market conditions generally, on the first date on which it would have been practicable, it being required that the need for a change of date be certified in the manner mentioned above).

These indemnities, to the extent permitted by law:

(1) constitute a separate and independent obligation from the other obligations of the Issuer and each Guarantor;

(2) will give rise to a separate and independent cause of action;

(3) will apply irrespective of any indulgence or waiver granted by any Holder; and

(4) will continue in full force and effect despite any other judgment, order, claim or proof for a liquidated amount in respect of any sum due under this Indenture or any Note or Guarantee or any other judgment or order.

Section 2.17    *Issuance of Additional Notes*

(a) The Issuer shall issue Additional Notes under this Indenture as interest and Additional Amounts, as applicable, unless the Issuer elects to pay interest or Additional Amounts in cash. The Additional Notes shall have identical terms as the Original Notes issued on the Issue Date, except that interest will begin to accrue from the date they are issued rather than the Issue Date.  Any Additional Notes issued as provided for herein and the Original Notes will be treated as a single class and as part of the same series for all purposes (including waivers, amendments, redemption and offers to purchase) under this Indenture.

(b) With respect to any Additional Notes, the Issuer shall deliver to the Trustee and the Paying Agent:

(1) no later than the record date for the relevant Interest Payment Date, a written notice setting forth the extent to which such interest payment will be made in the form of cash, if election is made to pay in cash, and if no such election is made, such interest payment shall otherwise be payable in Additional Notes; and

(2) no later than two Business Days prior to the relevant Interest Payment Date, (i) if such Notes are in definitive form, the required amount of new definitive Additional Notes and an order to authenticate and deliver such Additional Notes or (ii) if such Notes are in global form, an order to increase the principal amount of such Notes by the relevant amount (or, if necessary, to authenticate a new Global Note executed by the Issuer with such increased principal amounts).

44

(c) Any Additional Notes shall, after being executed and authenticated pursuant to Section 2.02, be (i) mailed to the person entitled thereto as shown on the register for the Definitive Notes if the Notes are then held in the form of Definitive Notes as of the relevant record date, or (ii) deposited into the account specified by the Holder or Holders thereof as of the relevant record date if the Notes are held in global form.  Alternatively, the Issuer may direct the Paying Agent to make the appropriate amendments to the schedule of principal amounts of the relevant Global Notes outstanding and arrange for deposit into the account specified by the Holder or Holders thereof as of the relevant record date.  Payment shall be made in such form and upon such terms as specified herein and the Issuer shall and the Paying Agent may take additional steps as is necessary to effect such payment.

(d) With respect to any Additional Notes issued after the Issue Date (except for Notes authenticated and delivered upon registration of transfer of, or in exchange for, or in lieu of, other Notes pursuant to Sections 2.07, 2.08, 2.09, 2.11 and 3.06), the aggregate principal amount of such Additional Notes which may be authenticated and delivered under this Indenture shall be (i) established in or pursuant to a resolution of the Board of Directors of the Issuer (provided that any such resolution may authorize authentication of up to a maximum aggregate principal amount from time to time without referring to aggregate principal amounts for specific interest periods) and (ii) set forth or determined in an Officer's Certificate of the Issuer.  If any of the terms of any Additional Notes are established by action taken pursuant to a resolution of the Board of Directors, a copy of an appropriate record of such action shall be certified by an Office's Certificate of the Issuer and delivered to the Trustee at or prior to the delivery of the Officer's Certificate of the Issuer in accordance with Section 2.17(d)(ii).

# ARTICLE 3
## REDEMPTION AND PREPAYMENT

Section 3.01    *Notices to Trustee*.

If the Issuer elects to redeem Notes pursuant to the optional redemption provisions of Section 3.07 hereof, it must furnish to the Trustee, at least 30 days but not more than 60 days before a redemption date, an Officer's Certificate setting forth:

> (1) the clause of this Indenture pursuant to which the redemption shall occur;

> (2) the redemption date and the record date;

> (3) the principal amount of Notes to be redeemed; and

> (4) the redemption price.

Section 3.02    *Selection of Notes to Be Redeemed or Purchased*.

If the Issuer is redeeming less than all of the Notes at any time, the Trustee will select the Notes to be redeemed as follows: (i) if the Notes to be redeemed are listed on any securities exchange, in compliance with the requirements, if any, of the principal securities exchange on which the Notes are listed as certified to the Trustee by the Issuer; or (ii) if the Notes to be redeemed are not listed on any securities exchange, or are listed on a securities exchange which does not require or specify the manner in which the Notes to be redeemed are to be selected, on a pro rata basis or by such other method as the Trustee in its sole discretion will deem to be fair and appropriate.

Notwithstanding the foregoing, no Notes of €100,000 in aggregate principal amount or less shall be redeemed in part.  Except as provided in the preceding sentence, provisions of this Indenture that apply to Notes called for redemption or purchase also apply to portions of Notes called for redemption or purchase.

LO\332299.7

In the event of partial redemption or purchase, the particular Notes to be redeemed or purchased will be selected, unless otherwise provided herein, not less than 30 nor more than 60 days prior to the redemption or purchase date by the Trustee from the outstanding Notes not previously called for redemption or purchase.  The Trustee will promptly notify the Issuer in writing of the Notes selected for redemption or purchase and, in the case of any Note selected for partial redemption or purchase, the principal amount thereof to be redeemed or purchased.

Section 3.03    *Notice of Redemption*.

Subject to the provisions of Section 4.10 hereof, the Issuer will cause notices of redemption to be mailed by first class mail at least 30 but not more than 60 days before the redemption date to each Holder of Notes to be redeemed at its registered address.  Any such notice of redemption may be subject to the satisfaction of one or more conditions precedent.  In addition, so long as any Notes are admitted to the official list of the Luxembourg Stock Exchange and admitted to trading on the Euro MTF market, and to the extent required by the Luxembourg Stock Exchange, the Issuer will provide a copy of all notices to the Luxembourg Stock Exchange for publication on the Luxembourg Stock Exchange's website (www.bourse.lu).

The notice will identify the Notes to be redeemed and will state:

(1) the redemption date and the record date;

(2) the redemption price;

(3) if any Note is being redeemed in part, the portion of the principal amount of such Note to be redeemed and that, after the redemption date upon surrender of such Note, a new Note or Notes in principal amount equal to the unredeemed portion will be issued upon cancellation of the original Note;

(4) the name and address of the Paying Agent;

(5) that Notes called for redemption must be surrendered to the Paying Agent to collect the redemption price;

(6) that, unless the Issuer defaults in making such redemption payment, interest on Notes called for redemption ceases to accrue on and after the redemption date;

(7) the paragraph of the Notes and/or Section of this Indenture pursuant to which the Notes called for redemption are being redeemed; and

(8) that no representation is made as to the correctness or accuracy of the Common Codes or ISIN number, if any, listed in such notice or printed on the Notes.

At the Issuer's request, the Trustee will give the notice of redemption in the Issuer's name and at its expense; *provided, however*, that the Issuer has delivered to the Trustee, at least 45 days prior to the redemption date, an Officer's Certificate requesting that the Trustee give such notice and setting forth the information to be stated in such notice as provided in the preceding paragraph.

Section 3.04    *Effect of Notice of Redemption*.

Once notice of redemption is mailed in accordance with Section 3.03 hereof or published in accordance with Section 14.02, Notes called for redemption become due and payable on the redemption date at the redemption price upon the satisfaction of any conditions precedent to which such notice of redemption is subject.

LO\332299.7

Section 3.05    *Deposit of Redemption or Purchase Price*.

One Business Day prior to the redemption or purchase date, the Issuer will deposit with the Paying Agent money sufficient to pay the redemption or purchase price of and accrued interest on all Notes to be redeemed or purchased on that date.  The Paying Agent will promptly return to the Issuer any money deposited with the Paying Agent by the Issuer in excess of the amounts necessary to pay the redemption or purchase price of, and accrued interest on, all Notes to be redeemed or purchased.

If the Issuer complies with the provisions of the preceding paragraph, on and after the redemption or purchase date, interest will cease to accrue on the Notes or the portions of Notes called for redemption or purchase.  If a Note is redeemed or purchased on or after an interest record date but on or prior to the related interest payment date, then any accrued and unpaid interest shall be paid to the Person in whose name such Note was registered at the close of business on such record date.  If any Note called for redemption or purchase is not so paid upon surrender for redemption or purchase because of the failure of the Issuer to comply with the preceding paragraph, interest shall be paid on the unpaid principal, from the redemption or purchase date until such principal is paid, and to the extent lawful on any interest not paid on such unpaid principal, in each case at the rate provided in the Notes and in Section 4.01 hereof.

Section 3.06    *Notes Redeemed or Purchased in Part*.

Upon surrender of a Note that is redeemed or purchased in part, the Issuer will issue and, upon receipt of an Authentication Order, the Trustee will authenticate for the Holder at the expense of the Issuer a new Note equal in principal amount to the unredeemed or unpurchased portion of the Note surrendered.

Section 3.07    *Optional Redemption*.

(a) Except as set forth below or under Section 3.09, the Issuer will not be entitled to redeem the Notes at its option prior to January 15, 2008.

(b) On and after January 15, 2008, the Issuer will be entitled at its option to redeem all or a portion of the Notes upon not less than 30 nor more than 60 days' notice, at the redemption prices (expressed in percentages of principal amount on the redemption date), plus accrued and unpaid interest to the redemption date (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant interest payment date) set forth below, if redeemed during the 12 month period commencing on January 15 of the years set forth below:

| Period | Redemption Price |
|---|---|
| 2008 | 102% |
| 2009 | 101% |
| 2010 and Thereafter | 100% |

(c)  Any redemption pursuant to this Section 3.07 shall be made pursuant to the provisions of Sections 3.01 through 3.06 hereof.

Section 3.08    *Mandatory Redemption*.

The Issuer is not required to make mandatory redemption or sinking fund payments with respect to the Notes.

Section 3.09    *Redemption for Changes in Withholding Tax*.

The Issuer may at its option at any time upon giving not less than 30 nor more than 60 days' notice to Holders redeem all (but not less than all) of the Notes then outstanding, at 100% of the

47

aggregate principal amount thereof, plus accrued and unpaid interest and Additional Amounts, if any, to such redemption date (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant interest payment date), in the event the Issuer or Guarantor has become, or would become, obligated to pay, on the next date on which any amount would be payable with respect to such Notes, any Additional Amounts as a result of:

(1) a change in or an amendment to the laws (including any regulations promulgated thereunder) of a Relevant Taxing Jurisdiction affecting taxation; or

(2) any change in or amendment to any official position regarding the application or interpretation of such laws or regulations (each of (1) and (2) a "*Change of Tax Law*"),

which change or amendment is announced or becomes effective on or after the date hereof and the Issuer cannot avoid such obligation by taking reasonable measures available to it.

Notwithstanding the foregoing, no such notice of redemption may be given earlier than 90 days prior to the earliest date on which the Issuer or Guarantor would be obligated to pay such Additional Amounts were a payment in respect of the Notes then due and payable.

Before the Issuer publishes or mails notice of redemption of the Notes as described above, it will deliver to the Trustee an Officer's Certificate to the effect that it cannot avoid its obligation to pay Additional Amounts by taking reasonable measures available to it and an opinion in form and substance reasonably satisfactory to the Trustee of independent legal counsel of recognized standing stating that the Issuer or Guarantor is or would be obligated to pay Additional Amounts as a result of a Change in Tax Law.

The foregoing provisions will apply *mutatis mutandis* to any successor Person to the Issuer or Guarantor after such successor Person becomes a party to this Indenture.

For so long as the Notes are listed and admitted for trading on the Euro MTF market of the Luxembourg Stock Exchange, and to the extent the rules and regulations of the Luxembourg Stock Exchange so require, the Issuer will provide a copy of any such notice to the Luxembourg Stock Exchange. Notices of redemption will be given in accordance with the provisions set forth under Section 3.03.

## ARTICLE 4
## COVENANTS

Section 4.01    *Payment of Notes*.

The Issuer will pay or cause to be paid the principal of, premium, if any, and interest on, the Notes on the dates and in the manner provided in the Notes and in this Indenture. Principal, premium, if any, and interest will be considered paid on the date due if the Paying Agent, if other than the Parent Guarantor or a Subsidiary thereof, holds as of 10:00 a.m. London time in respect of payments to be made in London, 10:00 a.m. Luxembourg time in respect of payments to be made in Luxembourg or 10:00 a.m. New York time in respect of payments to be made in New York, on the due date interest (in the form of Additional Notes, unless the Issuer has elected to pay interest in cash) deposited by the Issuer (if cash, in immediately available funds) and designated for and sufficient to pay all principal, premium, if any, and interest then due.

The Issuer will pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal at the rate equal to 1% per annum in excess of the then applicable interest rate on the Notes to the extent lawful; it will pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest (without regard to any applicable grace period) at the same rate to the extent lawful.

48

LO\332299.7

Section 4.02     *Maintenance of Office or Agency.*

The Issuer will maintain in Luxembourg and in London, an office or agency (which may be an office of the Trustee or an affiliate of the Trustee, Registrar or co-registrar) where Notes may be surrendered for registration of transfer or for exchange and where notices and demands to or upon the Issuer in respect of the Notes and this Indenture may be served.  The Issuer will give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency.  If at any time the Issuer fails to maintain any such required office or agency or fails to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office of the Trustee.

The Issuer may also from time to time designate one or more other offices or agencies where the Notes may be presented or surrendered for any or all such purposes and may from time to time rescind such designations; *provided, however*, that no such designation or rescission will in any manner relieve the Issuer of its obligation to maintain an office or agency in Luxembourg or London for such purposes.  The Issuer will give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

The Issuer hereby designates the Corporate Trust Office of the Trustee as one such office or agency of the Issuer in accordance with Section 2.03 hereof.

Section 4.03     *Reports.*

Subject to compliance with applicable law, so long as the Notes are outstanding, the Parent Guarantor will provide the Trustee (who, at the Parent Guarantor's expense, will furnish by mail to the Holders):

(1) within 120 days after the end of the Parent Guarantor's fiscal year, annual reports containing the following information with a level of detail that is substantially comparable to the offering memorandum dated December 18, 2006 in respect of the offering of the Notes: (a) audited consolidated balance sheet of the Parent Guarantor as of the end of the most recent fiscal year and audited consolidated income statements and statements of cash flow of the Parent Guarantor for the two most recent fiscal years, including complete footnotes to such financial statements and the report of the independent auditors on the financial statements; (b) *pro forma* income statement and balance sheet information, together with explanatory footnotes, for any material acquisitions, dispositions or recapitalizations that have occurred since the beginning of the most recently completed fiscal year, unless *pro forma* information has been provided in a previous report pursuant to clause 2(b) below (*provided* that such *pro forma* financial information will be provided only to the extent available without unreasonable expense, in which case, the Parent Guarantor will provide, in the case of a material acquisition, acquired company financial statements); (c) an operating and financial review of the audited financial statements, including a discussion of the results of operations, financial condition and liquidity and capital resources, and a discussion of material commitments and contingencies and critical accounting policies; (d) a description of the business, management and shareholders of the Parent Guarantor, all material affiliate transactions and a description of all material contractual arrangements, including material debt instruments; and (e) material risk factors and material recent developments;

(2) within 60 days following the end of each fiscal quarter in each fiscal year of the Parent Guarantor, quarterly reports containing the following information: (a) an unaudited condensed consolidated balance sheet as of the end of such quarter and unaudited condensed statements of income and cash flow for the quarterly and year to date periods ending on the unaudited condensed balance sheet date, and the comparable prior year periods, together with condensed footnote disclosure or such lesser financial information that would be required in a report on Form 10-Q; (b) *pro forma* income statement and balance sheet information, together

49

LO\332299.7

with explanatory footnotes, for any material acquisitions, dispositions or recapitalizations that have occurred since the beginning of the most recently completed fiscal quarter, *provided* that such *pro forma* financial information will be provided only to the extent available without unreasonable expense, in which case, the Parent Guarantor will provide, in the case of a material acquisition, acquired company financials or such lesser financial information that would be required in a report on Form 10-Q; (c) an operating and financial review of the unaudited financial statements, including a discussion of material commitments and contingencies and changes in critical accounting policies; and (d) material recent developments and any material changes to the risk factors disclosed in the most recent annual report; and

(3) promptly after the occurrence of a material acquisition, disposition, restructuring or change in accountants or any other material event that the Parent Guarantor announces publicly, a report containing a description of such event;

*provided, however,* that the reports set forth in clauses (1), (2) and (3) above will not be required to (i) contain any reconciliation to U.S. generally accepted accounting principles, except as otherwise required herein, or (ii) include separate financial statements for any Guarantor or non-guarantor Subsidiaries of the Parent Guarantor or certifications or exhibits required to be filed with reports filed with the U.S. Securities and Exchange Commission.

At any time that any of the Parent Guarantor's Subsidiaries are Unrestricted Subsidiaries, then the quarterly and annual financial information required by the preceding paragraph will include a reasonably detailed presentation, either on the face of the financial statements or in the footnotes thereto, and in the review of the financial conditions and results of operations of the Parent Guarantor and its Restricted Subsidiaries separate from the financial condition and results of operations of the Unrestricted Subsidiaries of the Parent Guarantor.

All financial statement information required under this Section 4.03 (i) will be prepared on a consistent basis in accordance with the accounting standards adopted by the International Accounting Standards Board and its predecessors, as adopted by the European Union, as in effect from time to time (or such other jurisdiction as may be selected in good faith by the Parent Guarantor from time to time) and (ii) from and after such time as such principles vary from IFRS in a material manner, will be accompanied by a reconciliation to IFRS.

In addition, during any period which the Parent Guarantor is not subject to Section 13 or 15(d) of the Exchange Act nor exempt therefrom pursuant to Rule 12g3-2(b), the Parent Guarantor will furnish to the Holders of the Notes and to prospective investors, upon the requests of such Holders, any information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act.

The Parent Guarantor will also make available copies of the above information required by clauses (1) through (3) above (x) on the website of TIM Hellas Telecommunications S.A., and (y) if and for so long as the Notes are admitted to listing on the official list of the Luxembourg Stock Exchange and are admitted for trading on the Euro MTF market and the Luxembourg Stock Exchange so requires, at the office of the paying agent in Luxembourg.

Section 4.04    *Compliance Certificate.*

(a)  The Issuer and each Guarantor shall deliver to the Trustee, within 120 days after the end of each fiscal year, an Officer's Certificate stating that a review of the activities of the Parent Guarantor and its Subsidiaries during the preceding fiscal year has been made under the supervision of the signing Officers with a view to determining whether the Parent Guarantor, the Issuer and any other Guarantor have kept, observed, performed and fulfilled their obligations under this Indenture and the Security Document, and further stating, as to each such Officer signing such certificate, that to the best of his or her knowledge the Parent Guarantor, the Issuer and any other Guarantor have kept,

50

observed, performed and fulfilled each and every covenant contained in this Indenture and the Security Document and are not in default in the performance or observance of any of the terms, provisions and conditions of this Indenture or the Security Document (or, if a Default or Event of Default has occurred, describing all such Defaults or Events of Default of which he or she may have knowledge and what action the Parent Guarantor, Issuer or any other Guarantor are taking or propose to take with respect thereto) and that to the best of his or her knowledge no event has occurred and remains in existence by reason of which payments on account of the principal of or interest, if any, on the Notes is prohibited or if such event has occurred, a description of the event and what action the Parent Guarantor, Issuer or any other Guarantor are taking or propose to take with respect thereto.

(b) *[Reserved].*

(c) So long as any of the Notes are outstanding, the Parent Guarantor will deliver to the Trustee, within 30 days upon any Officer becoming aware of any Default or Event of Default, an Officer's Certificate specifying such Default or Event of Default and what action the Parent Guarantor is taking or proposes to take with respect thereto.

Section 4.05    *Taxes.*

The Parent Guarantor will pay, and will cause each of its Subsidiaries to pay, prior to delinquency, all material taxes, assessments, and governmental levies imposed upon it or its Subsidiaries except such as are contested in good faith and by appropriate proceedings or where the failure to effect such payment is not adverse in any material respect to the Holders of the Notes.

Section 4.06    *Stay, Extension and Usury Laws.*

The Issuer and each Guarantor covenants (to the extent that it may lawfully do so) that it will not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Indenture; and the Issuer and each Guarantor (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it will not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law has been enacted.

Section 4.07    *Limitation on Indebtedness.*

(a) The Parent Guarantor will not, and will not permit any Restricted Subsidiary to, Incur, directly or indirectly, any Indebtedness (including Acquired Indebtedness); *provided, however,* that any Restricted Subsidiary (other than the Issuer and other than any direct or indirect parent company of the Issuer or Hellas II) may Incur Indebtedness if, on the date of such Incurrence and after giving effect thereto on a *pro forma* basis (including *pro forma* application of the proceeds thereof), the Consolidated Leverage Ratio for the Parent Guarantor is less than 6.50 to 1.00.

(b) The foregoing paragraph (a) will not prohibit the Incurrence of any or all of the following Indebtedness ("*Permitted Indebtedness*"):

> (1) the Incurrence by Hellas II or any Hellas II Restricted Subsidiary of Indebtedness under Credit Facilities, and any Refinancing Indebtedness in respect thereof, in an aggregate principal amount at any one time outstanding not to exceed €250 million minus the amount of any permanent repayments or prepayments of such Indebtedness with the proceeds of Asset Dispositions made in accordance with Section 4.10;

51

(2) any guarantees by Hellas II or any Hellas II Restricted Subsidiary of any Indebtedness of Hellas II or any Hellas II Restricted Subsidiary; any guarantee by any Restricted Subsidiary of the Notes;

(3) Indebtedness of any Restricted Subsidiary (other than the Issuer and other than any direct or indirect parent company of the Issuer or Hellas II) arising by reason of any Lien granted by or applicable to such Person securing Indebtedness of the Parent Guarantor or any other Restricted Subsidiary so long as the Incurrence of such Lien is permitted under the terms of this Indenture;

(4) Indebtedness of the Parent Guarantor owing to and held by any Restricted Subsidiary or Indebtedness of a Restricted Subsidiary owing to and held by the Parent Guarantor or any other Restricted Subsidiary; *provided, however,* that (A) any subsequent issuance or transfer of Capital Stock or any other event which results in any such Indebtedness being beneficially held by a Person other than the Parent Guarantor or any Restricted Subsidiary; and (B) any sale or other transfer of any such Indebtedness to a Person other than the Parent Guarantor or a Restricted Subsidiary will be deemed, in each case, to constitute an Incurrence of such Indebtedness by the Parent Guarantor or such Restricted Subsidiary, as the case may be;

(5) Indebtedness represented by: (A) the Notes issued on the Issue Date and the Parent Guarantee thereof; (B) Additional Notes issued in payment of accrued interest or Additional Amounts on the Notes, (C) any Indebtedness of Hellas II or any Hellas II Restricted Subsidiary (other than the Indebtedness described in clauses (1), (4), (8), (12) and (13) of this paragraph (b)) outstanding on the Issue Date (including the Subordinated Notes and the Senior Secured Notes issued on the Issue Date); (D) any Refinancing Indebtedness Incurred in respect of any Indebtedness described in this clause (5) or clause (6) of this paragraph (b) or Incurred pursuant to paragraph (a) of this Section 4.07; and (E) any Management Advances;

(6) Indebtedness of any Person outstanding on the date on which such Person becomes a Hellas II Restricted Subsidiary or is merged, consolidated, amalgamated or otherwise combined with (including pursuant to any acquisition of assets and assumption of related liabilities) any Hellas II Restricted Subsidiary (other than Indebtedness Incurred (A) to provide all or any portion of the funds used to consummate the transaction or series of related transactions pursuant to which such Person became a Hellas II Restricted Subsidiary or was otherwise acquired by a Hellas II Restricted Subsidiary or (B) otherwise in connection with or contemplation of such acquisition); *provided, however,* that at the time of such acquisition or other transaction and after giving *pro forma* effect thereto, either (Y) a Restricted Subsidiary would have been able to Incur €1.00 of additional Indebtedness pursuant to paragraph (a) of this Section 4.07 or (Z) the Consolidated Leverage Ratio would not be greater than it was immediately prior to giving *pro forma* effect to such acquisition or other transaction;

(7) Indebtedness of any Restricted Subsidiary (other than the Issuer and other than any direct or indirect parent company of the Issuer or Hellas II) under Hedging Obligations entered into for bona fide hedging purposes and not for speculative purposes (as determined in good faith by the Board of Directors of Hellas II);

(8) Indebtedness represented by Capital Lease Obligations or Purchase Money Obligations of Hellas II or any Hellas II Restricted Subsidiary, and, in each case, any Refinancing Indebtedness in respect thereof, in an aggregate outstanding principal amount which, when taken together with the principal amount of all other Indebtedness Incurred pursuant to this clause (8) and then outstanding, will not exceed at any time outstanding the greater of €40 million and 4% of Total Assets;

52

(9) Indebtedness of any Restricted Subsidiary (other than the Issuer and other than any direct or indirect parent company of the Issuer or Hellas II) Incurred in respect of (A) workers' compensation claims, self-insurance obligations, performance, surety, bid, judgment, appeal, advance payment, customs, VAT or other tax guarantees or other similar bonds, instruments or obligations and completion bonds, guarantees and warranties provided by such Restricted Subsidiary or relating to liabilities or obligations Incurred in the ordinary course of business and not in connection with the borrowing of money or the obtaining of advances or credit, (B) letters of credit, bankers' acceptances or other similar instruments or obligations issued or relating to liabilities or obligations Incurred in the ordinary course of business and (C) the financing of insurance premiums in the ordinary course of business;

(10) Indebtedness of any Restricted Subsidiary (other than the Issuer and other than any direct or indirect parent company of the Issuer or Hellas II) arising from agreements of such Restricted Subsidiary providing for customary guarantees, indemnification obligations in respect of earnouts or other adjustments of purchase price or similar obligations, in each case, Incurred or assumed in connection with the acquisition or disposition of any business or assets of any Person or any Capital Stock of a Subsidiary (other than guarantees of Indebtedness Incurred by any Person acquiring or disposing of such business or assets or such Subsidiary for the purpose of financing such acquisition or disposition); *provided* that the maximum aggregate liability of Hellas II and the Hellas II Restricted Subsidiaries in respect of all such Indebtedness will at no time exceed the gross proceeds, including the Fair Market Value of non-cash proceeds (measured at the time received and without giving effect to any subsequent changes in value), actually received by Hellas II or any Hellas II Restricted Subsidiary in connection with such disposition;

(11) Indebtedness of the Parent Guarantor or any Restricted Subsidiary arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; *provided, however*, that such Indebtedness is extinguished within five Business Days of Incurrence;

(12) Indebtedness of Hellas II or any Hellas II Restricted Subsidiary under daylight borrowing facilities incurred in connection with the Acquisition or the refinancing (including by way of set-off or exchange) of the Intercompany Corporate Bond Loans (as defined in the Senior Notes Indentures) so long as any such Indebtedness is repaid within three days of the date on which such Indebtedness is Incurred; and

(13) Indebtedness of Hellas II or any Hellas II Restricted Subsidiary in an aggregate principal amount which, when taken together with any Refinancing Indebtedness in respect thereof and the principal amount of all other Indebtedness of Hellas II or any Hellas II Restricted Subsidiary incurred pursuant to this clause (13) and outstanding on the date of such Incurrence does not exceed the greater of €40 million and 4% of Total Assets.

(c) For purposes of determining compliance with, and the outstanding principal amount of any particular Indebtedness Incurred pursuant to, this Section 4.07:

(A) in the event that Indebtedness meets the criteria of more than one of the types of Indebtedness described in this Section 4.07, the Parent Guarantor, in its sole discretion, will classify, and may from time to time reclassify, such item of Indebtedness and will only be required to include the amount and type of such Indebtedness in one of such subsections;

(B) all Indebtedness Incurred under clause (1) or clause (7) of paragraph (b) of this Section 4.07, as the case may be, will not be reclassified pursuant to the foregoing clause (A) of this paragraph (c));

53

(C) guarantees of, or obligations in respect of letters of credit, bankers' acceptances or other similar instruments relating to, or Liens securing, Indebtedness that is otherwise included in the determination of a particular amount of Indebtedness will not be included;

(D) the principal amount of any Disqualified Stock of the Parent Guarantor or any Restricted Subsidiary, or Preferred Stock of a Restricted Subsidiary, will be equal to the greater of the maximum mandatory redemption or repurchase price (not including, in either case, any redemption or repurchase premium) or the liquidation preference thereof;

(E) subject to clause (B) above of this paragraph (c), Indebtedness permitted by this Section 4.07 need not be permitted solely by reference to one provision permitting such Indebtedness but may be permitted in part by one such provision and in part by one or more other provisions of this Section 4.07 permitting such Indebtedness; and

(F) the amount of Indebtedness issued at a price that is less than the principal amount thereof will be equal to the amount of the liability in respect thereof determined on the basis of IFRS.

(d) Accrual of interest, accrual of dividends, the accretion of accreted value, the accretion or amortization of original issue discount, the payment of interest in the form of additional Indebtedness and the payment of dividends in the form of additional shares of Preferred Stock or Disqualified Stock will not be deemed to be an Incurrence of Indebtedness for purposes of this Section 4.07. The amount of any Indebtedness outstanding as of any date will be the accreted value thereof in the case of any Indebtedness issued with original issue discount and the principal amount, or liquidation preference thereof, in the case of any other Indebtedness.

(e) If at any time an Unrestricted Subsidiary becomes a Restricted Subsidiary, any Indebtedness of such Subsidiary will be deemed to be Incurred by a Restricted Subsidiary as of such date (and, if such Indebtedness is not permitted to be Incurred as of such date as described under this Section 4.07, the Parent Guarantor will be in Default of this Section 4.07).

(f) For purposes of determining compliance with any euro-denominated restriction on the Incurrence of Indebtedness, the Euro Equivalent of the principal amount of Indebtedness denominated in another currency will be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was Incurred, in the case of term Indebtedness, or first committed, in the case of Indebtedness Incurred under a revolving credit facility; *provided that*: (A) if such Indebtedness is Incurred to refinance other Indebtedness denominated in a currency other than euros, and such refinancing would cause the applicable euro-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such euro-denominated restriction will be deemed not to have been exceeded so long as the principal amount of such Refinancing Indebtedness does not exceed the principal amount of such Indebtedness being refinanced; (B) the Euro Equivalent of the principal amount of any such Indebtedness outstanding on the Issue Date will be calculated based on the relevant currency exchange rate in effect on the Issue Date; and (C) if and for so long as any such Indebtedness is subject to a Currency Agreement with respect to the currency in which such Indebtedness is denominated covering principal and interest on such Indebtedness, the amount of such Indebtedness, if denominated in euros, will be the amount of the principal payment required to be made under such Currency Agreement and, otherwise, the Euro Equivalent of such amount plus the Euro Equivalent of any premium which is at such time due and payable but is not covered by such Currency Agreement.

(g) Notwithstanding any other provision of this Section 4.07, the maximum amount of Indebtedness that the Parent Guarantor or any Restricted Subsidiary may Incur pursuant to this

54

Section 4.07 will not be deemed to be exceeded solely as a result of fluctuations in the exchange rate of currencies. The principal amount of any Indebtedness Incurred to refinance other Indebtedness, if Incurred in a different currency from the Indebtedness being refinanced, will be calculated based on the currency exchange rate applicable to the currencies in which such Refinancing Indebtedness is denominated that is in effect on the date of such refinancing.

Section 4.08    *Limitation on Restricted Payments.*

(a)  The Parent Guarantor will not, and will not permit any Restricted Subsidiary, directly or indirectly, to make a Restricted Payment.  Notwithstanding the foregoing, the Parent Guarantor or any Restricted Subsidiary (other than the Issuer) may make a Restricted Investment (other than an Investment in a Parent Company of the Parent Guarantor) if after giving effect thereto:

(1) a Default or Event of Default will not have occurred and be continuing (or would result therefrom);

(2) a Restricted Subsidiary is entitled to Incur an additional €1.00 of Indebtedness pursuant to paragraph (a) of Section 4.07; or

(3) the aggregate amount of such Restricted Investment and all other Restricted Payments made since the Issue Date (and not returned or rescinded) (without duplication) would not exceed the sum of:

(A) 50% of the Consolidated Net Income accrued during the period (treated as one accounting period) from January 1, 2007 to the end of the most recent fiscal quarter for which internal financial statements are available at the time of such Restricted Investment (or, in case such Consolidated Net Income will be a deficit, minus 100% of such deficit); plus

(B) 100% of the aggregate Net Cash Proceeds or the Fair Market Value of marketable securities received by the Parent Guarantor as consideration for the issuance or sale of its Capital Stock (other than Disqualified Stock and Designated Preferred Stock) or Subordinated Shareholder Funding subsequent to the Issue Date or otherwise contributed to equity (other than an issuance or sale (i) to a Restricted Subsidiary or (ii) to an employee stock ownership plan or to a trust established by the Parent Guarantor or any of its Subsidiaries for the benefit of their employees to the extent funded by the Parent Guarantor or any Restricted Subsidiary) and 100% of any cash capital contribution to its common equity received by the Parent Guarantor from its shareholders subsequent to the Issue Date (other than an Excluded Contribution and amounts referred to in subclause (B) to the second proviso of clause (b)(4) below that have been applied to make a repurchase or other acquisition covered by such clause); plus

(C) the amount by which Indebtedness of the Parent Guarantor or a Restricted Subsidiary is reduced on the Parent Guarantor's consolidated balance sheet upon the conversion or exchange subsequent to the Issue Date of any Indebtedness of the Parent Guarantor or a Restricted Subsidiary convertible or exchangeable for Capital Stock (other than Disqualified Stock and Designated Preferred Stock) of the Parent Guarantor (less the amount of any cash, or the fair value of any other property, distributed by the Parent Guarantor upon such conversion or exchange); *provided, however,* that the foregoing amount will not exceed the Net Cash Proceeds received by the Parent Guarantor or any Restricted Subsidiary from the sale of such Indebtedness and upon such conversion or exchange (excluding, in each case, Net Cash Proceeds from sales to a Restricted Subsidiary or to an employee stock ownership plan or a trust established by the Parent Guarantor or any of its

55

Subsidiaries for the benefit of their employees to the extent funded by the Parent Guarantor or any Restricted Subsidiary and also excluding any such Net Cash Proceeds comprising funds borrowed from the Parent Guarantor or any Restricted Subsidiary until and to the extent such borrowing is repaid); plus

(D) an amount equal to the sum of (v) in the case of the sale of a Restricted Investment or upon the repurchase, repayment or redemption of a Restricted Investment by any Person, 100% of the aggregate Net Cash Proceeds or the Fair Market Value of marketable securities received by the Parent Guarantor or a Restricted Subsidiary upon such sale, repurchase, repayment or redemption, (w) upon the full and unconditional release of a Restricted Investment that is a guarantee made by the Parent Guarantor or a Restricted Subsidiary to any Person, an amount equal to the amount of such guarantee, (x) in the case of a designation of an Unrestricted Subsidiary as a Restricted Subsidiary, the portion (proportionate to the Parent Guarantor's equity interest in such Unrestricted Subsidiary) of the Fair Market Value of the net assets of such Unrestricted Subsidiary at the time such Unrestricted Subsidiary is designated as a Restricted Subsidiary, (y) in the case of a sale or disposition of Capital Stock of an Unrestricted Subsidiary (other than to the Parent Guarantor or a Restricted Subsidiary or an employee stock ownership plan or trust established by the Parent Guarantor or any of its Subsidiaries for the benefit of its employees to the extent funded by the Parent Guarantor or any of its Restricted Subsidiaries), 100% of the Net Cash Proceeds received by the Parent Guarantor or any Restricted Subsidiary from such sale or disposition and (z) any distribution or dividends from an Unrestricted Subsidiary to the Parent Guarantor or a Restricted Subsidiary; *provided that* such amount in each case under this clause (D) was included in the calculation of the amount of Restricted Payments; *provided, furthermore*, that no amount will be included under clause (A) to the extent that, at the option of the Parent Guarantor, it is already included in this clause (D).

(b)  The preceding provisions will not prohibit:

(1) any Restricted Investment made out of the Net Cash Proceeds of the substantially concurrent issuance or sale of, or made by exchange for, Capital Stock or Subordinated Shareholder Funding of the Parent Guarantor (other than, in each case, Disqualified Stock, Designated Preferred Stock and other than an issuance, sale or exchange of Capital Stock to a Restricted Subsidiary or an employee stock ownership plan or to a trust established by the Parent Guarantor or any of its Subsidiaries for the benefit of their employees to the extent funded by the Parent Guarantor or any Restricted Subsidiary) or a substantially concurrent cash capital contribution to its common equity received by the Parent Guarantor from its shareholders; *provided, however,* that (A) such Restricted Payment will be excluded in the calculation of the amount of Restricted Payments and (B) the Net Cash Proceeds from such issuance or sale or such cash capital contribution (to the extent used for such Restricted Payment) will be excluded from the calculation of amounts under clause (3) of paragraph (a) above.

(2) any purchase, repurchase, redemption, defeasance or other acquisition or retirement for value of Subordinated Obligations of the Parent Guarantor or the Issuer made by exchange for, or out of the proceeds of the substantially concurrent sale or Incurrence of, Refinancing Indebtedness of such Person permitted to be Incurred under this Indenture; *provided, however,* that such purchase, repurchase, redemption, defeasance or other acquisition or retirement for value will be excluded in the calculation of the amount of Restricted Payments;

(3) the repurchase, redemption or other acquisition (including in exchange for the cancellation of Indebtedness), or dividends, distributions or loans to a Parent Company for the

purpose of funding any such repurchase, redemption or other acquisition, of shares of Capital Stock or Subordinated Obligations of the Parent Guarantor, any of its Subsidiaries or any Parent Company from any future, present or former employees, directors or consultants of the Parent Guarantor, any of its Subsidiaries or any Parent Company, as the case may be, (or permitted transferees of such employees, directors or consultants), pursuant to the terms of the agreements (including employment agreements) or plans (or amendments thereto) approved by the Board of Directors under which such individuals purchase or sell or are granted the option to purchase or sell, shares of such Capital Stock or Subordinated Obligations; *provided, however,* that the aggregate amount of such repurchases, redemptions or acquisitions (excluding amounts representing cancellation of Indebtedness) will not exceed €7.5 million in any calendar year, with unused amounts in any preceding calendar year being carried over to succeeding calendar years subject to a maximum of €15 million in any calendar year; *provided, further,* that the maximum amount of such repurchases, redemptions or acquisitions in any calendar year may be increased by an amount not to exceed (A) the cash proceeds of key man life insurance policies received by the Parent Guarantor and any Restricted Subsidiary in such year and (B) the Net Cash Proceeds from the sale of Capital Stock or Subordinated Obligations of the Parent Guarantor or any Parent Company and, to the extent received by the Parent Guarantor as an equity capital contribution from its shareholders (other than through the issuance of Disqualified Stock, Designated Preferred Stock or an Excluded Contribution) the Net Cash Proceeds from the sale of Capital Stock or Subordinated Obligations by a Parent Company, in each case to any future, present or former employees, directors or consultants of the Parent Guarantor, any Restricted Subsidiary or any Parent Company that occurs after the Issue Date, to the extent such Net Proceeds have not otherwise been applied to the payment of Restricted Payments by virtue of clause (3) of paragraph (a) above (which amounts in the foregoing clauses (A) and (B) may be carried forward to the extent not used in a prior calendar year); *provided, further,* that such repurchases and other acquisitions will be excluded in the calculation of the amount of Restricted Payments;

(4) the declaration and payment of regularly scheduled or accrued dividends to holders of any class or series of Disqualified Stock of Hellas II (other than any Designated Preferred Stock) or Preferred Stock of any Hellas II Restricted Subsidiary that, in any such case, was issued on or after the Issue Date in compliance with Section 4.07; *provided, however,* that at the time of payment of such dividend, no Default will have occurred and be continuing or would otherwise result therefrom; *provided, further, however,* that such dividends will be excluded in the calculation of the amount of Restricted Payments;

(5) repurchases or other acquisitions of Capital Stock deemed to occur upon exercise of stock options, warrants or other securities, if such Capital Stock represents a portion of the exercise price of such options, warrants or other securities; *provided, however,* that such Restricted Payments will be excluded in the amount of Restricted Payments;

(6) cash payments in lieu of the issuance of fractional shares in connection with share dividends, splits, combinations or business combinations or the exercise of warrants, options or other securities convertible into or exchangeable for Capital Stock of the Parent Guarantor or any Parent Company; *provided, however,* that any such cash payment will not be for the purpose of evading the limitation of this Section 4.08 (as determined in good faith by the Board of Directors); *provided, further, however,* that such payments will be excluded in the calculation of the amount of Restricted Payments;

(7) payments of subordinated intercompany Indebtedness, the Incurrence of which was permitted under Section 4.07(b)(4); *provided, however,* that no Default has occurred and is continuing or would otherwise result therefrom; *provided, further, however,* that such payments will be excluded in the calculation of the amount of Restricted Payments;

57

(8) payments pursuant to any tax sharing agreement or arrangement among the Parent Guarantor and its Subsidiaries and other Persons with which the Parent Guarantor or any of its Subsidiaries is required or permitted to file a consolidated tax return or with which the Parent Guarantor or any of its Restricted Subsidiaries is a part of a group for tax purposes; *provided, however,* that such payments will not exceed the amount of tax that the Parent Guarantor and its Subsidiaries would owe on a stand alone basis and the related tax liabilities of the Parent Guarantor and its Subsidiaries are relieved thereby; *provided, further, however,* that such payments will be excluded in the calculation of the amount of Restricted Payments;

(9) the declaration and payment of dividends or other distributions by the Parent Guarantor or any Restricted Subsidiary to, or the making of loans to, any Parent Company of up to €15 million in the aggregate per annum in amounts and at times required to pay:

(A) franchise taxes, duties or similar fees and expenses required to maintain the corporate existence of any Parent Company or any Management Equity Subsidiary or which are otherwise attributable to the ownership, business, operations or profits of the Parent Guarantor or any Restricted Subsidiary;

(B) any income taxes, to the extent such income taxes are attributable to the income of the Parent Guarantor and any Restricted Subsidiary and, to the extent of the amount actually received in cash from its Unrestricted Subsidiaries, in amounts required to pay such taxes to the extent attributable to the income of such Unrestricted Subsidiaries;

(C) customary salary, bonus and other benefits (including insurance and indemnification) payable to or in favor of officers and employees of any Parent Company or any Management Equity Subsidiary to the extent such salaries, bonuses and other benefits are attributable to the ownership or operation of the Parent Guarantor and any Restricted Subsidiary;

(D) general corporate overhead expenses of any Parent Company or any Management Equity Subsidiary to the extent such expenses are attributable to the ownership or operation of the Parent Guarantor and any Restricted Subsidiary or related to the proper administration of such Parent Company, including (i) fees and expenses properly incurred in the ordinary course of business to auditors and legal advisors, (ii) payments in respect of services provided by directors, officers or employees of any such Parent Company and (iii) costs associated with the maintenance of a head office function of any Parent Company or a successor thereof selected by the Parent Guarantor;

(E) costs (including all professional fees and expenses) Incurred by any Parent Company in connection with reporting obligations under or otherwise Incurred in connection with compliance with applicable laws, rules or regulations of any governmental, regulatory or self-regulatory body or stock exchange, this Indenture or any other agreement or instrument relating to Indebtedness of the Parent Guarantor or any Restricted Subsidiary, including in respect of any reports filed with respect to the Securities Act, Exchange Act or the respective rules and regulations promulgated thereunder;

(F) fees and expenses of any Parent Company incurred in relation to:

(a) the issuance of the Notes;

(b) any public offering or other sale of Capital Stock or Indebtedness

58

(x)    where the net proceeds of such offering or sale are intended to be received by or contributed to the Parent Guarantor or a Restricted Subsidiary;

(y)    in a prorated amount of such expenses in proportion to the amount of such net proceeds intended to be so received or contributed; or

(z)    otherwise on an interim basis prior to completion of such offering so long as any Parent Company will cause the amount of such expenses to be repaid to the Parent Guarantor or the relevant Restricted Subsidiary out of the proceeds of such offering promptly if completed;

(G) taxes with respect to income derived from funding made available to the Parent Guarantor and its Subsidiaries or any successor thereof by any Parent Company; and

(H) the Management Fees;

*provided, however,* that such payments will be excluded in the calculation of the amount of Restricted Payments;

(10) purchases of shares of Capital Stock for contribution to an employee stock ownership plan of the Parent Guarantor or a Parent Company not in excess of €10 million in the aggregate; *provided, however,* that such purchases will be excluded in the calculation of the amount of Restricted Payments;

(11) so long as no Default has occurred and is continuing or would otherwise result therefrom, any other Restricted Investments in an aggregate amount at any time outstanding, when taken together with all other Restricted Investments made pursuant to this clause (16), not to exceed €30 million; *provided, however,* that such Restricted Investments will be included in the calculation of the amount of Restricted Payments;

(12) Subsequent to the conclusion of a Change of Control Offer, no greater than €10 million in the aggregate in respect of exit fees payable to Apax Partners and TPG Group in connection with an exit which triggers a Change of Control; *provided, however,* that such Restricted Payment will be included in the calculation of the amount of Restricted Payments; or

(13) Payment of the Proceeds Distribution.

(c)  The amount of all Restricted Payments made other than in cash will be as determined in good faith by the Board of Directors.

Section 4.09    *Limitation on Liens.*

The Parent Guarantor will not, and will not permit the Issuer to, directly or indirectly, create, Incur, assume or suffer to exist any Lien (the "*Initial Lien*") (other than Permitted Liens) of any kind or assign or otherwise convey any right to receive any income, profits or proceeds on or with respect to any of the Parent Guarantor's or the Issuer's property or assets, whether owned at or acquired after the date of this Indenture, or any income, profits or proceeds therefrom securing any Indebtedness, unless the Notes and the Guarantee are secured on an equal and ratable or prior basis with the obligations so secured until such time as such obligations are no longer secured by such Lien.

LO\332299.7

Any Lien created for the benefit of the Holders pursuant to this Section 4.09 will provide by its terms that such Lien will be automatically and unconditionally released and discharged (a) upon the release and discharge of the Initial Lien, (b) upon the sale or other disposition of the assets subject to such Initial Lien (or the sale or other disposition of the Person that owns such assets) in compliance with the terms of this Indenture, (c) with respect to any Guarantor the assets or the Capital Stock of which are encumbered by such Lien, upon the release of the Guarantee of such Guarantor in accordance with the terms of this Indenture or (d) upon the designation of a Restricted Subsidiary whose property or assets secure such Initial Lien as an Unrestricted Subsidiary in accordance with the terms of this Indenture, or (e) upon the effectiveness of any legal defeasance of the Notes as specified in this Indenture.

Section 4.10    *Limitation on Sales of Assets and Subsidiary Stock.*

(a)  The Parent Guarantor will not, and will not permit any Restricted Subsidiary to, directly or indirectly, consummate any Asset Disposition unless:

(1) the Parent Guarantor or such Restricted Subsidiary receives consideration (including by way of relief from, or by any other Person assuming responsibility for, any liabilities, contingent or otherwise) at the time of such Asset Disposition at least equal to the Fair Market Value (including as to the value of all non-cash consideration), as determined in good faith by the Board of Directors, of the shares and assets subject to such Asset Disposition;

(2) at least 75% of the consideration thereof received by the Parent Guarantor or such Restricted Subsidiary is in the form of cash; and

(3) an amount equal to 100% of the Net Available Cash from such Asset Disposition is applied by the Parent Guarantor (or such Restricted Subsidiary, as the case may be) to the extent the Parent Guarantor elects (or is required by the terms of any Indebtedness) (i) to prepay, repay, redeem or purchase Indebtedness of the Parent Guarantor or any Restricted Subsidiary within 365 days from the later of the date of such Asset Disposition or the receipt of such Net Available Cash or (ii) to reinvest in Additional Assets within 365 days from the later of the date of such Asset Disposition or the receipt of such Net Available Cash (or to commit to such reinvestment within such 365-day period and complete such reinvestment within the 180-day period after such 365-day period);

provided, however, that in connection with any prepayment, repayment or purchase of Indebtedness, such Restricted Subsidiary will permanently retire such Indebtedness and will cause the related loan commitment (if any) to be permanently reduced in an amount equal to the principal amount so prepaid, repaid or purchased; and *provided further,* that any Net Available Cash from an Excess Proceeds Offer not applied in accordance with clause (3) shall constitute "Excess Proceeds."

For the purposes of clause (a)(2) of this Section 4.10, the following are deemed to be cash:

(1) Temporary Cash Investments;

(2) the assumption or discharge of Indebtedness of the Parent Guarantor or any Restricted Subsidiary (other than Indebtedness (i) between and among the Parent Guarantor and a Restricted Subsidiary, (ii) owed to an Affiliate of the Parent Guarantor, (iii) that is subordinated to the Notes or any Guarantee thereof or (iv) that is secured by a Lien that is junior to the Lien securing the Notes) or Preferred Stock of Hellas II or any Hellas II Restricted Subsidiary by the transferee of any such assets and the release of the Parent Guarantor and the Restricted Subsidiaries from all liability on such Indebtedness or Preferred Stock in connection with such Asset Disposition;

60

(3) Indebtedness or Preferred Stock of Hellas II or any Hellas II Restricted Subsidiary that is no longer a Restricted Subsidiary as a result of such Asset Disposition, to the extent that the Parent Guarantor and its Restricted Subsidiaries following such Asset Disposition are released from any Guarantee of such Indebtedness or Preferred Stock in connection with such Asset Disposition;

(4) consideration consisting of Indebtedness of or Preferred Stock of any Restricted Subsidiary (other than the Issuer and other than any direct or indirect parent company of the Issuer or Hellas II) which is either repaid in full or cancelled in connection with such Asset Disposition;

(5) securities or other obligations (other than Temporary Cash Investments) received by the Parent Guarantor or any Restricted Subsidiary from the transferee that are converted by the Parent Guarantor or such Restricted Subsidiary into cash or Temporary Cash Investments within 180 days of receipt thereof;

(6) all or substantially all of the assets of, or Capital Stock of, a Related Business received as consideration in an Asset Disposition if, after giving effect to any such receipt of Capital Stock, the Related Business is or becomes a Restricted Subsidiary; and

(7) assets or Capital Stock received as consideration in an Asset Disposition and designated by the Parent Guarantor as received under this clause, *provided* that (a) the aggregate Fair Market Value of such assets and/or Capital Stock may not exceed €17.5 million in the aggregate for all Asset Dispositions (measured at the time of receipt) and (b) such assets are used or useful in, or such Capital Stock is of a Person engaged in, a Related Business.

(b) Notwithstanding the foregoing provisions of this Section 4.10, the Parent Guarantor and the Restricted Subsidiaries will not be required to apply any Net Available Cash in accordance with this covenant except to the extent that the aggregate Net Available Cash from all Asset Dispositions which is not applied in accordance with this Section 4.10 exceeds €15 million. Pending application of Net Available Cash pursuant to this Section 4.10, such Net Available Cash may be invested in Temporary Cash Investments or applied to temporarily reduce revolving credit indebtedness.

(c) When the amount of Excess Proceeds exceeds €15 million, the Parent Guarantor or the Issuer will purchase Notes tendered pursuant to an offer by the Parent Guarantor for the Notes at a purchase price of 100% of their principal amount, plus accrued but unpaid interest in this Indenture (the "*Excess Proceeds Offer*"), *provided, however*, that neither the Parent Guarantor nor the Issuer shall be obligated to purchase such Notes to the extent the application of proceeds required by such Excess Proceeds Offer would cause a default under the terms of the Revolving Credit Facility or the Senior Notes Indentures. If the aggregate purchase price of the securities or other Indebtedness tendered exceeds the Net Available Cash allotted to their purchase, the Parent Guarantor will select the securities and other Indebtedness to be purchased on a pro rata basis but in round denominations.

(d) In the event that the Parent Guarantor is required to commence an Excess Proceeds Offer, it will follow the procedures specified below.

The Excess Proceeds Offer will remain open for a period of at least 20 Business Days following its commencement and not more than 30 Business Days, except to the extent that a longer period is required by applicable law (the "*Offer Period*"). No later than three Business Days after the termination of the Offer Period (the "*Purchase Date*"), the Parent Guarantor will apply all proceeds required by this Section 4.10 to be so applied (the *"Offer Amount"*) to the purchase of Notes and such other *pari passu* Indebtedness (on a *pro rata* basis, if applicable) or, if less than the Offer Amount has been tendered, all Notes and other Indebtedness tendered in response to the Excess Proceeds Offer. Payment for any Notes so purchased will be made in the same manner as interest payments are made.

61

If the Purchase Date is on or after an interest record date and on or before the related interest payment date, any accrued and unpaid interest will be paid to the Person in whose name a Note is registered at the close of business on such record date, and no additional interest will be payable to Holders who tender Notes pursuant to the Excess Proceeds Offer.

Upon the commencement of an Excess Proceeds Offer, the Parent Guarantor will send, by first class mail, a notice to the Trustee and each of the Holders.  The notice will contain all instructions and materials necessary to enable such Holders to tender Notes pursuant to the Excess Proceeds Offer.  The notice, which will govern the terms of the Excess Proceeds Offer, will state:

(1) that the Excess Proceeds Offer is being made pursuant to this Section 4.10 and the length of time the Excess Proceeds Offer will remain open;

(2) the Offer Amount, the purchase price and the Purchase Date;

(3) that any Note not tendered or accepted for payment will continue to accrue interest;

(4) that, unless the Parent Guarantor defaults in making such payment, any Note accepted for payment pursuant to the Excess Proceeds Offer will cease to accrue interest after the Purchase Date;

(5) that Holders electing to have a Note purchased pursuant to an Excess Proceeds Offer may elect to have Notes purchased in the denominations and integral multiples set forth in clause (c) above only;

(6) that Holders electing to have Notes purchased pursuant to any Excess Proceeds Offer will be required to surrender the Note, with the form entitled "Option of Holder to Elect Purchase" attached to the Notes completed, or transfer by book-entry transfer, to the Parent Guarantor, a Depositary, if appointed by the Issuer, or a Paying Agent at the address specified in the notice at least three days before the Purchase Date;

(7) that Holders will be entitled to withdraw their election if the Parent Guarantor, the Depositary or the Paying Agent, as the case may be, receives, not later than the expiration of the Offer Period, a telegram, telex, facsimile transmission or letter setting forth the name of the Holder, the principal amount of the Note the Holder delivered for purchase and a statement that such Holder is withdrawing his or her election to have such Note purchased;

(8) that, if the aggregate principal amount of Notes and other *pari passu* Indebtedness surrendered by holders thereof exceeds the Offer Amount, the Parent Guarantor will select the Notes and other *pari passu* Indebtedness to be purchased on a *pro rata* basis based on the principal amount of Notes and such other *pari passu* Indebtedness surrendered (with such adjustments as may be deemed appropriate by the Parent Guarantor so that only Notes in the minimum denominations and integral multiples set forth in clause (c) above will be purchased); and

(9) that Holders whose Notes were purchased only in part will be issued new Notes equal in principal amount to the unpurchased portion of the Notes surrendered (or transferred by book-entry transfer).

On or before the Purchase Date, the Parent Guarantor will, to the extent lawful, accept for payment, on a *pro rata* basis to the extent necessary, the Offer Amount of Notes or portions thereof tendered pursuant to the Excess Proceeds Offer, or if less than the Offer Amount has been tendered, all Notes tendered, and will deliver or cause to be delivered to the Trustee the Notes properly accepted together with an Officer's Certificate stating that such Notes or portions thereof were accepted for

62

payment by the Parent Guarantor in accordance with the terms of this Section 4.10.  The Parent Guarantor, the Depositary or the Paying Agent, as the case may be, will promptly (but in any case not later than five days after the Purchase Date) mail or deliver to each tendering Holder an amount equal to the purchase price of the Notes tendered by such Holder and accepted by the Parent Guarantor for purchase, and the Issuer will promptly issue a new Note, and the Trustee, upon written request from the Issuer, will authenticate and mail or deliver (or cause to be transferred by book entry) such new Note to such Holder, in a principal amount equal to any unpurchased portion of the Note surrendered. Any Note not so accepted shall be promptly mailed or delivered by the Issuer to the Holder thereof. The Issuer will publicly announce the results of the Excess Proceeds Offer on the Purchase Date and, so long as the Notes are listed on the official list of the Luxembourg Stock Exchange and admitted to trading on the Euro MTF market, forthwith inform the Luxembourg Stock Exchange of the results of the Excess Proceeds Offer.

Other than as specifically provided in this Section 4.10, any purchase pursuant to this Section 4.10 shall be made pursuant to the provisions of Sections 3.01 through 3.06 hereof.

(e)  The Parent Guarantor and the Issuer will comply with the requirements of all applicable securities laws or regulations in connection with the repurchase of Notes pursuant to this covenant. To the extent that the provisions of any securities laws or regulations conflict with provisions of this Section 4.10, the Issuer will comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under this Section 4.10 by virtue of its compliance with such securities laws or regulations.

Section 4.11     *Limitation on Affiliate Transactions*.

(a)  The Parent Guarantor will not, and will not permit any Restricted Subsidiary to, enter into or permit to exist any transaction (including, without limitation, the purchase, sale, lease or exchange of any assets or property, employee compensation arrangements or the rendering of any service) with, or for the benefit of, any Affiliate of the Parent Guarantor or any Restricted Subsidiary (an "*Affiliate Transaction*") unless:

(1) such Affiliate Transaction is on terms that are no less favorable, taken as a whole, to the Parent Guarantor or such Restricted Subsidiary, as the case may be, than those that could reasonably have been expected to be obtained at the time in a comparable arm's-length transaction with a Person that is not an Affiliate;

(2) if such Affiliate Transaction involves an amount in excess of €10 million, a majority of the members of the Board of Directors of the Parent Guarantor who are disinterested with respect to such Affiliate Transaction have determined in good faith that the criteria set forth in clause (1) are satisfied and have approved the relevant Affiliate Transaction; and

(3) if such Affiliate Transaction involves an amount in excess of €20 million, the Board of Directors will also have received a written opinion from an Independent Financial Advisor to the effect that such Affiliate Transaction is fair, from a financial standpoint, to the Parent Guarantor and its Restricted Subsidiaries or is not less favorable, taken as a whole, to the Parent Guarantor and its Restricted Subsidiaries than could reasonably be expected to be obtained at the time in a comparable arm's length transaction with a Person who was not an Affiliate.

(b)  The provisions of the preceding paragraph (a) will not apply to:

(1) any Restricted Payment or Permitted Investment permitted by Section 4.08;

LO\332299.7

(2) transactions with customers, suppliers, contractors, joint venture partners or purchasers or sellers of goods or services, in each case which are in the ordinary course of business (including pursuant to joint venture agreements) and otherwise in compliance with the terms of this Indenture, and which are fair to the Parent Guarantor and its Restricted Subsidiaries in the reasonable determination of the Board of Directors or the senior management of the Parent Guarantor or are on terms at least as favorable as could reasonably have been obtained at such time from an unaffiliated party;

(3) any issuance or sale of Capital Stock, options, other equity-related interests or other securities, or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, or entering into, or maintenance of, any employment, consulting, collective bargaining or benefit plan, program, agreement or arrangement, related trust or other similar agreement and other compensation arrangements, options, warrants or other rights to purchase Capital Stock of the Parent Guarantor or any Parent Company, restricted stock plans, long-term incentive plans, stock appreciation rights plans, participation plans or similar employee benefits or consultant plans (including, valuation, health, insurance, deferred compensation, severance, retirement, savings or similar plans, programs or arrangements) and/or indemnities provided on behalf of officers, employees or directors or consultants approved by the Board of Directors, in each case in the ordinary course of business;

(4) Management Advances and loans (and the cancellation of loans) or advances, or guarantees of third-party loans, to employees, officers or directors of the Parent Guarantor or any Parent Company or any Restricted Subsidiary approved by the Board of Directors;

(5) the payment of reasonable fees to directors of the Parent Guarantor or any Parent Company and any Restricted Subsidiary who are not employees of the Parent Guarantor or any Restricted Subsidiary;

(6) loans (and the cancellation of loans) and advances, or guarantees of third-party loans, to the Parent Guarantor's or any Restricted Subsidiary's officers, directors and employees for travel, entertainment, moving and other relocation expenses or otherwise approved by the Board of Directors;

(7) agreements and arrangements existing on the date of this Indenture and any amendment or modification thereto, *provided* that any such amendment or modification is not more disadvantageous to the Holders in any material respect than the original agreement or arrangement as in effect on the date of this Indenture;

(8) any payments or other transactions pursuant to a tax sharing agreement between the Parent Guarantor and any other Person or a Restricted Subsidiary and any other Person with which the Parent Guarantor or a Restricted Subsidiary files a consolidated tax return or with which the Parent Guarantor or a Restricted Subsidiary is part of a group for tax purposes or any tax advantageous group contribution made pursuant to applicable legislation; *provided, however,* that any such tax sharing or arrangement and payment does not permit or require payments in excess of the amounts of tax that would be payable by the Parent Guarantor and its Restricted Subsidiaries on a stand-alone basis;

(9) any transaction with, or for the benefit of, any Person (other than the Parent Guarantor or a Restricted Subsidiary); *provided, however*, that such Person is an Affiliate of the Parent Guarantor or a Restricted Subsidiary solely as a result of the ownership, directly or indirectly, by the Parent Guarantor or a Restricted Subsidiary of Capital Stock in such Person;

(10) (i) payment of fees and the reimbursement of other expenses to the Permitted Holders in connection with the offering of the Notes and (ii) customary payments for financial

64

advisory, financing, underwriting, corporate brokerage, asset management, sales and trading or placement services or any other investment banking, banking, brokerage, lending or similar services involving the Parent Guarantor and any of its Restricted Subsidiaries (including any payments in cash, Capital Stock or other consideration made by the Parent Guarantor or any of its Restricted Subsidiaries in connection therewith) on the one hand and the Permitted Holders on the other hand, which services (and payments and other transactions in connection therewith) are approved by the Board of Directors in good faith;

(11) payment of Management Fees;

(12) the issuance or sale of any Capital Stock (other than Disqualified Stock) of the Parent Guarantor;

(13) the issuance of any Subordinated Shareholder Funding;

(14) any series of related transactions entered into during a period of 12 consecutive months, or any single transaction, in each case, involving aggregate consideration of less than €1 million that is entered into in good faith;

(15) any transaction with a Restricted Subsidiary or joint venture or similar entity (other than an Unrestricted Subsidiary) which would constitute an Affiliate Transaction solely because the Parent Guarantor, or a Restricted Subsidiary owns an equity interest in, can designate one or more board members of, or otherwise controls such Restricted Subsidiary, joint venture or similar entity;

(16) transactions between or among the Parent Guarantor and the Restricted Subsidiaries or between or among Restricted Subsidiaries; and

(17) the payment of the Proceeds Distribution.

Section 4.12    *[Reserved].*

Section 4.13    *Limitation on Activities.*

The Parent Guarantor will not, and will not permit any of its Restricted Subsidiaries to, engage in any business other than Related Businesses.

Any Restricted Subsidiary which is not Hellas II or a Hellas II Restricted Subsidiary shall not own any Capital Stock directly or indirectly in Hellas II or a Hellas II Restricted Subsidiary.

The Issuer will not engage in any business activity or undertake any other activity, except any activity (i) reasonably relating to the offering, sale, issuance and servicing, purchase, redemption, refinancing or retirement of the Notes, the incurrence of Indebtedness represented by the Notes or other Indebtedness permitted by the terms of this Indenture and distributing, lending or otherwise advancing, whether directly or through an intermediary bank or institution, funds to the Parent Guarantor or any Restricted Subsidiary, and (ii) undertaken with the purpose of fulfilling any other obligations under the Notes or this Indenture and activities not specifically enumerated above that are *de minimis* in nature.  The Issuer will not create, incur, assume or suffer to exist any Lien over any of its property or assets, or any proceeds therefrom, to secure Indebtedness, except for Liens to secure the Notes or other Indebtedness permitted to be Incurred under this Indenture to the extent Liens securing such Indebtedness are permitted to be Incurred under this Indenture.  The Issuer will at all times remain a wholly owned Restricted Subsidiary. The Issuer will not merge, consolidate, amalgamate or otherwise combine with or into another Person or sell, transfer, lease or otherwise dispose of any material property or assets to any Person.

LO\332299.7

For so long as any Notes are outstanding, the Issuer will not (i) change the Stated Maturity of the principal of, or any installment of interest on, the Intercompany Proceeds Loan; (ii) reduce the rate of interest on the Intercompany Proceeds Loan; (iii) change the currency for payment of any amount under the Intercompany Proceeds Loan; (iv) prepay or otherwise reduce or permit the prepayment or reduction of the Intercompany Proceeds Loan (save to facilitate a corresponding payment of principal on the Notes); (v) assign or novate the Intercompany; or (vi) amend, modify or alter the Intercompany Proceeds Loan.  Notwithstanding the foregoing, the Intercompany Proceeds Loan may be prepaid or reduced to facilitate or otherwise accommodate or reflect a repayment, redemption or repurchase of outstanding Notes.

For so long as any Notes are outstanding, the Parent Guarantor will not commence or take any action or facilitate a winding-up, liquidation or other analogous proceeding in respect of the Issuer.

Section 4.14    *Corporate Existence*.

Subject to Article 5 hereof, the Issuer and each Guarantor shall do or cause to be done all things necessary to preserve and keep in full force and effect:

> (1) its corporate existence, and the corporate, partnership or other existence of each of its Subsidiaries, in accordance with the respective organizational documents (as the same may be amended from time to time) of the Issuer, each Guarantor or any such Subsidiary; and

> (2) the rights (charter and statutory), licenses and franchises of the Issuer, each Guarantor and each of their respective Subsidiaries; *provided, however,* that the Issuer and each Guarantor shall not be required to preserve any such right, license or franchise, or the corporate, partnership or other existence of any of its Subsidiaries, if the Board of Directors shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Issuer, each Guarantor and their respective Subsidiaries, taken as a whole, and that the loss thereof is not adverse in any material respect to the Holders of the Notes.

Section 4.15    *Change of Control*.

(a)  Upon the occurrence of any of the following events (each a "*Change of Control*"), the Parent Guarantor or the Issuer will offer to repurchase all outstanding Notes at a purchase price in cash equal to 101% of the principal amount thereof on the date of purchase plus accrued and unpaid interest to the date of purchase (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant interest payment date) (the "*Change of Control Payment*"); *provided, however,* that notwithstanding the occurrence of a Change of Control, the Parent Guarantor and the Issuer will not be obligated to purchase the Notes pursuant to this section in the event that it has exercised its right to redeem all the Notes under the terms of Section 3.07:

> (1) the direct or indirect sale, lease, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the properties or assets of the Parent Guarantor, the Issuer and any other Restricted Subsidiaries taken as a whole to any "person" (as that term is used in Section 13(d)(3) of the Exchange Act) other than one or more Permitted Holders;

> (2) the consummation of any transaction or series of related transactions (including, without limitation, any merger or consolidation), the result of which is that any "person" (as defined above), other than one or more Permitted Holders, becomes the beneficial owner (as defined in Rules 13d-3 and 13d-5 under the Exchange Act), directly or indirectly, of more than 50% of the total voting power of the Voting Stock of the Parent Guarantor (or any successor of any such entity permitted by Section 5.01); or

(3) the Parent Guarantor fails to directly own 100% of the issued and outstanding Capital Stock of each of (i) Hellas Finance and (ii) Hellas II, excluding (a) treasury shares and (b) directors' qualifying shares or shares required by any applicable law to be held by a Person other than the Parent Guarantor or another wholly-owned Subsidiary of the Parent Guarantor.

Within 30 days following any Change of Control, the Parent Guarantor or the Issuer will mail a notice to each Holder with a copy to the Trustee (the "*Change of Control Offer*") stating:

(1) that a Change of Control has occurred and the Parent Guarantor or the Issuer is offering to purchase all of the Notes at a purchase price in cash equal to 101% of the principal amount thereof on the date of purchase, plus accrued and unpaid interest, if any, to the date of purchase (subject to the right of Holders of record on the relevant record date to receive interest on the relevant interest payment date);

(2) the circumstances and relevant facts regarding such Change of Control;

(3) the purchase date (which will be no earlier than 30 days nor later than 60 days from the date such notice is mailed) (the "*Change of Control Payment Date*");

(4) that any Note not tendered will continue to accrue interest;

(5) that, unless the Issuer defaults in the payment of the Change of Control Payment, all Notes accepted for payment pursuant to the Change of Control Offer will cease to accrue interest after the Change of Control Payment Date;

(6) that Holders electing to have any Notes purchased pursuant to a Change of Control Offer will be required to surrender the Notes, with the form entitled "Option of Holder to Elect Purchase" attached to the Notes completed, or transfer by book-entry transfer, to the Paying Agent at the address specified in the notice prior to the close of business on the third Business Day preceding the Change of Control Payment Date;

(7) that Holders will be entitled to withdraw their election if the Paying Agent receives, not later than the close of business on the second Business Day preceding the Change of Control Payment Date, a telegram, telex, facsimile transmission or letter setting forth the name of the Holder, the principal amount of Notes delivered for purchase, and a statement that such Holder is withdrawing his or her election to have the Notes purchased;

(8) that Holders whose Notes are being purchased only in part will be issued new Notes equal in principal amount to the unpurchased portion of the Notes surrendered, which unpurchased portion must be equal to €1 in principal amount or an integral multiple thereof; and

(9) the instructions, as determined by the Parent Guarantor or the Issuer, consistent with the covenant described hereunder, that a Holder must follow in order to have its Notes purchased,

and will publish a notice to that effect in accordance with the rules and regulations of the Luxembourg Stock Exchange, so long as the Notes are listed on the official list of the Luxembourg Stock Exchange and admitted to trading on the Euro MTF market.

The Parent Guarantor and the Issuer will not be required to make a Change of Control Offer following a Change of Control if a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in this Indenture applicable to a Change of Control Offer made by the Parent Guarantor or the Issuer and purchases all Notes validly

LO\332299.7

tendered and not withdrawn under such Change of Control Offer. A Change of Control Offer may be made in advance of a Change of Control, conditional upon such Change of Control, if a definitive agreement is in place for the Change of Control at the time of making the Change of Control Offer.

The Parent Guarantor or the Issuer, as applicable, will comply with the requirements of all applicable securities laws or regulations in connection with the repurchase of Notes as a result of a Change of Control. To the extent that the provisions of any securities laws or regulations conflict with the provisions of this Section 4.15, the Parent Guarantor or the Issuer, as applicable, will comply with the applicable securities laws and regulations and will not be deemed to have breached their obligations under this Section 4.15 by virtue of compliance with such securities laws or regulations.

(b) On the Change of Control Payment Date, the Issuer will, to the extent lawful:

(1) accept for payment all Notes or portions of Notes properly tendered pursuant to the Change of Control Offer;

(2) deposit with the Paying Agent prior to 10:00 am (London time) an amount equal to the Change of Control Payment in respect of all Notes or portions of Notes properly tendered; and

(3) deliver or cause to be delivered to the Trustee the Notes properly accepted together with an Officer's Certificate stating the aggregate principal amount of Notes or portions of Notes being purchased by the Issuer.

The Paying Agent will promptly mail (but in any case not later than five days after the Change of Control Payment Date) to each Holder of Notes properly tendered the Change of Control Payment for such Notes, and the Trustee will promptly authenticate and mail (or cause to be transferred by book entry) to each Holder a new Note equal in principal amount to any unpurchased portion of the Notes surrendered, if any. The Issuer will publicly announce the results of the Change of Control Offer on or as soon as practicable after the Change of Control Payment Date.

If at the time of such Change of Control, the Notes are admitted to listing on the official list of the Luxembourg Stock Exchange and are admitted for trading on the Euro MTF market, to the extent required by the rules and regulations of the Luxembourg Stock Exchange, the Issuer will notify the Luxembourg Stock Exchange that a Change of Control has occurred and any relevant details relating to such Change of Control.

The provisions under this Indenture relative to the Parent Guarantor's and the Issuer's obligation to make an offer to repurchase the Notes as a result of a Change of Control may be waived or modified with the written consent of the Holders of a majority in principal amount of the Notes then outstanding.

Section 4.16    *[Reserved].*

Section 4.17    *Limitation on Sale and Leaseback Transactions.*

(a) The Parent Guarantor will not, and will not permit the Issuer to enter into any Sale/Leaseback Transaction with respect to any property or assets.

(b) The Parent Guarantor will not permit Hellas II or any Hellas II Restricted Subsidiary to enter into any Sale/Leaseback Transaction with respect to any property or assets unless:

(1) on the date of such Sale/Leaseback Transaction and after giving *pro forma* effect thereto for the four quarters immediately preceding such Sale/Leaseback Transaction (including for the avoidance of doubt the use of the proceeds of the sale (including, if

applicable, to reduce debt or reinvest in Additional Assets)) the Consolidated Leverage Ratio for the Parent Guarantor would be less than 6.50 to 1.00;

(2) the gross proceeds received by Hellas II or any Hellas II Restricted Subsidiary in connection with such Sale/Leaseback Transaction are at least equal to the Fair Market Value (as determined by the Board of Directors) of such property; and

(3) Hellas II or such Hellas II Restricted Subsidiary applies the proceeds of such transaction in compliance with Section 4.10.

Section 4.18    *Withholding Taxes*.

The Issuer and each Guarantor are required to make all payments under or with respect to the Notes or its Guarantee free and clear of and without withholding or deduction for or on account of any present or future tax, duty, levy, impost, assessment or other governmental charge (including penalties, interest and other liabilities related thereto) (hereinafter "*Taxes*") imposed or levied by or on behalf of the government of any of the countries in which any of the Issuer or the relevant Guarantor and, in each case, any successor thereof (each, a "*Payor*") is organized or any political subdivision or any authority or agency therein or thereof having power to tax, or any other jurisdiction in which a Payor is otherwise resident for tax purposes or any jurisdiction from or through which any payment under or with respect to the Notes or any Guarantee is made (each, a "*Relevant Taxing Jurisdiction*"), unless the relevant Payor is required to withhold or deduct Taxes by law or by the interpretation or administration thereof.

If a Payor is so required to withhold or deduct any amount for or on account of Taxes imposed by a Relevant Taxing Jurisdiction from any payment made under or with respect to the Notes or a Guarantee, as applicable, such Payor will be required to pay such additional amounts ("*Additional Amounts*") as may be necessary so that the net amount received by any Holder (including Additional Amounts) after such withholding or deduction will not be less than the amount such Holder would have received if such Taxes had not been withheld or deducted; *provided, however,* that the foregoing obligation to pay Additional Amounts does not apply to (1) any Taxes that would not have been so imposed but for the existence of any present or former connection between the relevant Holder or beneficial owner (or between a fiduciary, settlor, beneficiary, member or shareholder of, or possessor of power over, the relevant Holder, if the relevant Holder is an estate, nominee, trust or corporation) and the Relevant Taxing Jurisdiction, including such Holder or beneficial owner (or such fiduciary, settlor, beneficiary, partner, member, shareholder, or possessor) of the Notes being or having been a citizen, resident, or national thereof or being or having been present or engaged in a trade or business therein or having or having had a permanent establishment therein (but not including the mere receipt of such payment or the ownership, holding or enforcement of such Note); (2) any estate, inheritance, gift, sales, transfer, personal property tax or similar Taxes; (3) any withholding or deduction in respect of the Notes (a) where such withholding or deduction is imposed on a payment to an individual and is required to be made pursuant to European Council Directive 2003/48/EC or any other Directive implementing the conclusions of the ECOFIN Council meeting of 26th-27th November 2000 on the taxation of savings income or any law implementing or complying with, or introduced in order to conform to, such Directive, or (b) presented for payment by or on behalf of a Holder who would have been able to avoid such withholding or deduction by presenting the Notes to any other paying agent in a European Union Member State, or (c) where the payment could have been made without such deduction or withholding if the beneficiary of the payment had presented the Notes for payment within 30 days after the date on which such payment on such Notes became due and payable or the date on which payment thereof is duly provided for, whichever is later (except to the extent that the Holder would have been entitled to Additional Amounts had the Notes been presented on the last day of such 30-day period); (4) any Taxes imposed with respect to any payment of principal of (or premium, if any, on) or interest on the Notes by the Issuer or Guarantor to any Holder who is a fiduciary or partnership or any Person other than the sole beneficial owner of such payment, to the extent that a beneficiary or settlor with respect to such fiduciary, a member of such a partnership or

69

the beneficial owner of such payment would not have been entitled to the Additional Amounts had such beneficiary, settlor, member or beneficial owner been the actual Holder of such Notes; (5) any Taxes that are payable other than by deduction or withholding from payments made under or with respect to the Notes; (6) any Taxes that would not have been imposed but for the failure of the Holder and/or beneficial owner to comply with the Issuer's, a Guarantor's or the paying agent's request in accordance with Section 14.02 herein, providing reasonable notice, to the Holder to provide certification, documentation, information or other evidence concerning the nationality, residence, identity or connection with the Relevant Taxing Jurisdiction of the Holder and/or beneficial owner of such Notes or to make any valid or timely declaration or similar claim or satisfy any other reporting requirement relating to such matters, whether required or imposed by statute, treaty, regulation or administrative practice of the Relevant Taxing Jurisdiction, as a precondition to exemption from, or reduction in the rate of withholding or deduction of, Taxes imposed by the Relevant Taxing Jurisdiction; or (7) any combination of (1) to (6) above.

The Issuer or the relevant Guarantor will provide the Trustee with official receipts or, if notwithstanding the efforts of the Issuer or the relevant Guarantor official receipts are not obtainable, other documentation satisfactory to the Trustee, evidencing the payment of any Taxes so deducted or withheld from each Relevant Taxing Jurisdiction imposing such Taxes. The Issuer or such Guarantor, as applicable, will attach to each official receipt or other documentation a certificate stating (x) that the amount of such Tax evidenced by the official receipt or other documentation was paid in connection with payments in respect of the principal amount of Notes then outstanding and (y) the amount of such Tax paid per €1,000 of principal amount of the Notes.

At least 30 calendar days prior to each date on which any payment under or with respect to the Notes or any Guarantee, as the case may be, is due and payable (unless such obligation to pay Additional Amounts arises shortly before or after the 30th day prior to such date, in which case it shall be promptly thereafter), if the Issuer or any Guarantor will be obligated to pay Additional Amounts with respect to such payment, the Issuer or such Guarantor will deliver to the Trustee and Paying Agent an Officer's Certificate stating the fact that such Additional Amounts will be payable and the amounts so payable and will set forth such other information necessary to enable the Trustee or Paying Agent, as the case may be, to pay such Additional Amounts to Holders of Notes on the payment date. Each such Officer's Certificate shall be relied upon until receipt of a further Officer's Certificate addressing such matters.

Whenever in this Indenture there is mentioned, in any context:

(1) the payment of principal;

(2) redemption prices or purchase prices in connection with a redemption or purchase of Notes;

(3) interest; or

(4) any other amount payable on or with respect to any of the Notes,

such reference will be deemed to include payment of Additional Amounts as described under this heading to the extent that, in such context, Additional Amounts are, were or would be payable in respect thereof.

The Issuer will pay any present or future stamp, court or documentary taxes or any other excise or property taxes, charges or similar levies that arise in any Relevant Taxing Jurisdiction from the execution, delivery, enforcement or registration of the Notes, the Guarantees, this Indenture or any other document or instrument in relation thereto (other than a transfer of the Notes) and the Issuer and each Guarantor will agree to indemnify the Holders for any such Taxes paid by such Holders.

70

LO\332299.7

The obligations described under this Section 4.18 will survive any termination, defeasance or discharge of this Indenture or any Guarantee and will apply mutatis mutandis to any jurisdiction in which any successor Person to the Issuer or a Guarantor is organized or any political subdivision or taxing authority or agency thereof or therein.

Section 4.19    *Listing*.

The Issuer will, and the Parent Guarantor will procure that the Issuer will, use all commercially reasonable efforts to have the Notes admitted to listing on the official list of the Luxembourg Stock Exchange and admitted for trading on the Euro MTF market; *provided, however,* that if the Issuer is unable to list the Notes on the official list of the Luxembourg Stock Exchange or if maintenance of such listing becomes unduly onerous, it will, prior to the delisting of the Notes from the official list of the Luxembourg Stock Exchange, use all commercially reasonable efforts to list and maintain a listing of such Notes on another internationally recognized stock exchange.

## ARTICLE 5
## SUCCESSORS

Section 5.01    *Merger and Consolidation.*

(a)  The Parent Guarantor will not consolidate with or merge with or into, or convey, transfer or lease, in one transaction or a series of transactions, directly or indirectly, all or substantially all its properties and assets to any Person unless the transaction is a Proposed Subsidiary Merger or:

(1) the resulting surviving or transferee Person (the "*Successor Company*") will be a corporation duly incorporated and validly existing under the laws of any European Union Member State, the United States of America, any state thereof, or the District of Columbia and the Successor Company (if not the Parent Guarantor) will expressly assume, by a supplemental agreement, all the obligations of the Parent Guarantor, if any, under the Notes and this Indenture;

(2) immediately after giving *pro forma* effect to such transaction or series of transactions (and treating any obligation of the Parent Guarantor or any Restricted Subsidiary Incurred in connection with or as a result of such transaction or series of transactions as having been Incurred by the Parent Guarantor or such Restricted Subsidiary at the time of such transaction), no Default or Event of Default will have occurred and be continuing;

(3) immediately after giving *pro forma* effect to such transaction or series of transactions either (A) a Restricted Subsidiary could Incur at least €1.00 of additional Indebtedness under the provisions of paragraph (a) of Section 4.07 or (B) the Consolidated Leverage Ratio will not be greater than it was immediately prior to such transaction or series of transactions; and

(4) the Parent Guarantor or the Successor Company will have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each to the effect that such consolidation, merger or transfer, and if a supplemental indenture is required in connection with such transaction, such supplemental indenture, comply with the requirements of this Indenture; *provided* that in giving an Opinion of Counsel, counsel may rely on an Officer's Certificate as to matters of fact.

(b) The Successor Company will succeed to, and be substituted for, and may exercise every right and power of, the relevant obligor under this Indenture, but, in the case of a lease of all or substantially all of the Parent Guarantor's, the Issuer's or a Guarantor's assets, the Parent Guarantor, the Issuer or, as applicable, such Guarantor will not be released from the obligation to pay the principal of and interest, and Additional Amounts, if any, on the Notes.

LO\332299.7

Section 5.02    *Successor Person Substituted.*

Upon any consolidation or merger, or any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of the properties or assets of the Parent Guarantor, Issuer or any Guarantor in a transaction that is subject to, and that complies with the provisions of, Section 5.01 hereof, the successor Person formed by such consolidation or into or with which the Parent Guarantor, Issuer or any Guarantor, as applicable, is merged or to which such sale, assignment, transfer, lease, conveyance or other disposition is made shall succeed to, and be substituted for (so that from and after the date of such consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition, the provisions of this Indenture referring to the "Parent Guarantor" or "Issuer," as applicable, shall refer instead to the successor Person and not to the Parent Guarantor or Issuer, as applicable, (or in the case of provisions referring to any "Guarantor," shall include reference to the successor Person), and may exercise every right and power of the Parent Guarantor, Issuer or any Guarantor, as applicable, under this Indenture with the same effect as if such successor Person had been so named herein; *provided, however*, that the predecessor Parent Guarantor, Issuer or any Guarantor, as applicable, shall not be relieved from the obligation to pay the principal of and interest on the Notes except in the case of a sale of all assets of such predecessor Person in a transaction that is subject to, and that complies with the provisions of, Section 5.01 hereof.

## ARTICLE 6
## DEFAULTS AND REMEDIES

Section 6.01    *Events of Default.*

(a)  Each of the following is an "*Event of Default*":

(1) a default in the payment of interest or any Additional Amounts on the Notes when due, continued for 30 days;

(2) a default in the payment of principal of any Note when due at its maturity, upon optional redemption, upon required purchase, upon declaration of acceleration or otherwise;

(3) the failure by the Parent Guarantor or the Issuer to comply with its obligations under Section 5.01 above;

(4) the failure by the Parent Guarantor or the Issuer to comply for 30 days after notice with any of the obligations in the covenants described above under Article 4 (other than a failure to purchase Notes, as required thereby which will be covered by clause (2) above or a failure to comply with Section 5.01, which is covered by clause (3) above);

(5) the failure by the Parent Guarantor or the Issuer to comply for 60 days after notice with its other agreements contained in this Indenture;

(6) default under the terms of any instrument evidencing or securing the Parent Guarantor's Indebtedness, or Indebtedness of any Restricted Subsidiary having an outstanding principal amount in excess of €25 million individually or in the aggregate, that results in the acceleration of the payment of such Indebtedness or constitutes the failure to pay such Indebtedness at final maturity thereof (other than by regularly scheduled required prepayment) and such failure to make any payment has not been waived or cured, such acceleration has not been rescinded, or the maturity of such Indebtedness has not been extended;

(7) any Guarantee ceases to be, or is asserted in writing by any Guarantor, or any person acting on behalf of any Guarantor, not to be in full force and effect or enforceable in accordance with its terms (other than as provided for in this Indenture or any Guarantee);

72

(8) one or more final judgments, orders or decrees (not subject to appeal and not covered by insurance) will be rendered against the Issuer, any Guarantor or any Restricted Subsidiary, either individually or in an aggregate amount, in excess of €25 million, and either a creditor has commenced an enforcement proceeding upon such judgment, order or decree or there has been a period of 60 consecutive days or more during which a stay of enforcement of such judgment, order or decree was not (by reason of pending appeal or otherwise) in effect;

(9)        (A) the Parent Guarantor, the Issuer, any Guarantor or any Significant Subsidiary, pursuant to or within the meaning of any Bankruptcy Law:

(i)        commences a voluntary case;

(ii)        consents to the entry of an order for relief against it in an involuntary case;

(iii)        consents to the appointment of a Custodian (including, without limitation, in relation to the Luxembourg Companies, any *commissaire, liquidateur, juge-commissaire* or *curateur*) of it or for any substantial part of its property;

(iv)        makes a general assignment for the benefit of its creditors;

(v)        admits in writing its inability to pay its debts generally as they become due; or

(vi)        takes any action comparable to that referred to in subclauses (A)(i) to (A)(v) above under any foreign laws relating to insolvency; or

(B) a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

(i)        is for relief against the Parent Guarantor, the Issuer, any Guarantor or any Significant Subsidiary in an involuntary case;

(ii)        appoints a Custodian of the Parent Guarantor, the Issuer, any Guarantor or any Significant Subsidiary or for any substantial part of its property;

(iii)        orders the winding up or liquidation of the Parent Guarantor, the Issuer, any Guarantor or any Significant Subsidiary; or

(iv)        any relief similar to that referred to in subclauses (B)(i) to (B)(iii) above is granted under any foreign laws,

and any such order or decree remains unstayed and in effect for 60 days;

(b) However, a Default under clauses (a)(4) and (a)(5) hereof will not constitute an Event of Default until the Trustee or the Holders of 25% in principal amount of the outstanding Notes notify the Parent Guarantor or the Issuer of the Default and the Parent Guarantor does not cure or cause to be cured such Default within the time specified after receipt of such notice.

(c) The Trustee shall have the right to receive an Officer's Certificate in accordance with Section 4.04(c) hereof.

73

Section 6.02    *Acceleration*.

In the case of an Event of Default specified in Section 6.01(a)(9) hereof, with respect to the Parent Guarantor, the Issuer, any Restricted Subsidiary that is a Significant Subsidiary or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary, all outstanding Notes will become due and payable immediately without further action or notice.  If any other Event of Default occurs and is continuing, the Trustee or the Holders of at least 25% in aggregate principal amount of the then outstanding Notes may declare the principal of and accrued but unpaid interest on all the Notes to be due and payable immediately.

Upon any such declaration, such principal and interest on Notes shall become due and payable immediately.

The Holders of a majority in aggregate principal amount of the then outstanding Notes by written notice to the Trustee may, on behalf of all of the Holders, rescind an acceleration and its consequences, if the rescission would not conflict with any judgment or decree and if all existing Events of Default (except nonpayment of principal, interest or premium that has become due solely because of the acceleration) have been cured or waived.

Section 6.03    *Other Remedies*.

If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy to collect the payment of principal, premium, if any, and interest on the Notes or to enforce the performance of any provision of the Notes or this Indenture.

The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding.  A delay or omission by the Trustee or any Holder of a Note in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default.  All remedies are cumulative to the extent permitted by law.

The Trustee may direct the Security Agent to take enforcement action with respect to the Collateral if any amount is declared or becomes due and payable pursuant to Section 6.02 (but not otherwise).

Section 6.04    *Waiver of Past Defaults*.

Holders of not less than a majority in aggregate principal amount of the then outstanding Notes by notice to the Trustee may on behalf of the Holders of all of the Notes waive an existing Default or Event of Default and its consequences hereunder, except a continuing Default or Event of Default in the payment of the principal of, premium, if any, or interest on, the Notes (including in connection with an offer to purchase); *provided, however*, that the Holders of a majority in aggregate principal amount of the then outstanding Notes may rescind an acceleration and its consequences, including any related payment default that resulted from such acceleration.  Upon any such waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured for every purpose of this Indenture; but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereon.

Section 6.05    *Control by Majority*.

Holders of a majority in aggregate principal amount of the then outstanding Notes may direct the time, method and place of conducting any proceeding for exercising any remedy available to the Trustee or exercising any trust or power conferred on it.  However, the Trustee may refuse to follow any direction that conflicts with law or this Indenture that the Trustee determines may be unduly prejudicial to the rights of other Holders of Notes or that may involve the Trustee in personal liability.

74

Section 6.06    *Limitation on Suits.*

(a)  Subject to the provisions of this Indenture relating to the duties of the Trustee, in case an Event of Default occurs and is continuing, the Trustee will be under no obligation to exercise any of the rights or powers under this Indenture at the request or direction of any of the Holders unless such Holders have offered to the Trustee indemnity or security satisfactory to the Trustee against any loss, liability or expense. Except to enforce the right to receive payment of principal, premium (if any) or interest when due, no Holder may pursue any remedy with respect to this Indenture or the Notes unless:

(1) such Holder has previously given the Trustee notice that an Event of Default is continuing;

(2) Holders of at least 25% in principal amount of the outstanding Notes have requested the Trustee to pursue the remedy;

(3) such Holders have offered the Trustee security or indemnity satisfactory to the Trustee against any loss, liability or expense;

(4) the Trustee has not complied with such request within 60 days after the receipt thereof and the offer of security or indemnity; and

(5) Holders of a majority in principal amount of the outstanding Notes have not given the Trustee a direction inconsistent with such request within such 60-day period.

(b)  A Holder of a Note may not use this Indenture to prejudice the rights of another Holder of a Note or to obtain a preference or priority over another Holder of a Note.

Section 6.07    *Rights of Holders of Notes to Receive Payment.*

Notwithstanding any other provision of this Indenture, the right of any Holder of a Note to receive payment of principal, premium, if any, and interest on the Note, on or after the respective due dates expressed in the Note (including in connection with an offer to purchase), or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such Holder; *provided* that a Holder shall not have the right to institute any such suit for the enforcement of payment if and to the extent that the institution or prosecution thereof or the entry of judgment therein would, under applicable law, result in the surrender, impairment, waiver or loss of the Lien of this Indenture upon any property subject to such Lien.

Section 6.08    *Collection Suit by Trustee.*

If an Event of Default specified in Section 6.01(a)(1) or 6.01(a)(2) hereof occurs and is continuing, the Trustee is authorized to recover judgment in its own name and as trustee of an express trust against the Issuer for the whole amount of principal of, premium, if any, and interest remaining unpaid on, the Notes and interest on overdue principal and, to the extent lawful, interest and such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel.

Section 6.09    *Trustee May File Proofs of Claim.*

The Trustee is authorized to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel) and the Holders of the Notes allowed in any judicial proceedings relative to the Issuer or any

75

Guarantor (or any other obligor upon the Notes), its creditors or its property and shall be entitled and empowered to collect, receive and distribute any money or other property payable or deliverable on any such claims and any custodian in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee, and in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.07 hereof.  To the extent that the payment of any such compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.07 hereof out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Holders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise.  Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

Section 6.10    *Priorities*.

If the Trustee collects any money pursuant to this Article 6, it shall pay out the money in the following order:

*First*:    to the Trustee, its agents and attorneys for amounts due under Section 7.07 hereof, including payment of all compensation, expenses and liabilities incurred, and all advances made, by the Trustee and the costs and expenses of collection;

*Second*:    to Holders of Notes for amounts due and unpaid on the Notes for principal, premium, if any, and interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal, premium, if any, and interest, respectively; and

*Third*:    to the Issuer or to such party as a court of competent jurisdiction shall direct.

The Trustee may fix a record date and payment date for any payment to Holders of Notes pursuant to this Section 6.10.

Section 6.11    *Undertaking for Costs*.

In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as a Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant.  This Section 6.11 does not apply to a suit by the Trustee, a suit by a Holder of a Note pursuant to Section 6.07 hereof, or a suit by Holders of more than 10% in aggregate principal amount of the then outstanding Notes.

**ARTICLE 7**
TRUSTEE

76

Section 7.01    *Duties of Trustee*.

(a) If an Event of Default has occurred and is continuing, the Trustee will exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(b) Except during the continuance of an Event of Default:

(1) the duties of the Trustee will be determined solely by the express provisions of this Indenture and the Trustee need perform only those duties that are specifically set forth in this Indenture and no others, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(2) in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture. However, the Trustee will examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture (but need not confirm or investigate the accuracy or mathematical calculations or other facts stated therein).

(c) The Trustee may not be relieved from liabilities for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(1) this paragraph does not limit the effect of paragraph (b) of this Section 7.01;

(2) the Trustee will not be liable for any error of judgment made in good faith by a Responsible Officer, unless it is proved that the Trustee was negligent in ascertaining the pertinent facts; and

(3) the Trustee will not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.05 hereof.

(d) Whether or not therein expressly so provided, every provision of this Indenture that in any way relates to the Trustee is subject to paragraphs (a), (b), and (c) of this Section 7.01.

(e) No provision of this Indenture will require the Trustee to expend or risk its own funds or incur any liability. The Trustee will be under no obligation to exercise any of its rights and powers under this Indenture at the request of any Holders, unless such Holder has offered to the Trustee security and indemnity satisfactory to it against any loss, liability or expense.

(f) The Trustee will not be liable for interest on any money received by it except as the Trustee may agree in writing with the Issuer. Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

Section 7.02    *Rights of Trustee*.

(a) The Trustee may conclusively rely upon any document believed by it to be genuine and to have been signed or presented by the proper Person. The Trustee need not investigate any fact or matter stated in the document.

(b) Before the Trustee acts or refrains from acting, it may require an Officer's Certificate or an Opinion of Counsel or both. The Trustee will not be liable for any action it takes or omits to take in good faith in reliance on such Officer's Certificate or Opinion of Counsel. The Trustee may consult with counsel and the written advice of such counsel or any Opinion of Counsel will be full

77

LO\332299.7

and complete authorization and protection from liability in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

(c)  The Trustee may act through its attorneys and agents and will not be responsible for the misconduct or negligence of any attorney or agent appointed with due care.

(d)  The Trustee will not be liable for any action it takes or omits to take in good faith that it believes to be authorized or within the rights or powers conferred upon it by this Indenture.

(e)  Unless otherwise specifically provided in this Indenture, any demand, request, direction or notice from the Issuer will be sufficient if signed by a duly authorized Officer of the Issuer.

(f)  The Trustee will be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the Holders unless such Holders have offered to the Trustee indemnity or security against the losses, liabilities and expenses that might be incurred by it in compliance with such request or direction.

(g)  The Trustee shall have no duty to inquire as to the performance of the covenants of the Issuer and/or its Restricted Subsidiaries in Article 4 hereof, except with respect to Section 4.01.  In addition, the Trustee shall not be deemed to have knowledge of any Default or Event of Default except: (i) any Event of Default occurring pursuant to Section 6.01(a)(1) or 6.01(a)(2) hereof; and (ii) any Default or Event of Default of which a Responsible Officer shall have received written notification or obtained actual knowledge.  Delivery of reports, information and documents to the Trustee under Section 4.03 is for informational purposes only and the Trustee's receipt of the foregoing shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Issuer's compliance with any of their covenants hereunder (as to which the Trustee is entitled to rely on Officer's Certificates).

(h)  The Trustee shall not have any obligation or duty to monitor, determine or inquire as to compliance, and shall not be responsible or liable for compliance with restrictions on transfer, exchange, redemption, purchase or repurchase, as applicable, of minimum denominations imposed under this Indenture or under applicable law or regulation with respect to any transfer, exchange, redemption, purchase or repurchase, as applicable, of any interest in any Notes.

(i)  In no event shall the Trustee be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of, or caused by, directly or indirectly, forces beyond its control, including, without limitation, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God; it being understood that the Trustee shall use reasonable best efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

(j)  The rights, privileges, protections, immunities and benefits given to the Trustee, including without limitation its right to be indemnified and all other rights provided in Section 7.07, Section 7.08, Section 7.01(d) and (e) and this Section 7.02, are extended to, and shall be enforceable by The Bank of New York in each of its capacities hereunder and by The Bank of New York (Luxembourg) S.A. and each agent, custodian and other person employed to act hereunder.

(k)  The Trustee is not required to give any bond or surety with respect to the performance of its duties or the exercise of its powers under this Indenture.

(l)  The Trustee may request that the Issuer deliver an Officer's Certificate setting forth the names of the individuals and/or titles of officers, authorized at such time to take specified actions pursuant to this Indenture, which Officer's Certificate may be signed by any person authorized to sign an Officer's Certificate, including any person specified as so authorized in any such certificate previously delivered and not superseded.

LO\332299.7

(m) The permissive right of the Trustee to take the actions permitted by this Indenture shall not be construed as an obligation or duty to do so.

(n) The Trustee will not be liable to any person if prevented or delayed in performing any of its obligations or discretionary functions under this Indenture by reason of any change in law applicable to it which comes into force after the date of this Indenture, *provided* that the Trustee shall use its reasonable best efforts to promptly comply with such changes in applicable law and not delay the performance of such obligations or discretionary functions.

(o) The Trustee shall not be liable for any consequential loss (being loss of business, goodwill, opportunity or profit of any kind) of the Issuer, Successor Company, the Parent Guarantor or any Restricted Subsidiary arising out of a breach by the Trustee of the terms of this Indenture unless the breach resulted from the bad faith, willful misconduct or gross negligence on the part of the Trustee.

(p) In the event the Trustee receives inconsistent or conflicting requests and indemnity from two or more groups of Holders, each representing less than a majority in aggregate principal amount of the Notes then outstanding, pursuant to the provisions of this Indenture, the Trustee, in its sole discretion, may determine what action, if any, will be taken and shall not incur any liability for its failure to act until such inconsistency or conflict is, in its reasonable opinion, resolved.

Section 7.03    *Individual Rights of Trustee.*

The Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Issuer or any Affiliate of the Issuer with the same rights it would have if it were not Trustee.  However, in the event that the Trustee acquires any conflicting interest it must eliminate such conflict within 90 days or resign.  Any agent may do the same with like rights and duties.  The Trustee is also subject to Sections 7.10 hereof.

Section 7.04    *Trustee's Disclaimer.*

The Trustee will not be responsible for and makes no representation as to the validity or adequacy of this Indenture or the Notes, it shall not be accountable for the Issuer's use of the proceeds from the Notes or any money paid to the Issuer or upon the Issuer's direction under any provision of this Indenture, it will not be responsible for the use or application of any money received by any Paying Agent other than the Trustee, and it will not be responsible for any statement or recital herein or any statement in the Notes or any other document in connection with the sale of the Notes or pursuant to this Indenture other than its certificate of authentication.

Section 7.05    *Notice of Defaults.*

If a Default or Event of Default occurs and is continuing and if it is known to the Trustee, the Trustee will mail to Holders of Notes a notice of the Default or Event of Default within 90 days after it occurs.  Except in the case of a Default or Event of Default occurring pursuant to Section 6.01(a)(1) or Section 6.01(a)(2) hereof, the Trustee may withhold the notice if and so long as a committee of its Responsible Officers in good faith determines that withholding the notice is in the interests of the Holders of the Notes.

Section 7.06    *Reports by Trustee to Holders of the Notes.*

Within 60 days after each May 15 beginning with the May 15 following the date of this Indenture, and for so long as Notes remain outstanding, the Trustee will mail to the Holders of the Notes a brief report dated as of such reporting date that substantially complies with TIA § 313(a) as if this Indenture were required to be qualified under the TIA (but if no event described in TIA § 313(a) has occurred within the twelve months preceding the reporting date, no report need be transmitted).

79

The Trustee also will comply with TIA § 313(b)(2) as if this Indenture were required to be qualified under the TIA. The Trustee will also transmit by mail all reports as required by TIA § 313(c) as if this Indenture were required to be qualified under the TIA.

Section 7.07    *Compensation and Indemnity*.

(a) The Issuer, failing which any Guarantor, will pay or cause to be paid to the Trustee from time to time reasonable compensation for its acceptance of this Indenture and services hereunder. The Trustee's compensation will not be limited by any law on compensation of a trustee of an express trust. The Issuer, failing which any Guarantor, will reimburse the Trustee promptly upon request for all reasonable disbursements, advances and expenses incurred or made by it in addition to the compensation for its services. Such expenses will include the reasonable compensation, disbursements and expenses of the Trustee's agents and counsel.

(b) The Issuer, failing which any Guarantor, will jointly and severally indemnify the Trustee, its agents and their officers, directors and agents against any and all losses, liabilities or expenses incurred by it arising out of or in connection with the acceptance or administration of its duties under this Indenture, including the reasonable costs and expenses of enforcing this Indenture against the Issuer and each Guarantor (including this Section 7.07) and defending itself against any claim (whether asserted by the Issuer, any Guarantor, any Holder or any other Person or liability in connection with the exercise or performance of any of its powers or duties hereunder, except to the extent any such loss, liability or expense may be attributable to its negligence or bad faith. The Trustee will notify the Issuer promptly of any claim for which it may seek indemnity. Failure by the Trustee to so notify the Issuer will not relieve the Issuer or any Guarantor of their obligations hereunder. The Issuer or such Guarantor will defend the claim and the Trustee will cooperate in the defense. In the event of a conflict of interest between the Trustee and the Issuer, the Trustee may have separate counsel and the Issuer will pay the reasonable fees and expenses of such counsel. Neither the Issuer nor any Guarantor need pay for any settlement made without its consent, which consent will not be unreasonably withheld.

(c) The obligations of the Issuer and any Guarantor under this Section 7.07 will survive the satisfaction and discharge of this Indenture.

(d) To secure the Issuer's and any Guarantor's payment obligations in this Section 7.07, the Trustee will have a Lien prior to the Notes on all money or property held or collected by the Trustee, except that held in trust to pay principal and interest on particular Notes. Such Lien will survive the satisfaction and discharge of this Indenture.

(e) When the Trustee incurs expenses or renders services after an Event of Default specified in Section 6.01(a)(9) hereof occurs, the expenses and the compensation for the services (including the fees and expenses of its agents and counsel) are intended to constitute expenses of administration under any Bankruptcy Law.

(f) The Trustee will comply with the provisions of TIA § 313(b)(2) to the extent applicable.

Section 7.08    *Replacement of Trustee*.

(a) A resignation or removal of the Trustee and appointment of a successor Trustee will become effective only upon the successor Trustee's acceptance of appointment as provided in this Section 7.08.

(b) The Trustee may resign in writing at any time and be discharged from the trust hereby created by so notifying the Issuer. The Holders of a majority in aggregate principal amount of the then outstanding Notes may remove the Trustee by so notifying the Trustee and the Issuer in writing. The Issuer may remove the Trustee if:

80

(1) the Trustee fails to comply with Section 7.10 hereof;

(2) the Trustee is adjudged a bankrupt or an insolvent or an order for relief is entered with respect to the Trustee under any Bankruptcy Law;

(3) a custodian or public officer takes charge of the Trustee or its property; or

(4) the Trustee becomes incapable of acting.

(c)  If the Trustee resigns or is removed or if a vacancy exists in the office of Trustee for any reason, the Issuer will promptly appoint a successor Trustee.  Within one year after the successor Trustee takes office, the Holders of a majority in aggregate principal amount of the then outstanding Notes may appoint a successor Trustee to replace the successor Trustee appointed by the Issuer.

(d)  If a successor Trustee does not take office within 60 days after the retiring Trustee resigns or is removed, (i) the retiring Trustee, the Issuer, or the Holders of at least 10% in aggregate principal amount of the then outstanding Notes may petition any court of competent jurisdiction for the appointment of a successor Trustee or (ii) the retiring Trustee may appoint a successor Trustee at any time prior to the date on which a successor Trustee takes office; provided that such appointment shall be reasonably satisfactory to the Issuer.

(e)  If the Trustee, after written request by any Holder who has been a Holder for at least six months, fails to comply with Section 7.10 hereof, such Holder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(f)  A successor Trustee will deliver a written acceptance of its appointment to the retiring Trustee and to the Issuer.  Thereupon, the resignation or removal of the retiring Trustee will become effective, and the successor Trustee will have all the rights, powers and duties of the Trustee under this Indenture.  The successor Trustee will mail a notice of its succession to all Holders.  The retiring Trustee will promptly transfer all property held by it as Trustee to the successor Trustee; *provided* all sums owing to the Trustee hereunder have been paid and subject to the Lien provided for in Section 7.07 hereof.  Notwithstanding replacement of the Trustee pursuant to this Section 7.08, the Issuer's obligations under Section 7.07 hereof will continue for the benefit of the retiring Trustee.

Section 7.09    *Successor Trustee by Merger, etc.*

If the Trustee consolidates, merges or converts into, or transfers all or substantially all of its corporate trust business to, another corporation, the successor corporation without any further act will be the successor Trustee.

Section 7.10    *Eligibility; Disqualification.*

There will at all times be a Trustee hereunder that is a corporation organized and doing business under the laws of the United States of America or of any state thereof, or a member state of the European Union or a political subdivision thereof, that is authorized under such laws to exercise corporate trustee power, that is subject to supervision or examination by federal or state authorities or by the authorities of a member state of the European Union or a political subdivision thereof and that has a combined capital and surplus of at least €100.0 million as set forth in its most recent published annual report of condition.

## ARTICLE 8
### LEGAL DEFEASANCE AND COVENANT DEFEASANCE

81

Section 8.01    *Option to Effect Legal Defeasance or Covenant Defeasance.*

The Parent Guarantor or the Issuer may at any time, at the option of its Board of Directors evidenced by a resolution set forth in an Officer's Certificate, elect to have either Section 8.02 or 8.03 hereof be applied to all outstanding Notes upon compliance with the conditions set forth below in this Article 8.

Section 8.02    *Legal Defeasance and Discharge.*

Upon the Parent Guarantor's or Issuer's exercise under Section 8.01 hereof of the option applicable to this Section 8.02, the Parent Guarantor, the Issuer and any other Guarantor will, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, be deemed to have been discharged from their obligations with respect to all outstanding Notes (including the Guarantees) on the date the conditions set forth below are satisfied (hereinafter, "*Legal Defeasance*").  For this purpose, Legal Defeasance means that the Parent Guarantor, the Issuer and any other Guarantor will be deemed to have paid and discharged the entire Indebtedness represented by the outstanding Notes (including the Guarantees), which will thereafter be deemed to be "outstanding" only for the purposes of Section 8.05 hereof and the other Sections of this Indenture referred to in clauses (1) and (2) below, and to have satisfied all their other obligations under such Notes, the Guarantees and this Indenture (and the Trustee, on demand of and at the expense of the Parent Guarantor or the Issuer, shall execute proper instruments acknowledging the same), except for the following provisions which will survive until otherwise terminated or discharged hereunder:

(1) the rights of Holders of outstanding Notes to receive payments in respect of the principal of, or interest or premium, if any, on, such Notes when such payments are due from the trust referred to in Section 8.04 hereof;

(2) the Issuer's obligations with respect to such Notes under Article 2 and Section 4.02 hereof;

(3) the rights, powers, trusts, duties and immunities of the Trustee hereunder and the Parent Guarantor's, the Issuer's and any other Guarantor's obligations in connection therewith; and

(4) this Article 8.

Subject to compliance with this Article 8, the Parent Guarantor or the Issuer may exercise its option under this Section 8.02 notwithstanding the prior exercise of its option under Section 8.03 hereof.

Section 8.03    *Covenant Defeasance.*

Upon the Parent Guarantor's or the Issuer's exercise under Section 8.01 hereof of the option applicable to this Section 8.03, the Parent Guarantor, the Issuer and any other Guarantor will, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, be released from each of their obligations under Sections 4.03, 4.04, 4.05, 4.07, 4.08, 4.09, 4.10, 4.11, 4.13, 4.15, 4.17, 4.18 and 4.19 hereof and Section 5.01(a)(3) hereof with respect to the outstanding Notes on and after the date the conditions set forth in Section 8.04 hereof are satisfied (hereinafter, "*Covenant Defeasance*"), and the Notes will thereafter be deemed not "outstanding" for the purposes of any direction, waiver, consent or declaration or act of Holders (and the consequences of any thereof) in connection with such covenants, but will continue to be deemed "outstanding" for all other purposes hereunder (it being understood that such Notes will not be deemed outstanding for accounting purposes).  For this purpose, Covenant Defeasance means that, with respect to the outstanding Notes and Guarantees, the Parent Guarantor, the Issuer and each Guarantor may omit to comply with and will have no liability in respect of any term, condition or limitation set forth in any such covenant, whether directly or

82

indirectly, by reason of any reference elsewhere herein to any such covenant or by reason of any reference in any such covenant to any other provision herein or in any other document and such omission to comply will not constitute a Default or an Event of Default under Section 6.01(a) hereof, but, except as specified above, the remainder of this Indenture and such Notes and Guarantees will be unaffected thereby.  In addition, upon the Parent Guarantor's or the Issuer's exercise under Section 8.01 hereof of the option applicable to this Section 8.03, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, the Notes may not be accelerated because of an Event of Default specified in clauses (3), (4), (6), (7), (8) or (9) (with respect only to Significant Subsidiaries and any Guarantor) under Section 6.01(a) hereof.

Section 8.04     *Conditions to Legal or Covenant Defeasance*.

In order to exercise either Legal Defeasance or Covenant Defeasance under either Section 8.02 or 8.03 hereof:

(1) the Parent Guarantor or the Issuer must irrevocably deposit with the Trustee, in trust, for the benefit of the Holders, cash in euro or euro-denominated European Government Obligations or a combination thereof, in such amounts as will be sufficient, in the opinion of a nationally recognized investment bank, appraisal firm, or firm of independent public accountants, to pay the principal of, premium, if any, interest, and any Additional Amounts that may be then due and owing, if any, on the outstanding Notes on the stated date for payment thereof or on the applicable redemption date, as the case may be, and the Parent Guarantor or the Issuer must specify whether the Notes are being defeased to such stated date for payment or to a particular redemption date;

(2) in the case of an election under Section 8.02 hereof, the Parent Guarantor or the Issuer must deliver to the Trustee an Opinion of Counsel confirming that:

(A) the Parent Guarantor or the Issuer has received from, or there has been published by, the U.S. Internal Revenue Service a ruling; or

(B) since the Issue Date, there has been a change in the applicable U.S. federal income tax law,

in either case to the effect that, and based thereon such Opinion of Counsel shall confirm that, the Holders of the outstanding Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such Legal Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred;

(3) in the case of an election under Section 8.03 hereof, the Parent Guarantor or the Issuer must deliver to the Trustee an Opinion of Counsel confirming that the Holders of the outstanding Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such Covenant Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred;

(4) no Default or Event of Default shall have occurred and be continuing on the date of such deposit (other than a Default or Event of Default resulting from the borrowing of funds to be applied to such deposit) and the deposit will not result in a breach or violation of, or constitute a default under, any other instrument to which the Parent Guarantor, the Issuer or any other Guarantor is a party or by which the Parent Guarantor, the Issuer or any other Guarantor is bound;

LO\332299.7

(5) such defeasance or Covenant Defeasance shall not result in the trust arising from such deposit constituting an investment company within the meaning of the US Investment Company Act of 1940 unless such trust shall be registered under such act or exempt from registration thereunder;

(6) such Legal Defeasance or Covenant Defeasance will not result in a breach or violation of, or constitute a default under, any material agreement or instrument (other than this Indenture) to which the Issuer, the Parent Guarantor or any of its other Subsidiaries is a party or by which the Issuer, the Parent Guarantor or any of its other Subsidiaries is bound;

(7) the Parent Guarantor or the Issuer must deliver to the Trustee an Officer's Certificate stating that the deposit was not made by the Parent Guarantor or the Issuer with the intent of preferring the Holders of Notes over the other creditors of the Issuer with the intent of defeating, hindering, delaying or defrauding any creditors of the Parent Guarantor, the Issuer or others; and

(8) the Parent Guarantor or the Issuer must deliver to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that all conditions precedent relating to the Legal Defeasance or the Covenant Defeasance have been complied with.

Section 8.05      *Deposited Money and European Government Obligations to be Held in Trust; Other Miscellaneous Provisions.*

Subject to Section 8.06 hereof, all money and non-callable European Government Obligations (including the proceeds thereof) deposited with the Trustee (or other qualifying trustee, collectively for purposes of this Section 8.05, the "*Trustee*") pursuant to Section 8.04 hereof in respect of the outstanding Notes will be held in trust and applied by the Trustee, in accordance with the provisions of such Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Issuer acting as Paying Agent) as the Trustee may determine, to the Holders of such Notes of all sums due and to become due thereon in respect of principal, premium, if any, and interest, but such money need not be segregated from other funds except to the extent required by law.

The Parent Guarantor or the Issuer will pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the cash or non-callable European Government Obligations deposited pursuant to Section 8.04 hereof or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Holders of the outstanding Notes.

Notwithstanding anything in this Article 8 to the contrary, the Trustee will deliver or pay to the Parent Guarantor or the Issuer from time to time upon the request of the Parent Guarantor or the Issuer any money or non-callable European Government Obligations held by it as provided in Section 8.04 hereof which, in the opinion of a nationally recognized firm of independent public accountants expressed in a written certification thereof delivered to the Trustee (which may be the opinion delivered under Section 8.04(1) hereof), are in excess of the amount thereof that would then be required to be deposited to effect an equivalent Legal Defeasance or Covenant Defeasance.

If the Parent Guarantor or the Issuer exercises under Section 8.01 hereof its option under either Section 8.02 or Section 8.03 hereof, each Guarantor will be released from all of its obligations with respect to its Guarantee and the Collateral will be released.

Section 8.06      *Repayment.*

Any money deposited with the Trustee or any Paying Agent, or then held by the Parent Guarantor or the Issuer, in trust for the payment of the principal of, premium, if any, or interest on, any Note and remaining unclaimed for two years after such principal, premium, if any, or interest has

84

become due and payable shall be paid to the Parent Guarantor or the Issuer on its request or (if then held by the Parent Guarantor or the Issuer) will be discharged from such trust; and the Holder of such Note will thereafter be permitted to look only to the Parent Guarantor or the Issuer for payment thereof, and all liability of the Trustee or such Paying Agent with respect to such trust money, and all liability of the Parent Guarantor or the Issuer as trustee thereof, will thereupon cease.

Section 8.07    *Reinstatement*.

If the Trustee or Paying Agent is unable to apply any money or Government Obligations in accordance with Section 8.02 or 8.03 hereof, as the case may be, by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, then the Parent Guarantor's, the Issuer's and each Guarantor's obligations under this Indenture and the Notes and the Guarantees will be revived and reinstated as though no deposit had occurred pursuant to Section 8.02 or 8.03 hereof until such time as the Trustee or Paying Agent is permitted to apply all such money in accordance with Section 8.02 or 8.03 hereof, as the case may be; *provided, however*, that, if the Parent Guarantor or the Issuer makes any payment of principal of, premium, if any, or interest on, any Note following the reinstatement of its obligations, the Parent Guarantor or the Issuer will be subrogated to the rights of the Holders of such Notes to receive such payment from the money held by the Trustee or Paying Agent.

## ARTICLE 9
## AMENDMENT, SUPPLEMENT AND WAIVER

Section 9.01    *Without Consent of Holders of Notes*.

Notwithstanding Section 9.02 of this Indenture, the Parent Guarantor, the Issuer, any other Guarantor and the Trustee may amend or supplement this Indenture or the other Notes Documents without the consent of any Holder of Notes:

(1) to cure any ambiguity, omission, defect or inconsistency;

(2) to provide for the assumption by a successor corporation of the obligations of the Parent Guarantor, the Issuer or any Guarantor under this Indenture;

(3) to provide for uncertificated Notes in addition to or in place of certificated Notes (*provided* that the uncertificated Notes are issued in registered form for purposes of Section 163(f) of the Code, or in a manner such that the uncertificated Notes are described in Section 163(f)(2)(B) of the Code);

(4) to add Guarantees with respect to the Notes or to provide additional security for the Notes;

(5) to add to the covenants of the Parent Guarantor, the Issuer or any Guarantor for the benefit of the Holders or to surrender any right or power conferred upon the Parent Guarantor, the Issuer or any Guarantor or any grantor of Collateral;

(6) to make any change that does not adversely affect the rights of any Holder;

(7) to provide for the issuance of Additional Notes in accordance with the limitations set forth in this Indenture;

(8) to make any amendment to the provisions of this Indenture relating to the form, authentication transfer and legending of Notes; *provided, however,* that (a) compliance with this Indenture as so amended would not result in Notes being transferred in violation of the

LO\332299.7

Securities Act or any other applicable securities law and (b) such amendment does not materially and adversely affect the rights of Holders to transfer Notes;

(9) to the extent necessary to provide for the granting of a security interest for the benefit of any Person, *provided* that the granting of such security interest is not prohibited under this Indenture; or

(10) to evidence and provide for the acceptance and appointment under this Indenture of a successor trustee pursuant to the requirements hereof.

Upon the request of the Issuer accompanied by a resolution of its general partner (*gérant commandité*) authorizing the execution of any such amended or supplemental indenture, and upon receipt by the Trustee of the documents described in Section 7.02 hereof, the Trustee will join with the Issuer and any Guarantor in the execution of any amended or supplemental indenture authorized or permitted by the terms of this Indenture and to make any further appropriate agreements and stipulations that may be therein contained, but the Trustee will not be obligated to enter into such amended or supplemental indenture that affects its own rights, duties or immunities under this Indenture or otherwise.

Section 9.02    *With Consent of Holders of Notes*.

Except as provided below in this Section 9.02, the Issuer, any Guarantor, the Trustee and the other parties thereto, as applicable, may amend or supplement this Indenture, the Notes, the Security Document and the other Notes Documents with the consent of the Holders of at least a majority in aggregate principal amount of the then outstanding Notes (including, without limitation, Additional Notes, if any) voting as a single class (including, without limitation, consents obtained in connection with a consent solicitation, tender offer or exchange offer for, or purchase of, the Notes), and, subject to Sections 6.04 and 6.07 hereof, any existing Default or Event of Default (other than a Default or Event of Default in the payment of the principal of, premium, if any, or interest on, the Notes, except a payment default resulting from an acceleration that has been rescinded) or compliance with any provision of this Indenture or the Notes or the Guarantees may be waived with the consent of the Holders of a majority in aggregate principal amount of the then outstanding Notes (including, without limitation, Additional Notes, if any) voting as a single class (including, without limitation, consents obtained in connection with a consent solicitation, tender offer or exchange offer for, or purchase of, the Notes).  Section 2.09 hereof shall determine which Notes are considered to be "outstanding" for purposes of this Section 9.02.

Upon the request of the Issuer accompanied by a resolution of its general partner (*gérant commandité*) authorizing the execution of any such amended or supplemental indenture, and upon the filing with the Trustee of evidence satisfactory to the Trustee of the consent of the Holders of Notes as aforesaid, and upon receipt by the Trustee of the documents described in Section 7.02 hereof, the Trustee will join with the Issuer and any Guarantor in the execution of such amended or supplemental indenture unless such amended or supplemental indenture directly affects the Trustee's own rights, duties or immunities under this Indenture or otherwise, in which case the Trustee may in its discretion, but will not be obligated to, enter into such amended or supplemental Indenture.

The Notes issued on the Issue Date, and any Additional Notes, will be treated as a single class for all purposes under this Indenture, including with respect to waivers and amendments.  For the purposes of calculating the aggregate principal amount of Notes that have consented to or voted in favor of any amendment, waiver, consent, modifications or other similar action, the Issuer (acting reasonably and in good faith) shall be entitled to select a record date as of which the Euro Equivalent of the principal amount of any Notes shall be calculated in such consent or voting process.

The Parent Guarantor will, for so long as the Notes are admitted to listing on the official list of the Luxembourg Stock Exchange and are admitted for trading on the Euro MTF market, to the extent

required by the rules and regulations of the Luxembourg Stock Exchange, inform the Luxembourg Stock Exchange of any of the foregoing amendments, supplements and waivers and provide and publish, to the extent required by the rules and regulations of the Luxembourg Stock Exchange, a notice setting forth reasonable details in connection with any such amendments, supplements or waivers.

It is not necessary for the consent of the Holders of Notes under this Section 9.02 to approve the particular form of any proposed amendment, supplement or waiver, but it is sufficient if such consent approves the substance thereof. A consent to any amendment or waiver under this Indenture by any Holder of Notes given in connection with a tender of such Holder's Notes will not be rendered invalid by such tender.

After an amendment, supplement or waiver under this Section 9.02 becomes effective, the Parent Guarantor will mail to all the Holders of Notes affected thereby a notice briefly describing the amendment, supplement or waiver. Any failure of the Parent Guarantor to mail such notice, or any defect therein, will not, however, in any way impair or affect the validity of any such amended or supplemental indenture or waiver. Subject to Sections 6.04 and 6.07 hereof, the Holders of a majority in aggregate principal amount of the Notes then outstanding voting as a single class may waive compliance in a particular instance by the Issuer with any provision of this Indenture or the Notes or the Guarantees. However, without the consent of Holders of at least 90% of the principal amount of outstanding Notes affected thereby, an amendment or waiver may not, among other things:

(1) reduce the principal amount of Notes whose Holders must consent to an amendment supplement or waiver;

(2) reduce the rate of or extend the time for payment of interest on any Note;

(3) reduce the principal of or change the Stated Maturity of any Note;

(4) change the provisions applicable to the redemption of any Note as described in Section 3.07 or Section 3.09;

(5) make any Note payable in money other than that stated in the Note;

(6) impair the right of any Holder to receive payment of principal of and interest on such Holder's Notes on or after the due dates therefore or to institute suit for the enforcement of any payment on or with respect to such Holder's Notes or any Guarantee in respect thereof;

(7) make any change in the amendment or waiver provisions which require the consent of Holders of at least 90% of the principal amount of Notes outstanding;

(8) make any change in the provisions of this Indenture described in Section 4.18 that adversely affects the rights of any Holder or amend the terms of the Notes or this Indenture in a way that would result in the loss of an exemption from any of the Taxes described thereunder;

(9) release any Guarantor from any of its obligations under any Guarantee or this Indenture, as applicable, or amend, modify or waive any Guarantee in any manner adverse to the Holders, except in accordance with this Indenture; or

(10) release the Lien on the Collateral granted for the benefit of the Holders other than pursuant to the terms of the Security Document or as otherwise permitted by this Indenture.

LO\332299.7

Section 9.03     *Compliance with Trust Indenture Act*.

Every amendment or supplement to this Indenture or the Notes will be set forth in an amended or supplemental indenture that complies with the TIA as then in effect, to the same extent as this Indenture complies with the TIA.

Section 9.04     *Revocation and Effect of Consents*.

Until an amendment, supplement or waiver becomes effective, a consent to it by a Holder of a Note is a continuing consent by the Holder of a Note and every subsequent Holder of a Note or portion of a Note that evidences the same debt as the consenting Holder's Note, even if notation of the consent is not made on any Note. However, any such Holder of a Note or subsequent Holder of a Note may revoke the consent as to its Note if the Trustee receives written notice of revocation before the date the amendment, supplement or waiver becomes effective. An amendment, supplement or waiver becomes effective in accordance with its terms and thereafter binds every Holder.

A consent to any amendment or waiver under this Indenture by any Holder given in connection with a tender of such Holder's Notes will not be rendered invalid by such tender.

Section 9.05     *Notation on or Exchange of Notes*.

The Trustee may place an appropriate notation about an amendment, supplement or waiver on any Note thereafter authenticated. The Issuer in exchange for all Notes may issue and the Trustee shall, upon receipt of an Authentication Order, authenticate new Notes that reflect the amendment, supplement or waiver.

Failure to make the appropriate notation or issue a new Note will not affect the validity and effect of such amendment, supplement or waiver.

Section 9.06     *Trustee to Sign Amendments, etc*.

The Trustee will sign any amended or supplemental indenture authorized pursuant to this Article 9 if the amendment or supplement does not adversely affect the rights, duties, liabilities or immunities of the Trustee. The Issuer may not sign an amended or supplemental indenture until the general partner (*gérant commandité*) of the Issuer approves it. In executing any amended or supplemental indenture, the Trustee will be entitled to receive and (subject to Section 7.01 hereof) will be fully protected in relying upon, in addition to the documents required by Section 14.04 hereof, an Officer's Certificate and an Opinion of Counsel stating that the execution of such amended or supplemental indenture is authorized or permitted by this Indenture.

Section 9.07     *Payment for Consent*.

Neither the Parent Guarantor nor any Affiliate of the Parent Guarantor may, directly or indirectly, pay or cause to be paid any consideration, whether by way of interest, fee or otherwise, to any Holder for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of this Indenture or the Notes unless such consideration is offered to all Holders and is paid to all Holders that so consent, waive or agree to amend in the time frame set forth in solicitation documents relating to such consent, waiver or agreement.

**ARTICLE 10**
[RESERVED]

88

## ARTICLE 11
## COLLATERAL AND SECURITY

Section 11.01    *Security Document*.

(a)  The due and punctual payment of the principal, premium, interest and Additional Amounts on the Notes and the Guarantees when and as the same shall be due and payable, whether on a regular Interest Payment Date, at maturity, by acceleration, repurchase, redemption or otherwise, and interest on the overdue principal, premium, interest and Additional Amounts, if any, on the Notes and the Guarantees and performance of all other obligations of the Issuer and each Guarantor to the Holders of Notes or the Trustee under this Indenture, the Notes and the Guarantees, according to the terms hereunder or thereunder, are secured as provided in the Security Document.

(b)  Each Holder of Notes, by its acceptance thereof, consents and agrees to the terms of the Security Document (including, without limitation, the provisions providing for the foreclosure and release of Collateral) as the same may be in effect or may be amended from time to time in accordance with their terms and authorizes and directs the Trustee and/or the Security Agent to enter into the Security Document and to perform its respective obligations and exercise its respective rights thereunder in accordance therewith.

(c)  The Issuer and each Guarantor will do or cause to be done all such acts and things as may be necessary or proper, or as may be required by the provisions of the Security Document, to assure and confirm to the Trustee and/or the Security Agent that it holds, for the benefit of the Holders, duly created, enforceable and perfected Liens as contemplated hereby, by the Security Document or any part thereof, as from time to time constituted, so as to render the same available for the security and benefit of this Indenture and of the Notes and Guarantees secured hereby, according to the intent and purposes herein expressed.  The Issuer and any Guarantor will each take, and will cause their respective Subsidiaries to take, upon request of the Trustee and/or the Security Agent, any and all actions reasonably required to cause the Security Document to create and maintain, as security for the Obligations of the Issuer and each Guarantor hereunder, a valid and enforceable perfected Lien on the Collateral and subject to no other Liens other than as permitted by the terms of this Indenture.

Section 11.02    *[Reserved]*.

Section 11.03    *[Reserved]*.

Section 11.04    *Authorization of Actions to be Taken by the Trustee*.

(a)  Subject to the provisions of Section 7.01 and 7.02 hereof, the Trustee may, in its sole discretion and without the consent of the Holders, direct, on behalf of the Holders, the Security Agent to, take all actions it deems necessary or appropriate in order to;

(1) enforce any of the terms of the Security Document; and

(2) collect and receive any and all amounts payable in respect of the Obligations of the Issuer or the Guarantor hereunder.

(b)  Subject to the provisions hereof and the Security Document, the Trustee and/or the Security Agent will have power to institute and maintain such suits and proceedings as it may deem expedient to prevent any impairment of the pledged assets by any acts that may be unlawful or in violation of this Indenture or the Security Document, and such suits and proceedings as the Trustee and/or the Security Agent may deem expedient to preserve or protect its interests and the interests of the Holders of Notes in the Collateral (including power to institute and maintain suits or proceedings to restrain the enforcement of or compliance with any legislative or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid if the enforcement of, or compliance

89

with, such enactment, rule or order would impair the security interest hereunder or be prejudicial to the interests of the Holders of Notes or of the Trustee and/or the Security Agent).

Section 11.05    *Authorization of Receipt of Funds Under the Security Document.*

The Trustee and/or the Security Agent is authorized to receive any funds for the benefit of the Holders of Notes distributed under the Security Document, and to make further distributions of such funds to the Holders of Notes according to the provisions of this Indenture.

Section 11.06    *Termination of Security Interest.*

Upon the full and final payment and performance of all Obligations of the Issuer and each Guarantor under this Indenture, the Notes and the Guarantees, the Trustee will, at the request of the Issuer, deliver a certificate to the Security Agent stating that such Obligations have been paid in full, and instruct the Security Agent to release the Liens pursuant to this Indenture and the Security Document.

Section 11.07    *Appointment of Security Agent*

The parties hereto acknowledge and agree, and each Holder by accepting a Note acknowledges and agrees, that the Issuer hereby appoints Deutsche Bank AG, London Branch to act as Security Agent hereunder.  Deutsche Bank AG, London Branch accepts such appointment and is directed and instructed to enter into the Security Document.  The Security Agent shall have such duties and responsibilities as are explicitly set forth herein and in the Security Document to which it is a party and no others; *provided* that the Security Agent shall only take action with respect to or under the Security Document in accordance with the written instructions of the Trustee acting on behalf of the Holders of the Notes.  The provisions of Article 7 hereof relating to the Trustee acting in such capacity shall apply to the Security Agent to the extent applicable.  In addition, the Issuer and each Guarantor hereby, jointly and severally, agree to indemnify the Security Agent on the same basis as their indemnity to the Trustee in Article 7 with respect to actions taken or not taken by it in accordance with this Indenture and the Security Document to which it is a party.

## ARTICLE 12
## GUARANTEES

Section 12.01    *Guarantee.*

(a)  Subject to this Article 12, the Parent Guarantor unconditionally guarantees (and, together with any additional Guarantor that may guarantee the Notes in the future, shall jointly and severally unconditionally guarantee) to each Holder of a Note authenticated and delivered by the Trustee and to the Trustee and its successors and assigns, irrespective of the validity and enforceability of this Indenture, the Notes or the obligations of the Issuer hereunder or thereunder, that:

(1) the principal of, premium and Additional Amounts, if any, and interest on, the Notes will be promptly paid in full when due, whether at maturity, by acceleration, redemption or otherwise, and interest on the overdue principal, interest, premium and Additional Amounts, if any, on the Notes, if lawful, and all other obligations of the Issuer to the Holders or the Trustee hereunder or thereunder will be promptly paid in full or performed, all in accordance with the terms hereof and thereof; and

(2) in case of any extension of time of payment or renewal of any Notes or any of such other obligations, that same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration or otherwise.

90

Failing payment when due of any amount so guaranteed or any performance so guaranteed for whatever reason, each Guarantor will be jointly and severally obligated to pay the same immediately. Each Guarantor agrees that this is a guarantee of payment and not a guarantee of collection.

Each Guarantor agrees to pay, in addition to the amounts stated above, any and all costs and expenses (including counsel fees and expenses) properly incurred by the Trustee or the Holders in enforcing any rights under the Guarantees.

(b) Each Guarantor hereby agrees that their obligations hereunder are unconditional, irrespective of the validity, regularity or enforceability of the Notes or this Indenture, the absence of any action to enforce the same, any waiver or consent by any Holder of the Notes with respect to any provisions hereof or thereof, the recovery of any judgment against the Issuer, any action to enforce the same or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor.  Each Guarantor hereby waives diligence, presentment, demand of payment, filing of claims with a court in the event of insolvency or bankruptcy of the Issuer (including, without limitation, bankruptcy (*faillite*), insolvency, its voluntary or judicial liquidation (*liquidation volontaire ou judiciaire*), composition with creditors (*concordat préventif de faillite*), reprieve from payment (*sursis de paiement*), controlled management (*gestion contrôlée*), fraudulent conveyance (*action pauliana*), general settlement with creditors, reorganisation or similar laws affecting the rights of creditors generally), any right to require a proceeding first against the Issuer, protest, notice and all demands whatsoever and covenant that this Guarantee will not be discharged except by complete performance of the obligations contained in the Notes and this Indenture.

If any Holder or the Trustee is required by any court or otherwise to return to or for the benefit of the Issuer, any Guarantor or any custodian, trustee, liquidator (including, without limitation, in relation to the Issuer, any *commissaire*, *juge-commissaire*, *liquidateur* or *curateur*) or other similar official acting in relation to either the Issuer or any Guarantor, any amount paid by either the Issuer or any Guarantor to the Trustee or such Holder, this Guarantee, to the extent theretofore discharged, will be reinstated in full force and effect.

(c) Each Guarantor agrees that it will not be entitled to any right of subrogation in relation to the Holders in respect of any obligations guaranteed hereby until payment in full of all obligations guaranteed hereby.  Each Guarantor further agrees that, as between each Guarantor, on the one hand, and the Holders and the Trustee, on the other hand, (1) the maturity of the obligations guaranteed hereby may be accelerated as provided in Article 6 hereof for the purposes of this Guarantee, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the obligations guaranteed hereby, and (2) in the event of any declaration of acceleration of such obligations as provided in Article 6 hereof, such obligations (whether or not due and payable) will forthwith become due and payable by each Guarantor for the purpose of this Guarantee.  Each Guarantor will have the right to seek contribution from any non-paying Guarantor so long as the exercise of such right does not impair the rights of the Holders under the Guarantee.

Section 12.02    *Limitation on Guarantor Liability*.

(a) Each Guarantor, and by its acceptance of Notes, each Holder, hereby confirms that it is the intention of all such parties that the Guarantee of such Guarantor not constitute a fraudulent transfer or conveyance or a transaction at under value for purposes of Bankruptcy Law or any similar law or a transaction void under any applicable law, in each case to the extent applicable to any Guarantee.  To effectuate the foregoing intention, the Trustee, the Holders and each Guarantor hereby irrevocably agree that the obligations of such Guarantor will be limited to the maximum amount that will, after giving effect to such maximum amount and all other contingent and fixed liabilities of such Guarantor that are relevant under such laws, and after giving effect to any collections from, rights to receive contribution from or payments made by or on behalf of any other Guarantor in respect of the obligations of such other Guarantor under this Article 12, result in the obligations of such Guarantor

91

under its Guarantee not constituting either a fraudulent transfer or conveyance or transaction at under value or a transaction void under any applicable law.

(b) *Limitations for Luxembourg Guarantors*. Any obligation (but which shall not include any obligation which if incurred would constitute the provision of financial assistance) of each Guarantor incorporated in Luxembourg for any obligations under this Indenture or the Notes of any direct or indirect holding company of the Guarantor, shall be limited, at any time, to an aggregate amount not exceeding ninety per cent. (90%) of the greater of:

(1) the Guarantor's own funds (*capitaux propres*; as referred to in article 34 of the Luxembourg act dated 19 December 2002 concerning the trade and companies register and the accounting and annual accounts of undertakings) as reflected in its last annual accounts (approved at a general meeting of its shareholders) available on the date of payment under this Indenture; and

(2) the Guarantor's own funds (*capitaux propres*; as referred to in article 34 of the Luxembourg act dated 19 December 2002 concerning the trade and companies register and the accounting and annual accounts of undertakings) as reflected in its last annual accounts (approved at a general meeting of its shareholders) available as at the date of execution of this Indenture (or, if later, the date the Guarantor becomes a Guarantor),

*provided* that the limitation contained in this Section 12.02(b) shall not apply to any guarantee assumed under this Indenture for any obligations under any secured document of any member of the Group as at the date of this Indenture (or, if later, the date the Guarantor becomes a Guarantor) that is not, at the date of this Indenture (or, if later, the date the Guarantor becomes a Guarantor), a direct or indirect holding company of the Guarantor.

Section 12.03    *Execution and Delivery of Guarantee*.

To evidence its Guarantee set forth in Section 12.01 hereof, each Guarantor hereby agrees that a notation of such Guarantee substantially in the form attached as <u>Exhibit D</u> hereto will be endorsed by an Officer of such Guarantor on each Note authenticated and delivered by the Trustee and that this Indenture will be executed on behalf of such Guarantor by at least one of its Officers.

Each Guarantor hereby agrees that its Guarantee set forth in Section 12.01 hereof will remain in full force and effect notwithstanding any failure to endorse on each Note a notation of such Guarantee.

If an Officer whose signature is on this Indenture or on the Guarantee no longer holds that office at the time the Trustee authenticates the Note on which a Guarantee is endorsed, the Guarantee will be valid nevertheless.

The delivery of any Note by the Trustee, after the authentication thereof hereunder, will constitute due delivery of the Guarantee set forth in this Indenture on behalf of any Guarantor.

In the event that a Guarantor is released from its obligations under a Guarantee at a time when the Notes are listed on the official list of the Luxembourg Stock Exchange and admitted for trading on the Euro MTF market, the Issuer will, to the extent the rules and regulations of the Luxembourg Stock Exchange so require, notify the Luxembourg Stock Exchange.

Section 12.04    *Releases*.

Upon Legal Defeasance or Covenant Defeasance in accordance with Article 8 hereof or satisfaction and discharge of this Indenture in accordance with Article 12 hereof, each Guarantor will be released and relieved of any obligations under its Guarantee.

92

Any Guarantor not released from its obligations under its Guarantee as provided in this Section 12.04 will remain liable for the full amount of principal of and interest and premium, if any, on the Notes and for the other obligations of any Guarantor under this Indenture as provided in this Article 12.

In the event that a Guarantor is released from its obligations under a Guarantee at a time when the Notes are listed on the official list of the Luxembourg Stock Exchange and admitted for trading on the Euro MTF market, the Issuer will, to the extent the rules and regulations of the Luxembourg Stock Exchange so require, notify the Luxembourg Stock Exchange thereof.

## ARTICLE 13
## SATISFACTION AND DISCHARGE

Section 13.01    *Satisfaction and Discharge*.

This Indenture will be discharged and will cease to be of further effect as to all Notes issued hereunder, when:

(a)  (1) the Issuer delivers to the Trustee all outstanding Notes for cancellation or (2) all outstanding Notes have become due and payable, whether at maturity or on a redemption date as a result of the mailing of notice of redemption or (3) all outstanding Notes will become due and payable within one year or are to be called for redemption within one year under arrangements satisfactory to the Trustee, and, in the case of clauses (2) and (3), the Parent Guarantor or the Issuer irrevocably deposits, or causes to be deposited, with the Trustee cash in euro or euro-denominated European Government Obligations sufficient to pay at maturity or upon redemption all outstanding Notes, including interest thereon to maturity or such redemption date, and if in any case the Parent Guarantor or the Issuer pays, or causes to be paid, all other sums and obligations payable under this Indenture by it, and the Trustee is not prohibited from paying such money to the Holders on that date pursuant to this Indenture;

(b)  no Default or Event of Default has occurred and is continuing on the date of such deposit (other than a Default or Event of Default resulting from the borrowing of funds to be applied to such deposit) and the deposit will not result in a breach or violation of, or constitute a default under, any other instrument to which the Issuer or any Guarantor is a party or by which the Issuer or any Guarantor is bound;

(c)  the Issuer or any Guarantor has paid or caused to be paid all sums payable by it under this Indenture; and

(d)  the Issuer has delivered irrevocable instructions to the Trustee under this Indenture to apply the deposited money toward the payment of the Notes at maturity or on the redemption date, as the case may be.

In addition, the Issuer must deliver an Officer's Certificate and an Opinion of Counsel to the Trustee stating that all conditions precedent to satisfaction and discharge have been satisfied.

Upon satisfaction of the conditions precedent to satisfaction and discharge in accordance with this Section 13, each Guarantor will be released from all its obligations with respect to its Guarantee and the Collateral will be released.

Notwithstanding the satisfaction and discharge of this Indenture, if money has been deposited with the Trustee pursuant to of clause (a) of this Section 13.01, the provisions of Sections 13.02 and 8.06 hereof will survive.  In addition, nothing in this Section 13.01 will be deemed to discharge those provisions of Section 7.07 hereof, that, by their terms, survive the satisfaction and discharge of this Indenture.

LO\332299.7

If the Parent Guarantor or the Issuer exercises its satisfaction and discharge option pursuant to this Section 13.01, the Parent Guarantor will be released from all of its obligations with respect to its Guarantee and the Collateral will be released.

Section 13.02    *Application of Trust Money*.

Subject to the provisions of Section 8.06 hereof, all money deposited with the Trustee pursuant to Section 13.01 hereof shall be held in trust and applied by it, in accordance with the provisions of the Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Issuer acting as its own Paying Agent) as the Trustee may determine, to the Persons entitled thereto, of the principal (and premium, if any) and interest for whose payment such money has been deposited with the Trustee; but such money need not be segregated from other funds except to the extent required by law.

If the Trustee or Paying Agent is unable to apply any money or European Government Obligations in accordance with Section 13.01 hereof by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Issuer's and any Guarantor's obligations under this Indenture and the Notes shall be revived and reinstated as though no deposit had occurred pursuant to Section 13.01 hereof; *provided* that if the Issuer has made any payment of principal of, premium, if any, or interest on, any Notes because of the reinstatement of its obligations, the Issuer shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money or European Government Obligations held by the Trustee or Paying Agent.

## ARTICLE 14
MISCELLANEOUS

Section 14.01    *[Reserved]*.

Section 14.02    *Notices*.

Any notice or communication by the Issuer, any Guarantor or the Trustee to the others is duly given if in writing and delivered in Person or by first class mail (registered or certified, return receipt requested), facsimile transmission or overnight air courier guaranteeing next day delivery, to the others' address:

If to the Issuer and/or any Guarantor:

Hellas Telecommunications Finance
8-10, rue Mathias Hardt
L-1717 Luxembourg
Attention: the Managing Board

with a copy forwarded to:

Arendt & Medernach
14 rue Erasme B.P.
L-2010 Luxembourg
Attention: Guy Harles
(fax: +352 40 7804 650)

with a copy to:

94

Shearman & Sterling (London) LLP
Broadgate West, 9 Appold Street
London EC2A 2AP
(fax: +44 20 655 5500)
Attention: David J. Beveridge

If to the Trustee:

The Bank of New York
One Canada Square
London E14 5AL
Facsimile No.:  +44 20 7964 6399
Attention:  Corporate Trust Administration

The Issuer, any Guarantor or the Trustee, by notice to the others, may designate additional or different addresses for subsequent notices or communications.

All notices and communications (other than those sent to Holders) will be deemed to have been duly given: at the time delivered by hand, if personally delivered; five Business Days after being deposited in the mail, postage prepaid, if mailed; when receipt acknowledged, if transmitted by facsimile; and the next Business Day after timely delivery to the courier, if sent by overnight air courier guaranteeing next day delivery.

All notices to Holders of the Notes will be validly given if mailed to them at their respective addresses in the register of the Holders of such Notes, if any, maintained by the Registrar.  In addition, for so long as any of the Notes are listed and admitted for trading on the Euro MTF market, the alternative market of the Luxembourg Stock Exchange and the rules and regulations of the Luxembourg Stock Exchange so require, notices, with respect to the Notes listed on the Luxembourg Stock Exchange will be published in a daily newspaper having general circulation in Luxembourg (which is expected to be the *d'Wort* or the *Tageblatt*) or on the website of the Luxembourg Stock Exchange (www.bourse.lu). In addition, for so long as any Notes are represented by Global Notes, all notices to Holders of the Notes will be validly given if delivered to Euroclear and Clearstream, each of which will give such notices to the Holders.  If the Issuer mails a notice or communication to Holders, it will mail a copy to the Trustee at the same time.

Each such notice shall be deemed to have been given on the date of such publication or, if published more than once on different dates, on the first date on which publication is made; *provided* that, if notices are mailed, such notice shall be deemed to have been given on the later of such publication and the seventh day after being so mailed. Any notice or communication mailed to a Holder shall be mailed to such Person by first-class mail or other equivalent means and shall be sufficiently given to him if so mailed within the time prescribed. Failure to mail a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders. If a notice or communication is mailed in the manner provided above, it is duly given, whether or not the addressee receives it.

Section 14.03    *[Reserved]*.

Section 14.04    *Certificate and Opinion as to Conditions Precedent*.

Upon any request or application by the Issuer to the Trustee to take any action under this Indenture, the Issuer shall furnish to the Trustee:

(1) an Officer's Certificate in form and substance reasonably satisfactory to the Trustee (which must include the statements set forth in Section 14.05 hereof) stating that, in

95

the opinion of the signers, all conditions precedent and covenants, if any, provided for in this Indenture relating to the proposed action have been satisfied; and

(2) an Opinion of Counsel in form and substance reasonably satisfactory to the Trustee (which must include the statements set forth in Section 14.05 hereof) stating that, in the opinion of such counsel, all such conditions precedent and covenants have been satisfied.

Section 14.05    *Statements Required in Certificate or Opinion.*

Each certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture must include:

(1) a statement that the Person making such certificate or opinion has read such covenant or condition;

(2) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(3) a statement that, in the opinion of such Person, he or she has made such examination or investigation as is necessary to enable him or her to express an informed opinion as to whether or not such covenant or condition has been satisfied; and

(4) a statement as to whether or not, in the opinion of such Person, such condition or covenant has been satisfied.

Section 14.06    *Rules by Trustee and Agents.*

The Trustee may make reasonable rules for action by or at a meeting of Holders.  The Registrar or Paying Agent may make reasonable rules and set reasonable requirements for its functions.

Section 14.07    *No Personal Liability of Directors, Officers, Employees and Stockholders.*

No director, officer, employee, incorporator, member or stockholder of the Parent Guarantor, the Issuer (including its general partner (*gérant commandité*)) or any Guarantor will have any liability for any obligations of the Parent Guarantor, the Issuer or any Guarantor under the Notes, any Guarantee, any Security Document or this Indenture or for any claim based on, in respect of, or by reason of such obligations or their creation.  Each Holder by accepting a Note waives and releases all such liability.  The waiver and release are part of the consideration for issuance of the Notes.  Such waiver and release may not be effective to waive liabilities under the U.S. federal securities laws.

Section 14.08    *Governing Law.*

THE INTERNAL LAW OF THE STATE OF NEW YORK WILL GOVERN AND BE USED TO CONSTRUE THIS INDENTURE, THE NOTES AND THE GUARANTEE WITHOUT GIVING EFFECT TO APPLICABLE PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY.

Section 14.09    *Consent to Jurisdiction and Service*

The Parent Guarantor and the Issuer have appointed CT Corporation System, 111 Eighth Avenue, 13th Floor, New York, New York, 10011, USA as their agent (the "*Authorized Agent*") upon whom process may be served in any actions arising out of, based on, or relating to the Notes, this

LO\332299.7

Indenture or the transactions contemplated hereby or brought under U.S. Federal or state securities laws brought in any U.S. Federal or state court located in the Borough of Manhattan in The City of New York, expressly consent to the jurisdiction of any such court in respect of any such action, and waive any other requirements of or objections to personal jurisdiction with respect thereto. Such appointment shall be irrevocable. The Parent Guarantor and the Issuer represent and warrant that the Authorized Agent has agreed to act as such agent for service of process and agrees to take any and all action, including the filing of any and all documents and instruments, that may be necessary to continue such appointment in full force and effect as aforesaid. Service of process upon the Authorized Agent and written notice of such service to the Parent Guarantor and the Issuer shall be deemed, in every respect, effective service of process upon the Parent Guarantor and the Issuer.

The Parent Guarantor and the Issuer irrevocably (i) agree that any legal suit, action or proceeding against the Parent Guarantor or the Issuer arising out of, based on, or relating to the Notes, this Indenture or the transactions contemplated hereby may be instituted in any U.S. Federal or state court in the Borough of Manhattan in The City of New York and (ii) waive, to the fullest extent they may effectively do so, any objection which they may have now or hereafter have to the laying of venue of any such proceeding.

Section 14.10    *No Adverse Interpretation of Other Agreements*.

This Indenture may not be used to interpret any other indenture, loan or debt agreement of the Issuer or its Subsidiaries or of any other Person. Any such indenture, loan or debt agreement may not be used to interpret this Indenture.

Section 14.11    *Successors*.

All agreements of the Issuer in this Indenture and the Notes will bind its successors. All agreements of the Trustee in this Indenture will bind its successors. All agreements of each Guarantor in this Indenture will bind its successors, except as otherwise provided in Section 12.04 hereof.

Section 14.12    *Severability*.

In case any provision in this Indenture or in the Notes is invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions will not in any way be affected or impaired thereby.

Section 14.13    *Counterpart Originals*.

The parties may sign any number of copies of this Indenture. Each signed copy will be an original, but all of them together represent the same agreement.

Section 14.14    *Table of Contents, Headings, etc*.

The Table of Contents, Cross-Reference Table and Headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part of this Indenture and will in no way modify or restrict any of the terms or provisions hereof.

Section 14.15    *Luxembourg Law Provision*.

The Issuer, the Parent Guarantor and any other Guarantor expressly accept and confirm for the purposes of articles 1278 and 1281 of the Luxembourg civil code that, notwithstanding any assignment, transfer and/or novation made pursuant to this Indenture, the security created or guarantee given shall be preserved for the benefit of the Trustee and secures and guarantees all obligations of the Issuer and each Guarantor (including without limitation, all obligations with respect to all rights

and/or obligations so assigned, transferred or novated) and shall be preserved for the benefit of any successor and assign of the Trustee (if any).

Section 14.16    *Prescription.*

Claims against the Issuer for the payment of principal or Additional Amounts, if any, on the Notes will be prescribed ten years after the applicable due date for payment thereof.  Claims against the Issuer for the payment of interest on the Notes will be prescribed five years after the applicable due date for payment of interest.

[Signatures on following page]

98

LO\332299.7

SIGNATURES

Dated as of  December 21, 2006

**Hellas Telecommunications Finance**

By _____
Title:

**Hellas Telecommunications I as Guarantor**

By _____
Title:

S-1

THE BANK OF NEW YORK, as Trustee
by

Name:
Title:

THE BANK OF NEW YORK, as Registrar and
Paying Agent


by
Name:
Title:

THE BANK OF NEW YORK (LUXEMBOURG)
S.A., as Transfer Agent and Paying Agent


by
Name:
Title:




DEUTSCHE BANK AG, LONDON BRANCH,
as Security Agent,


by
Name:
Title:

S-2

LO\332299.7